McKinstry, J.
The question being, Can a private corporation divert the waters of a watercourse, and thereby deprive the riparian proprietors of all use of the same, without compensation made or tendered to such proprietors? held:—
1. The owners of land by or through which a watercourse naturally and usually flows have a right of property in the waters of the stream.
2. This property may be taken for a public use, just compensation being first made, or paid into court.
Water to supply “farming neighborhoods” is a public use. And it is for the legislature to determine whether, in the exercise of the power of eminent domain, it is necessary or expedient to provide further legal machinery for the appropriation (on due compensation) of private *265 rights to the flow of running streams and the distribution of waters thereof to public uses.
3. But one private person cannot take his property from another, either for the use of the taker or for an alleged public use, without any compensation paid or tendered. (Const., art. 1, sec. 14.)
4. Riparian owners may reasonably use water of the stream for purposes of irrigation.
5. The court below erred in rejecting certain evidence offered by the appellants.
This action was commenced by Charles Lux, Henry Miller, James C. Crocker, and others, as plaintiffs, against James B. Haggin and many individuals and corporations, as defendants. By dismissals and amendments, Lux, Miller, and Crocker became the only plaintiffs, and the Kern River Land and Canal Company the sole defendant. Since the amended complaint was filed the suit has been prosecuted to obtain a decree enjoining the defendant, the Kern River Land and Canal Company, from diverting waters of Kern River, which, it is alleged, had flowed down a watercourse known as Buena Vista Slough, through lands of the plaintiffs described in the complaint, and which (if not diverted) would have continued so to flow. Plaintiffs have appealed from a judgment in favor of the defendant, and from an order denying a new trial.
Before proceeding to decide what are the respective rights of riparian proprietors and appropriators of water, or to inquire into certain alleged errors of the court in rejecting evidence offered by the plaintiffs at the trial below, we propose to consider points made by respondent, which, if well taken, demanded an affirmance of the judgment, even though “ the common law ” as to riparian rights now prevails, or formerly prevailed, in this state.
1. As the case was presented in the court below the plaintiffs were not estopped from seeking relief by injunction, by reason of their laches or delay.
*266 As a conclusion of law from certain facts found, the court below declared “that the plaintiffs have been guilty of such laches and neglect as disentitle them to any relief in this action.” And it is insisted in this court, by counsel for respondent, “ that plaintiffs have been guilty of such laches as disentitles them to any relief in equity.” First. There are estoppels in pais, as where a defendant is induced to act by the declarations or conduct of a. plaintiff,—which are a defense both at law and equity. Here we cannot discover the elements of such an estoppel. The defendant has acted with full knowledge of all the facts, and, as must be presumed, with full knowledge of the law controlling the rights of the parties. To constitute the estoppel the party claiming the benefit of it must be destitute of knowledge of his own legal rights and of the means of acquiring such knowledge. (Biddle Boggs v. Merced etc. Co., 14 Cal. 279; Stockman v. Riverside, 64 Id. 57; Morrill v. St. Anthony Falls, 26 Minn. 229.) To constitute such an estoppel, it must also be shown that the person sought to be estopped has made an admission or done an act, with the intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, inconsistent with the evidence he proposes to give or the title he proposes to set up; that the other party has acted upon or been influenced by such act or declaration; that the party so influenced will be prejudiced by allowing the truth of the admission to be disproved. (Brown v. Bowen, 30 N. Y. 519; S. C., 86 Am. Dec. 406; Plumb v. Cattaraugus County Mut. Ins. Co., 18 N. Y. 392; S. C., 72 Am. Dec. 526.) In the case before us, the fact relied on as proving the estoppel is that plaintiffs had knowledge of the expensive canals and other works of defendant, while they were in progress, and did not object to them. The bare fact that ditches, etc., were constructed with the knowledge of the plaintiffs, though at great expense, without objection by plaintiffs, is not sufficient to constitute (such) an estoppel. (Stockman v. Riverside, supra.)
*267 Second. Where an express statute of limitations applies to a suit .in equity, mere delay to commence the suit for a period less than that of the statute of limitations is never a reason for dismissing the proceeding.
And when the defendant relies on mere delay and his own adverse use, the statutory period having expired, he must plead the statute. A party claiming the right to use water by adverse possession for the statutory time must set up the same as a defense in his answer. (American Co. v. Bradford, 27 Cal. 360.)
Appellants contend that they had five years after their cause of action accrued within which to bring this action. It may be conceded, however, for all the purposes of this case, that the Code of Civil Procedure limited them to four years.
It has been repeatedly decided in this state that section 343 of the Code of Civil Procedure (“An action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued”) applies as well to suits in equity as to actions at law. The same effects, positive and negative, follow from section 343 as from other sections of the code prescribing the periods within which actions may and must be commenced. With reference to other limitations, a party cannot be refused a hearing if he shall bring his action within the period named; and as to suits to which section 343 is applicable, mere lapse of time, less than four years, is not ground for defense. Throughout the code suits in equity are called “actions.” Sections 346 and 347 expressly relate to certain suits in equity. Section 307 declares “there is but one form of civil action,” etc. That section does not abolish the distinction recognized by the constitution between law and equity, but it indicates the legislative intent that the subsequent provisions of the code should be applicable to legal and equitable proceedings. The word “hereinbefore” in section 343 has never been held to limit its operation to actions at law, but it has often been held to the contrary.
*268 Third. It is said that when a court of equity is asked to exercise its jurisdiction, by means of injunction, it will decline to intervene, when there has been laches, although the statutory period of limitation has not expired
It would seem that the discretion of a court of equity in dismissing suits for unreasonable delay (in view of the facts appearing in each particular suit) was originally exercised, and has generally been employed, where there is no statute of limitations directly applicable ; or where the statute has been held generally applicable by analogy,-—courts of equity reserving the power to recognize exceptions to the general rule. And in exercising its prudent discretion in the last class of cases, the court, as the equities demanded, would sometimes dismiss a bill before the corresponding period at law had run, and sometimes entertain a cause long after the running of the time prescribed in the statute. Thus the power to entertain or to refuse to entertain a cause was said to be exercised “ independent of any statute of limitations.”
Mr. Wood, in his work on Limitations, remarks: “It is generally held by our courts that, except in the single case of concurrent jurisdiction ” (where the statute, like a statute in terms relating to suits in equity, operates ex vigore suo), “ courts of equity may act by analogy or not, as the ends of justice and the strict equity of the case may require.” (Sec. 59.) It was said by Lord Camden: “From the beginning there has always been a limitation to suits in this court.....But as the court has no legislative authority, it could not properly define the time of bar by a positive rule to an hour, a minute, or a year. It was governed by circumstances.” Sir Thomas Plummer spoke thus of courts of equity: “ They have refused relief to stale demands even when no statutory limitation existed,” etc. (Cholmondeley v. Clinton, 2 Jacob & W. 141.) It is said by Mr. Daniell: “ When there is no positive limitation, the question whether the. *269 court will interfere or not depends upon whether, from the facts of the case, the court will infer acquiescence, confirmation, or release.” (1 Daniell’s Ch. Pr., 560, 561.) And Judge Story says that in cases where equity adopts the statutory rule by analogy, it will often treat the lapse of a less period as a presumptive bar, on the ground of discouraging stale claims, or gross laches, or unexplained acquiescence. (Story’s Eq. Jur., 1920.) The writer on limitations already quoted says that where the claim is purely equitable, and there is no express statute barring it, the rights of the party will be enforced without reference to any statute. (Wood on Limitations, sec. 59.)
It might be claimed on principle that inasmuch as the conduct of equity, with respect to laches, etc., and the statute of limitations are both based on public policy, designed to discourage stale demands and to protect against possible loss of evidence, when the legislature— the peculiar exponent of the policy of the state—has spoken (by adopting a positive rule of limitation expressly to suits in equity, in which lapse of time alone is the controlling condition), the limitations applied by equity to cases not previously within the statute should be regarded as no longer existing or enforceable.
It must be conceded, however, that the weight of authority is to the effect that where the statute of limitations is directly applicable to a suit in equity, a court of chancery may properly refuse to grant relief by injunction when the plaintiff has assented to the acts complained of and their consequences; and that such assent may, in proper cases, be inferred from the plaintiff’s acquiescence with full knowledge of all the facts. Further, the acquiescence, proving assent, may bar relief in equity, although it may not be accompanied by all the circumstances which would make it an estoppel at law.
Each of the words, “delay,” “laches,” and “acquiescence,” has its appropriate meaning. Laches would strictly seem to imply neglect to do that which ought to *270 have been done; acquiescence a resting satisfied with or submission to an existing state of things. Laches (at least with other facts) may be evidence of acquiescence, and acquiescence may be evidence of consent. In the decisions of the reported cases, however, “laches” has sometimes been employed as the equivalent of “mere delay,” and sometimes “laches” or “gross laches” as the equivalent of “ acquiescence.” It is therefore important to consider the context, in connection with which either of these expressions has been used by a judge, in order to ascertain in what sense it is employed.
Speaking of the distinction between laches and acquiescence,-Wood remarks: “While the words ‘laches’ and ‘acquiescence’ are often used as similar in meaning, the distinction in their import is both great and important. Laches import a merely passive, while acquiescence implies active, assent; and while, when there is no statutory limitation applicable to the case, courts of equity would discourage laches, and refuse relief after great and unexplained delay, yet, when there is such a statutory limitation, they will not anticipate it, as they may when acquiescence has existed. Laches, in fact, amount only to that inferior species of acquiescence described in the following terms by Lord Kindersley, in Rochdale etc. Co. v. King, 2 Sim., N. S., 89: ‘Mere acquiescence (if by acquiescence is to be understood only abstaining from legal proceedings) is unimportant; where one party invades the right of another, that other does not in general deprive himself of the right of seeking redress merely because he remains passive, unless, indeed, he continues inactive so long as to bring the case within the purview of the statute of limitations.’” (Wood on Limitations, sec. 62.)
In cases of concurrent jurisdiction, or where the statute is express, equity will sometimes refuse relief before the statute has run. “But,” says the same writer, “this is only in rare and exceptional cases, where the party can be said to have acquiesced in the wrong of which he *271 complains” (sec. 59); and the same is said in effect in Reed v. West, 47 Tex. 240.
It may fairly be deduced from the authorities we have consulted that the acquiescence which will bar a complainant from the exercise in his favor of the discretionary jurisdiction by injunction must be such as proves his assent to the acts of the defendant, and to the injuries to himself which have flowed or can reasonably be anticipated to flow, from those acts.
If a degree of acquiescence less than establishes such assent has been regarded in any decision, it will be seen that it has been treated merely as tending to prove some other fact which rendered it inequitable to grant a preventive order.
We have tried to look at all the vast number of books referred to by counsel, and have not found any asserted doctrine which directly conflicts with what has just been said.
The granting or refusing a decree of specific performance of contracts for the purchase of lands—when there has been more or less delay—depends on principles somewhat different. (Green v. Covillaud, 10 Cal. 317; S. C., 70 Am. Dec. 725; Delevan v. Duncan, 49 N. Y. 485.) When the purchaser has not complied with his contract, he must show why. He must account for his failure in a reasonable manner; must make out a clear case, and show that the relief he asks is equitable. He comes into court with an admission that he has not done all he agreed to do. (Frink v. Parker, 49 N. Y. 1. See also Kirby v. Jacobs, 13 B. Mon. 435; Webber v. Marshall, 19 Cal. 447.) Nor will equity decree specific performance of a contract when its terms and conditions are uncertain or indefinite. (Harnett v. Yielding, 2 Sch. & Lef. 552.)
In Ferson v. Sanger, Daveis, 264, Ware, district judge, held that the plaintiff was too late in seeking damages in equity for an alleged fraud in the sale of land.
*272 Some of the cases cited relate to applications for a “preliminary” injunction, where, the equities being doubtful, the preliminary order was denied. (Society v. Halsman, 6 N. J. L. 126; Attorney-General v. Sheffield, 3 De Gex, M. & G. 304.) In the last case, Sir Knight Bruce observed: “ What is now done is not to be considered as deciding what will be done at the hearing of this cause, when possibly an injunction may be granted.” And the Lord Chancellor, Gran worth, added, he was not prepared to say it would be discreet for the court to interfere “ interlocutorily ” before the fact had been established, one way or.- the other, by a trial. Afterward, when the application came before the chancellor, he denied it, on the ground that the plaintiff would be subjected to no serious injury by reason of the temporary obstruction of a street by a gas company. And so in Great Western etc. Co. v. The Oxford etc. Co., 3 De Gex, M. & G. 341, Sir Knight Bruce commences by saying: “ It is not now to be determined what order or decree it will be proper to make if these cases shall be before the court for hearing. We are now dealing with interlocutory motions only.”
A learned writer on injunctions says: “While dela” may not amount to acquiescence in the wrong for whic, complainant seeks redress, it may yet suffice to preven his obtaining relief by injunction.” (High on Injunctions, sec. 7.) In support of this view he refers to th Attorney-General v. Sheffield, supra, and to Dulin v. Caldwell, 28 Ga. 117. But the Georgia case was an attempt to enjoin referees from making an award, on the ground that the plaintiff (plaintiff also in the cause referred) had been defrauded by reason of the fact that the adverse party in the cause before the referees had not fully answered. The chancellor said the plaintiff ought to ■have made himself acquainted with the contents of the answers, and ought to have excepted to them if insufficient. He had had his day in court.
*273 Wood v. Sutcliffe, 2 Sim., N. S., 163, was a suit by a manufacturer to enjoin the owner of dyeing-works above from fouling the water. The plaintiff had stood by for nearly five years while the defendant was constructing and using his works. Before defendant commenced to turn his dye-stuffs into the stream, the sewage of a dense population had rendered the water unfit for plaintiff’s purposes, who had in fact ceased to use it. The fouling of the water was an incident to the occupation of the large population, of which (said the chancellor) the plaintiff could not complain. He therefore suffered, no injury from the acts of the defendant, and by his long acquiescence had assented to them.
One cannot read the case of Wicks v. Hunt, John. 372, without perceiving that it did not turn on mere delay, or imperfect acquiescence. The complainant had a complete remedy at law, and the court said the English chancery interfered, notwithstanding the existence of a plain legal remedy, only “by granting an injunction to prevent irreparable damage before a trial, or on a bill of peace after one or more trials at law.” Then there were grave doubts whether the plaintiff had suffered any injury; and Wood, V. C., said: “Under these circumstances, it is impossible to interfere until the right has been tried, whatever the mode of trying it may be.” And the judge_said: “If there was no injury (as was contended) from such floods as occurred during the two and a half years of the plaintiff’s delay, a serious question might arise on the merits how far the possibility of an injury once in twenty or thirty years would justify the court in interfering with defendant’s works.”
Equitable relief in many cases depends upon the discretion of the chancellor, and it is true, as said by Bispham, that the laches of the complainant is often “one of the most important elements ” which is taken, into consideration. But laches—in the sense of delay only—is not important, except as it constitutes, with other cir *274 cumstances, evidence of acquiescence. Meredith v. Sayre, 32 N. J. Eq. 557, was not decided upon mere delay or laches in the sense of delay. The complainants waited for a year after a tramway was completed on a street in front of their lots, and this fact was, in view of the circumstances, treated as evidence of acquiescence. The court said: “The property is in an unimproved part of the city. No inconvenience of any account is inflicted on the plaintiffs by the obstruction,” etc.
In the two cases last cited, as in Wood v. Sutcliffe, supra, and other cases, it will appear on examination that the fact that the plaintiff had suffered, and would probably suffer, but slight injury as compared with that to which the defendant would be subjected if the injuncr tion was granted (or the fact that it remained doubtful whether the plaintiff would suffer injury of any account), was considered—with the delay—in reaching the conclusion that acquiescence was proved. It is, perhaps, more probable that one will assent to a slight or temporary than to a grave, serious, and permanent injury.
In C. & O. R. R. Co. v. Bobbett, 5 W. Va. 138, a bill to enjoin a diversion of waters was held to be insufficient because it neither alleged the insolvency of the defendant, nor set forth facts showing that a judgment for damages would not be ample redress; and in Huff v. Doylston, 4 Brewst. 333, it is said that injunction will not issue “if the injury be doubtful, eventful, or contingent.”
Varney v. Pope, 60 Me. 192, decides that injunction to restrain a nuisance cannot be resorted to unless the right of the complainant has been settled at law, or long enjoyed, or the defendant's acts will result in irreparable injury; Heiskell v. Gross, 7 Phila. 317, that equity will not relieve by injunction, where the right is disputed, until a trial at law, unless the injury is irreparable, and the necessity urgent, and there is no adequate remedy at law. Creighton v. Evans, 53 Cal. 55, was an action at law to recover damages for a diversion. The plaintiff was a *275 riparian proprietor, and as the defendant was not, the court held that, in the absence of proof of damages, the plaintiff was entitled to a verdict for nominal damages.' In Basey v. Gallagher, 20 Wall. 267, no question wás involved as to delay, laches, or acquiescence. Nor was there such a question in Atchison v. Patterson, 20 Wall. 507, which was an issue as between appropriaters on the public lands. The Supreme Court of the United States there said: “Whether a court of equity will interfere by injunction will depend upon the extent and character of the injury alleged, whether it is irremediable in its nature, whether an action at law will afford adequate remedy, whether the parties are able to respond for the damages resulting from the injury, and other considerations which ordinarily govern a court of equity in the exercise of its preventive process of injunction.”
Sprague v. Steere, 1 R. I. 267, holds that acquiescence may be a bar to the court’s interference by injunction; the cases therein considered are to the same, effect. The order was refused in Bridson v. Beneke, 1 Beav. 1, because the complainant had not proceeded with due celerity to establish his right at law. In Slade v. Sullivan, 17 Cal. 105, the Supreme Court refused to reverse the decree of the District Court dismissing a bill to enjoin miners from working a ravine a short distance in front of the plaintiff’s improvements on the public lands, holding that some of the damage anticipated by the plaintiff was very slight, and the rest “ a mere matter of speculation.” Cotchin v. Bassett, 32 L. J. Ch. D. 286, was an extinguishment of an easement by assent. In Birmingham v. Lloyd, 18 Ves. 515, the plaintiffs sought to restrain the defendants from draining water from their own coal mine. The legal rights of the respective parties were disputed. Lord Eldon refused an interlocutory order for an injunction until the plaintiffs’ right to damages had been established at law. In Parrott v. Palmer, 3 Mylne & K. 631, chancery refused to enjoin, in the face of long-con *276 tinued acquiescence in the act of defendants and its consequent injuries, but turned the complainant over to his action at law: Maxwell v. Hogg and Hogg v. Maxwell were cross-applications for an injunction order by rival promoters or publishers of magazines, both to be called the “Belgravia. ” Each was refused the order, under circumstances which justified the action of the court. (L. R. 2 Ch. 319.)
It appears in Bassett v. Salisbury etc. Co., 47 N. H. 426, that while the injury done to a small portion of the plaintiff’s land (caused by increasing the height of defendants’ dam) was 'trifling, the defendants had expended $850,000 in enlarging their works so that the additional water-power could he put in requisition. Under these circumstances, it was held that the fact that the plaintiff stood by for seven or eight years without objection was sufficient evidence of acquiescence to prevent an intervention by injunction. Grey v. Ohio etc. Co., 1 Grant Cas. 412, was a bill to restrain the defendant from using its railroad across the common in Alleghany City. Lewis, J., said: “The property taken is hardly of any appreciable value; the right of complainant is at least doubtful; his acquiescence until the road was compléted renders it impossible to grant the relief applied for without doing irreparable injury to the defendant, while no benefit would be conferred on the complainant which he could not obtain by an action at law.” Two of the judges dissented, and the injunction was refused “on an equal division.”
In Dann v. Spurrier, 7 Ves. Jr. 235, Lord Eldon remarked: “I fully subscribe to the doctrine that this court will not permit a man knowingly, though hut passively, to encourage another to lay out money under an erroneous opinion of title; and the circumstance of looking on is in many cases as strong as terms of encouragement. Still, it must be put upon the party to prove that case by strong and cogent evidence, leaving no reasonable doubt that he acted upon that sort of encouragement.”
*277 Mr. Wait observes (6 Wait on Actions and Defenses, 281), that while a court of equity will restrain a party in the use of water in a manner injurious to another, yet the court will not exercise the summary authority “where the right is doubtful, or the facts are not definitely ascertained.” This need not be disputed. He adds: “A complainant who asks the court to restrain by injunction must make a strong prima facie case in support of the title he asserts, and show that he has been guilty of no delay in applying for the interposition of the court.” In support of the whole of this statement he cites Bliss v. Kennedy, 43 Ill. 67; Burnham v. Kempton, 44 N. H. 78; Shields v. Arndt, 4 N. J. Eq. 234.
In Bliss v. Kennedy, supra, however, the court, after saying that, by the law of Illinois, the right of a riparian proprietor must ordinarily be established at law before equity will interfere by injunction, holds that equity will restrain until a decision at law only where the plaintiff has not been guilty of improper delay in bringing his action. And the court observes: “We do not think such a case has been made out by the complainants. They, do not allege in their, bill that they have commenced, or are about to commence, legal proceedings to establish their right, but call upon a court of chancery to establish it in the first instance.” The case in 44 N. H. (Burnham v. Kempton) only holds that equity will not take jurisdiction when the parties have a plain and perfect remedy at law, and have neglected to seek it; and the case in Green, that, where the right is doubtful, it should usually first be established at law.
Mr. Wait also says that equity will refuse to interfere “when the damage is not serious,” or when it appears that the renewal of the watercourse will still leave it impossible for the party claiming it to derive any benefit from it. “But,” he adds, “if the injuries by diversion are continuous, or the right to continue them is set up and persisted in by the defendant, a court of equity, if the *278 facts be properly established, will interfere by injunction effectually to protect the complainants; and if the diversion of water complained of is a violation of the plaintiff’s right, and may permanently injure that right, and become by lapse of time the foundation of an adverse right in the defendant, there is no more fit case for the interposition of a court of equity, by way of injunction, to restrain the defendant from such injurious act.” (6 Wait on Actions and Defenses, 282.)
In Nasser v. Seeley, 10 Neb. 460, the plaintiff “solicited employment ” in the work he afterwards sought to enjoin. This was strong evidence of assent.
The Supreme Court of Michigan said: “Except in very clear cases, it is better to leave the parties to their legal remedy in the recovery of damages.” (Hoxsie v. Hoxsie, 38 Mich. 77.)
Park v. Kilham, 8 Cal. 77, S. C., 68 Am. Dec. 310, was an action at law to recover certain water and damages, tried by a jury, who rendered a general verdict. The court held that an instruction in the following terms was “ substantially correct ”: “ That if those from and through whom the plaintiffs claim had the prior right to the waters, and they stood by and saw those from whom the defendant derives his title to the ditch, and the right to the waters of the creek, appropriate the water of the creek, at great expenditure of money and labor, under the mistaken idea that the defendant’s vendors were obtaining the first appropriation, and did not inform them of the mistake, they, plaintiffs’ vendors, and the plaintiffs who claim under them, are estopped from setting up their prior right at this time.”
In the light of the subsequent decisions, it can scarcely be claimed that the facts recited in the instruction constituted an equitable estoppel which could be relied on as a defense at law. It may be that the defendant had the better right. In fact, the defendant’s grantors seem to have appropriated the water before the *279 plaintiffs’ grantors even “located ” the mining claim. It does not appear that the plaintiffs’ predecessors ever took actual possession of the mining claim; and even if the location of the claim preceded the defendant’s appropriation, it does not appear that the manner of the location was such as that defendant’s grantors were bound to take notice of it. But, whatever the facts, we cannot assent to the proposition—apparently recognized by the court—that the mere silence of plaintiffs’ grantors,' disconnected from other circumstances in evidence, created an estoppel at law.
In Edwards v. Allouez M. Co., 38 Mich. 46, the court said: “ The writ is not ex debito justitise for any injury threatened or done, but the granting of it must always rest in sound discretion governed by the nature of the case”; and as the injury threatened to the plaintiff was small, for which damages at law would be full compensation, the injunction was refused.
Traphagan v. Mayor, 29 N. J. Eq. 208, was a case where the city authorities had already opened a street. The plaintiffs had permitted the authorities to oust them (without seeking to recover the possession at law), and to expend a large amount of public funds. The vice-chancellor said' the complainants “had encouraged or sanctioned” the action of the public authorities, and “by laches, if not acquiescence, had lost the right to have the use of the street forbidden.” Demarest v. Hardham, 34 N. J. Eq. 469, was a bill to enjoin the use of a steam-engine by a bookbinder in an adjoining building. The vice-chancellor refused a general injunction, but enjoined the defendant from operating his engine so as to produce a vibration in plaintiff’s building, etc. He said an injunction to restrain a lawful business should never be granted, except a plaintiff shows an invasion of a clear legal right, which cannot adequately be redressed by damages, but remarked: “Equity takes cognizance of a nuisance which is permanent in its character, or which *280 produces a constantly recurring grievance, more readily than any other.”
The Supreme Court of the United States has said that a hill for a private nuisance should show that the plaintiff is without adequate legal remedy; but that equity will interfere by injunction where the injury is irreparable, or from its continuance must occasion a constantly recurring grievance. And to justify an injunction until a trial at law can be had, no improper delay in resorting to a court of law must be shown,'—three years or more of delay precluding a party from relief in equity until he has vindicated his right at law. (Parker v. Woolen Co., 2 Black, 545.)
Brown v. Carolina: The injury to plaintiff was trifling, and susceptible of adequate compensation in damages. (83 N. C. 128.)
Fuller v. Inhabitants: A case of acquiescence. The application was 4o restrain the appropriation of money alleged to have been collected by a town under an illegal tax levy. (1 Allen, 166.)
Del Monte v. Pond: An appeal from an order refusing to dissolve a preliminary injunction. (23 Cal. 84.)
Royal Bank v. Grand Junction: The facts are very complicated. While the terms “ laches ” and “unreasonable delay” are employed with reference to the conduct of the plaintiff, the case shows that these expressions are used to denote an acquiescence or assent, which the plaintiff afterwards sought to withdraw. (125 Mass. 490.)
Brown v. County: A bill by the county to enjoin the collection of a judgment against it. The supervisors of the county made two several tax levies for the payment of the judgment after they were expressly notified of its existence, and for what it was recovered. (95 U. S. 157.)
Godden v. Kimmel: Clifford, J., said: “Where there has been gross laches and an unexplained acquiescence in the operation of an advers0e right, courts of equity fre *281 quently treat the lapse of time, even for a shorter period than that specified in the statute of limitations, as a presumptive bar to the claim.” (99 U. S. 201.)
Blanchard v. Doering: Clear case of acquiescence. (23 Wis. 203, 204.)
Sheldon v. Rockwell: “The plaintiff, by his silence and acquiescence ” for more than nineteen years, during most of which time the acts done by defendants were protected and fostered by express statute, “has invited and encouraged the defendants to expend their money,” etc. (9 Wis. 161.)
Angell says: “No single proprietor, without consent, has the right to use the flow of the water in such manner as will be to the prejudice of any other.” (Angell on Watercourses, sec. 340.)
In Cobb v. Smith, 16 Wis. 696, the court holds that an acquiescence by the plaintiffs of several years, in the flowing of their lands, was such evidence of assent as would authorize the refusal of an injunction. “If the plaintiffs have suffered damage, they have their common-lav/ remedy.”
“When a person acquiesces, .... a court of equity will not interfere by injunction, but his remedy at law remains.” (Wood on Nuisances, sec. 360.)
Estcourt v. Estcourt Hop Essence Co.: Bill to enjoin the use of a trade-mark. The “hop essence” was an article used by brewers only. The plaintiff waited seven months after advertisement of defendant asserting its rights, and then brought suit. He was unable to show that a single brewer had been misled,—a circumstance on which Lord Oairns lays some stress. But there was a conclusive reason why equity should not interfere. The “hop essence” was introduced, recommended, and sold to enable brewers to supply to the public a liquid which they might represent as being made of pure hops, when it was not in fact so made. The chancellor said: “It is not the province of the court to protect speculations of this kind.” (L. R. 10 Ch. App. 276.)
*282 Wendell v. VanRenssalaer: A case of complete estoppel. (1 Johns. Ch. 344.)
In Ware v. Regents, 3 De Gex & J. 230, the plaintiffs’ lands had been temporarily flooded, but there was no threatened future injury. The weight which may possibly be given to mere delay is suggested by the remark of the chancellor, who said that although the delay did not amount to absolute proof of acquiescence, yet “ it was calculated to throw considerable doubt upon the reality of the plaintiffs’ injury.”
Goodin v. Cincinnati: Held, in effect, that one who permits “a public railroad to be constructed over his land” cannot, after large expenditures, made on the faith of his apparent acquiescence, enjoin its use. There remains only the right' of compensation. (18 Ohio St. 169.)
Wiggin v. Mayor: An attempt to enjoin the collection of a local assessment for improving a street in New York City. Held, after the report of the commissioners of assessment was approved by the Supreme Court (in accordance with the statute), equity would not interfere to correct their estimates. Further, if the proceedings of the common council were void, a sale of the complainant’s property would not cast a cloud on his title. (9 Paige, 24.)
The master of the rolls said that acquiescence in the erection of noxious works, while they produce little injury, does not warrant the subsequent enlargement of them to an extent productive of great damage. (Bankart v. Houghton, 27 Beav. 425.)
Mr. Spence writes: “The Court of Chancery will therefore in many cases refuse to give its aid in favor of an equitable claim, though a less period than the corresponding statutory period shall have elapsed, if the length of time, and circumstances of the case shall require the application of that principle.” (Spence’s Eq. Jur. 61.)
In the Matter of Lord: For the peace of society, equity *283 will refuse to interfere when there has been gross neglect in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights. (78 N. Y. 112.)
Grant v. Tynney: The court refused injunction when a trifling though continuous trespass had been submitted to for six years, but left the plaintiffs to their rights at law. (L. R. 8 Ch. App. 14.)
Fullwoodv. Fullwood: The chancellor said: “Mere lapse of time, unaccompanied by anything else, has just as much effect and no more in barring an injunction, as it has in barring an action for deceit. ... In saying this I do not shut my eyes to the possible existence of a purely equitable defense, such as acquiescence,” etc. (L. R. 9 Ch. Div. 176.)
In Burden v. Stein, 27 Ala. 104, S. C., 62 Am. Dec. 758, it was held: 1. A riparian proprietor may enjoin in equity without first establishing his right, at law; 2. That while in cases where the plaintiff’s right is not clear until established at law, equity will refuse to enjoin if it is shown that he has been guilty of improper delay, the principle has no application where his right is clear, and of such a character as entitles him to ask for the interference of equity without resorting to law in the first instance.
Thomas v. Woodman: The only injury complained of by plaintiff was an offensive odor arising from the decay of grass accumulating in the bed of a stream near his premises. The plaintiff knew the “full consequences ” for two years before applying for relief. (23 Kan. 277.)
In Corning v. Winslow, 40 N. Y. 191, the Court of Appeals was divided. The judges agreed, however, that equity will interfere, by mandatory injunction, to compel the restoration of running water to its natural channel; and that since the code it is not necessary that plaintiffs’ right should be first established at law., A minority of the judges thought the circumstances—in view of the great loss and injury to the defendant, the *284 slight advantage to be "gained to the plaintiff by a restoration of the water, the assent of plaintiff’s grantor to the building of permanent and expensive works during the lease, and the delay of the plaintiff after the expiration of the lease—rendered the issuing of an injunction improper. The majority held these conditions did not deprive the plaintiff of his right to equitable relief.
In Corning v. Troy, 39 N. Y. 313, the court said: “In order to estop the owner of a water right in equity from enforcing his right on the ground of his knowledge and acquiescence in the making of expenditures and improvements thereon by another, the consent and agreement of such owner thereto ought to be established by the clearest and most satisfactory evidence.”
This statement is said to be a mere dictum, but it appears to us to be substantially a correct exposition of the rule. In the light of the authorities, it seems clear that the acquiescence of the plaintiff, which will deprive him of his right to appeal to equity, must be such as proves his intelligent assent.
It may be that delay in seeking relief may tend in some appreciable degree to strengthen the probability that plaintiff has assented to a slight injury; or tend, in connection with the other evidence, to show that ho has suffered no real injury,—as suggested in Ware v. Regents, supra. But in every case the question returns, Has the plaintiff assented to the acts of the defendant? We see no error in the statement (Corning v. Troy, supra), that the “consent and agreement” of the plaintiff must appear. It perhaps adds no force to this statement to say that the consent ought to be established by “the clearest and most satisfactory” evidence; although similar language was used by Lord Eldon. (Dann v. Spurrier, supra.)
Under our codes the riparian proprietor is not required to establish his right at law by recovering a judgment in damages before applying for an injunction. The decis *285 ions (in cases of alleged nuisances) based on the failure of the complainant to-have had his right established at law have no appositeness here. Here the plaintiff must indeed clearly make out his right in equity, and show that money damages will not give him adequate compensation. If he fail to do this, relief in equity will be denied. But if he proves his case, relief will be granted, although he has not demanded damages at law. In the case at bar the plaintiffs do not admit that damages would constitute compensation, and ask for an injunction until they shall recover such compensation in an action for damages. The decisions which bear on that class of cases, and which require of the plaintiff to show that he has promptly sought redress at law, have little applicability.
In considering the question whether, in the case at bar, the plaintiffs assented to the acts of the defendant, and the injuries caused by those acts, we are bound to assume that the waters of Kern River, in their natural course, ordinarily flow to the lands described in the complaint, or to a considerable part of them, because there was a substantial conflict in the evidence as to that matter, and the court below erred in rejecting certain testimony bearing on that issue. We must also assume that plaintiffs were the owners or entitled to the possession of such lands when the defendant’s alleged right to appropriate the waters began, because (if the certificates hereinafter spoken of had been admitted in evidence) the certificates of purchase would have proved the right of exclusive possession. Moreover, we must assume that the injury to the plaintiffs was of the character and extent which the evidence tended to prove, because, if any injuries flowed to plaintiffs from defendant’s acts, there was no conflict as to the nature of those injuries. •'
The injury to the plaintiffs, so far as it had already accrued, was, perhaps, such as could have been compensated in money damages. But even if this should be conceded, the defendant has asserted its right to continue *286 its diversions, and throughout these proceedings has persisted in that assertion. The entire injury, already accrued and future, is irremediable at law, since a judgment for damages would not constitute complete and adequate redress within the meaning of the decisions. We cannot so hold, in view of the nature and extent of the injuries, unless we hold that the riparian proprietor can never ask for an injunction when future diversions of waters are threatened; and the adjudications to the contrary are very numerous. So to hold would be to cast upon the plaintiffs the burden of bringing and maintaining a multiplicity of suits at law. The continuation of the diversions must result in constantly renewed grievances, and might result in the acquisition of an adverse right by the defendant. And while the defendant has expended very large sums of money, the evidence tends to prove that neither the injury already inflicted on the plaintiffs, nor that to be anticipated, is slight or trivial, but that it is great and substantial.
Under these circumstances, we must decline to hold that by their omission to bring this action'sooner than it was brought (with actual or presumed knowledge of the things done by the defendant), the plaintiffs are shown to have acquiesced in the defendant’s diversion of the water, and the consequences thereof, in such manner as that the assertion of their rights in this action is to be treated as an attempt to ignore or to recede from a previous assent.
A finding of unreasonable laches often assumes the existence at one time of a cause of action. But the facts found by the court below, on which is based the conclusion of laches, do not show assent, unless the plaintiffs must be held to have assented because they ought to have ascertained that the necessary consequences of the projected works of the defendant would be to deprive them of water which naturally flowed to their lands; or unless the delay to sue after the water ceased to flow, as a con *287 sequence of defendant’s works, was, under all the circumstances, evidence of assent. The facts from which the conclusion of laches and neglect is drawn, if sustained by the evidence, are sustained only by evidence of silence on the part of the plaintiffs, with knowledge proved or presumed from the notoriety of the acts and claims of defendant.
The inherent difficulty of anticipating, in the fall of 1875, when “a small quantity of water ” was used by the defendant, what would be the results of the completed canal, or when a considerable progress should be made in its construction, is a sufficient answer to the suggestion that the plaintiffs should then have known those results. If, immediately after the work done in 1875, the plaintiffs had applied for an injunction, would a court of equity •have granted it upon facts which would have shown a possible or contingent serious injury? It would have been obligatory on the plaintiffs, at least, to establish clearly that the threatened acts, if consummated, would result in grave injury to them; and in view of the many streams in that region, the various currents of some of them, and the other natural features of the country, it would have been extremely difficult, if not impossible, to prove that such injury would follow. And although the court found that the defendant continuously prosecuted its works, it does not appear from the findings how far those works were extended, or what were their consequences, at any point of time before the plaintiffs began to suffer the real, serious, and substantial injuries of which they complain.
The conclusion of law cannot be treated as a finding of fact. It is called a “conclusion of law” in the decision, and is in the form of a proposition of law,— “such laches and neglect as disentitle the plaintiffs,” etc. It does not respond to facts pleaded, nor is it a direct finding of the fact of assent. But if it were a finding of fact, the evidence does not sustain it. The *288 evidence, although it may be circumstantial, must affirmatively prove the assent.
It is urged, however, that the defendant was not bound to plead, nor (since the findings need respond only to the material issues made by the pleadings) was the court bound to find the plaintiffs’ consent, or the laches or acquiescence which would prove consent; that the matter of laches or neglect or acquiescence arises out of the evidence; and that a court of equity may and ought, sua sponte, to deny relief, where an appeal is made to its discretionary power of granting or refusing an injunction, when there has been unreasonable delay (which in view of the circumstances shows assent) in seeking its preventive process. *
If all this were conceded, the question would become an original one in this court, and the rule (if it were applicable otherwise) that this court will not interfere to set aside a finding when there is a substantial conflict in the evidence would not be applicable. As an original question, the evidence sent here does not prove assent. We are convinced that if the question were submitted to a jury upon that evidence a verdict of assent could not be upheld.
II. The plaintiffs are not estopped from maintaining this action by reason of their assent to and approval of certain acts of a third person,—the Kern Valley Water Company.
The next question is cognate to the one just discussed. It arises on certain findings from which, respondent contends, it appears plaintiffs lost their right to complain of any diversion of wafer before the commencement of this action.
The court below found: —
“That the waters of Kern River do not and never did naturally and usually flow to, through, along, by, over, or upon the said lands of plaintiffs, or any part thereof; and that until the year 1876, whatever of the water of Kern River flowed to or reached the said lands, *289 or a.ny part thereof, was from the unusual and extraordinary overflow of said river, or of Kern and Buena Vista lakes, or from the percolation and seepage in these findings mentioned.
“ That in December, 1875, one Souther commenced, and in J anuary, 187 6, completed, a dam across Buena Vista Slough, at a point designated on the map hereto annexed as Cole’s Crossing, on or about section five (5), township thirty-one (31) south, range twenty-five (25) east, Mount Diablo base and meridian, and south of where the waters of New River enter Buena Vista Slough, and thereby, at said point, checked the natural flow of the waters of said river through said slough into Buena Vista and Kern lakes, and caused the waters there flowing to take a northward course and away from the said lakes. That in March, 1876, the pressure of the waters against said dam broke through the same, and said river resumed its natural flow to Buena Vista and Kern lakes. That during the said interval of its flow northward, the waters of said New River flowed along said Buena Vista Slough and the adjacent country, to and over Buena Vista Swamp.
“ That in the fall of 1876, certain parties commenced the construction of two certain canals, which are correctly laid down on the map hereto annexed, and marked respectively ‘East Side Canal’ and ‘Kern Valley Water Company’s Canal.’ The said East Side Canal commences on section fourteen (14), township thirty (30) south, range twenty-four (24) east, and extends thence some three (3) miles north, on the eastern side of the said Buena Vista Swamp, and does not touch any of said lands of the plaintiffs. The other canal, heading on section fourteen (14), township thirty (30) south, range twenty-four (24) east, as at present constructed, extends northward some twenty-four miles, is one hundred and twenty feet wide on the bottom, one hundred and forty feet wide on the top, and ten feet deep, with a fall of one foot per *290 mile, and capable of carrying more than twelve hundred cubic feet of flowing water per second, and terminates at a point outside of said lands of plaintiffs. That in June, 1877, the Kern Valley Water Company, a corporation organized and existing under the laws of California, for the purpose of acquiring canals and water rights in said county of Kern and elsewhere within this state, to be used or disposed of for irrigation, transportation, domestic, mechanical, and other purposes, took possession and control of said canals, and thenceforth continued the construction thereof northward toward the lake known as Tulare Lake, designated on said» map. That in the fall of the year 1877, the said Kern Valley Water Company reconstructed the said dam at Cole’s Crossing; and in connection therewith constructed a levee extending westward to the bluffs on high ground, and running eastward from said dam about one and one quarter miles, as shown on said map, thereby preventing the waters of Kern River from flowing to Buena Vista Lake, and turning the same northward to their said two canals. That at the head of said canals, and in conjunction therewith, the said Kern Valley Water Company, in 1877, constructed a certain other dam and levee, extending completely across the said Buena Vista Swamp, as shown on said map, and thereby completely obstructed and prevented the natural flow of any water into, through, or over said swamp northward of said last-mentioned levee, and appropriated and took possession and control of all the waters reaching said levee, and turned the same into the .said canals. That the said dam and levee last mentioned are some distance southward from the southernmost .part of the said lands of the plaintiffs, and from and after their construction no water has naturally flowed, or could naturally flow, beyond the head of said canals, or to or upon the said lands of the plaintiffs, or any part thereof.
•“That the.construction of the canals, dams, and levees *291 described in the preceding finding was undertaken and prosecuted with the knowledge, consent, and approval of the plaintiffs.
“That the levee last described in said preceding finding was constructed for the purpose of diverting all the water reaching said levee, into the said canals, and such levee does entirely obstruct, and since its construction has obstructed, the natural flow of any water northward in said Buena Vista Swamp, beyond said levee, and diverts the same into said canals, and that the plaintiffs, at and before the time of the commencement of the construction of the said levee, knew of the purposes thereof, and approved the same, and knew of the beginning and prosecution of the construction thereof, and consented to and approved of such construction. That said canals and levee were constructed at great expense, and because of and in reliance upon the said approval and consent of the plaintiffs, and but for such approval and consent would not have been constructed.”
The notice of appropriation of seventy-four thousand inches of water was posted and filed for record by defendant’s assignors May 4, 1875. Their subsequent acts (it may here be conceded) related back to the posting and filing of the notice.
It may well be doubted whether the evidence sustains the finding that the plaintiffs consented to and approved of the canals and dams mentioned in the foregoing findings. We shall assume, however, that there was a substantial conflict in the evidence in that regard.
The building of the two dams, and the assent of the plaintiffs thereto, as found by the court, intervened between the appropriation by defendant’s assignors and the commencement of this action.
The construction of the dam at Cole’s Crossing, with or without the plaintiffs’ consent, is unimportant (with reference to the question we are about to consider) if the waters of Kern River have never naturally or usually *292 flowed to their lands. The plaintiffs did not become riparian proprietors by reason of a diversion of the waters of Kern River toward their land (caused by the dam at Cole’s Crossing), with any right to complain of an appropriation made by the defendant or its assignors above Cole’s Crossing and before the dam was constructed at that place. And on the other hand, if part of the waters of Kern River, in their usual and natural flow, reached the lands of plaintiffs (and they were deprived of it by defendant), it is immaterial that more water was turned in their direction by the dam at Cole’s Crossing.
It is said by appellants that, since the court found the waters of Kern River never naturally and usually flowed to the lands of the plaintiffs, the findings last recited must be read as a finding that the levee near the head of the canals was built for the purpose of diverting, and did divert, into the canals of the Kern Valley Water Company, only the waters turned toward plaintiffs’ lands by the dam at Cole’s Crossing and the waters of extraordinary overflows.
But as the court found that the levee last mentioned prevented the passage of any water to the northward thereof, the respondent is entitled to the benefits of the findings in the alternative, that is, as declaring that, even if the waters of Kern River in their natural and usual flow would reach the plaintiffs’ lands, the plaintiffs had consented to the erection of a dam or levee by the Kern Valley Water Company which diverted all such waters from their lands.
Section 811 of the Civil Code provides that the servitude may be extinguished by the performance of any act by the owner of the servitude, or with his assent,—upon either the dominant or servient tenement,—which is inconsistent with its nature or exercise. This seems to be a recognition and statutory declaration of the rule which Professor Washburn says has become well settled, that if. the owner of a dominant estate do acts thereon which per *293 manently prevent his enjoying an easement, the same is extinguished, or if he authorize the owner of the servient estate to do upon the same that which prevents the dominant estate from any longer enjoying the easement, the effect will he to extinguish it. (Easements and Servitudes, 560.)
The same writer says that, as forming the subject of property in connection with realty, water may be viewed in two lights: one, as one of the elements of which an estate is composed; the other, as being valuable alone for its use, to be enjoyed in connection with the occupation of the soil. “In the latter sense it constitutes an incorporeal hereditament, to which the term easement ’ is [has been] applied.” (Washburn on Easements and Servitudes, 207.) The flow of the water to and over the riparian lands is not a mere easement. (Stoker v. Singer, 8 El. & B. 36.) But the riparian right, while more than an easement, may be said to include the qualities of an easement.
In section 801 of the Civil Code, among “land burdens, or servitudes upon land,” are enumerated “the right of receiving water from land,” and “the right of having water flow without diminution or disturbance of any kind,”—which last includes the right to have a natural watercourse flow, subject to such diminution as results necessarily from a reasonable use by a superior riparian proprietor.
It has been held that when the lower proprietor licenses the upper to divert water which would flow to the lands of the licenser, and the licensee has executed the license, the licenser does not grant the servitude within the prohibition of the statute of frauds, but rather is estopped from asserting any right in it. It is not necessary to enter into that question. Whether the executed license would or would not be an executed contract; whether the transaction would or would not operate a transfer from the licenser to the licensee,—section *294 811 of the Civil Code declares that the effect is to “extinguish ” the servitude. The legislature had as much power to make this enactment as to pass a statute of frauds.
The possession of the Kern Valley Water Company, at the points where water was taken, was perhaps some evidence of its riparian ownership. But if the act is to be done by the licensee on a third person’s estate, and the license be executed, it cannot be revoked. (Washburn on Easements and Servitudes, 563.)
Appellants claim that the evidence with respect to ti p consent of plaintiffs to the diversion by the Kern Vail f Water Company was not admissible under the allej ¡- tions of the answer, because defendant did not pie! ¡I therein the facts establishing license and its executio |. Counsel refer to Humphreys v. McCall, 9 Cal. 59, whe, p it was held, in an action for damages for the diversion of water appropriated by plaintiffs on the public lands, — the defendants having pleaded the general issue only, —that it was not competent for the defendants to prove that a prior claim to the water existed in a third person, but that such defense should have been specially pleaded. That case turned on a priority of occupation as between the plaintiffs and defendants, and even if a still earlier occupation by a third person had been pleaded, it would have constituted no defense to an' action brought for a diversion of water appropriated by plaintiffs previous to any appropriation by the defendants, unless the defendants connected themselves with the third person,—the first appropriator. In the case now before us, it was for the plaintiffs to show that they •were entitled to the flow of the stream, or of some part of it, when this action was commenced. If their right to the flow was legally extinguished prior to the commencement of the action, we cannot perceive why defendant was not entitled to prove the fact under the denials of the answer.
*295 If, therefore, the findings last above referred to are sustained by the evidence, or there is a substantial conflict in the evidence with respect to the matters set forth in those findings, the judgment and order must be affirmed.
It is to be observed that plaintiffs count upon their ownership of the banks of Buena Vista Slough. If they licensed the ICern Valley Water Company permanently to divert the waters from the slough, and by expenditures on the part of the company the license was executed, plaintiffs cannot recover, whatever the purposes of the diversion, although these included a purpose to benefit the lands of plaintiffs by draining them, and the conduct of the water to a point below such lands, or even a purpose to irrigate the plaintiffs’ lands through gates in the canals of the company at points separated from the channel of the slough. However it might be (supposing plaintiffs had counted on their ownership of the banks of one of the canals), if it appeared that all the stock of the Kern Valley Water Company was owned by the riparian proprietors below the places of diversion of water from the slough,— so that the corporation might be treated as the mere instrumentality through which the riparian proprietors carried out a design agreed upon among themselves, to change the channel of the slough in such manner as to provide more effectually for the irrigation of their lands,—here such facts do not appear from the findings or evidence. The corporation was a distinct entity, in which the plaintiffs were in no way interested, except that there was evidence tending to prove that one (perhaps all) of them was a stockholder in it. Besides, as we have seen, the plaintiffs do not base their claim for relief on the statement in their bill of complaint that they are riparian proprietors on the new or artificial watercourse.
If, however, it should be conceded that all the plaintiffs consented to and approved of the construction by *296 the Kern Valley Water Company of the dam or levee across the swamps immediately below the east side and Kern Valley Water Company’s canals, this fact ¡of itself would not entirely extinguish the rights of plaintiffs to the flow of the watercourse, unless the dam — as built and consented to by plaintiffs—obstructed and preyented the natural flow of every portion of the water (except, perhaps, mere leakage) through Buena Vista Slough to land of the plaintiffs.
The court below found that the levee made by the Kern Valley Water Company prevented “the natural flow of any water into, through, or over said swamp north-, ward of said levee,” and that after the construction of said levee or dam, “no water has naturally flowed, or could flow, northward and beyond the head of said canals to or upon said land of the plaintiffs, or any part thereof.”
But there was uncontradicted testimony that there was a head-gate in the dam or levee, at a place designated by the witnesses as the place where the levee crossed the slough, which was at times open and through which, when open, water flowed in the slough.
The court did not find the existence of the head-gate, and there is neither finding nor definite and distinct evidence from which can be ascertained what was the arrangement or agreement between the plaintiffs and the water company, if any, with reference to the control and management of the head-gate. The court found that the plaintiffs consented to the building of the dam, and found that, as built, the dam entirely obstructed the flow of the water.
It is urged by appellants that the very fact of the existence of the head-gate in the slough, unexplained, proves that plaintiffs retained a right to water flowing there. But it is enough if the facts proved do not affirmatively establish that the easement was entirely extinguished. The levee as constructed did not permanently *297 and continuously stop the flow of all the water, and the license of plaintiffs was no broader than its execution.
Although the defendant was not bound to plead a license given and executed prior to the commencement of the suit, the burden was on the defendant of proving that plaintiffs had assented to acts of the Kern Valley Water Company which permanently deprived them of all the water. It was by such assent only that they could estop themselves from claiming the benefit of any of the water.
It may be contended, on behalf of respondent, the presumption is that the gate built by the Kern Valley Water Company, as part of its work, was under the control of the company, and in the absence of evidence of a reservation by plaintiffs of a right to enter upon the possession of the company and open the gate,—or of a right to demand that the Kern Valley Water Company should open it whenever plaintiffs might choose to exercise the right, or open it at definite times or for certain periods, —the court below was justified in finding that plaintiffs consented to a permanent occlusion of all the waters; and that such finding included and implied a finding that the license was not limited or restricted.
The question is not free from difficulty. It is apparent the court below considered the facts that the head-gate was there, that it was at times open, and that when open water flowed through it, as immaterial factors in the evidence, on which it based its conclusion that the dam as erected and assented to entirely obstructed the flow of the stream. The court in effect held that it was for the plaintiffs to prove affirmatively the reservation of a right to the flow at their option or at specified times. Doubtless, the conclusion that plaintiffs licensed a diversion of all the waters was based in part upon the presumption (in the absence of evidence to the contrary) that it was intended the water company should have entire control of its own head-gate; but this, it is argued, *298 is a presumption of fact which the court could properly indulge.
Suppose the single issue between these parties was, whether the license was general, extending to all the waters, or was limited, the burden of showing its general character being on the defendant. In such case, it might be asked, would not the defendant have made out its case, prima facie at least, by proving the consent of the plaintiffs to the construction of the levee, although it was built with a gate through which waters might flow if it should be opened? Would the possible fact—not proved—that plaintiffs may have reserved the right to have the gate opened when they demanded it, or for, a definite part of future time as time should pass, be considered as overcoming the presumption that the Kern Valley Water Company has the control of its own property. If so, it may be claimed, the case must constitute an exception to the general rule that the burden of proof is cast upon the opposite party when the party having the affirmative has established the issue on his part prima facie.
But here the burden was on the defendant of proving that the right of the plaintiffs to the flow of all the water was extinguished. It would not have been sufficient that it was made to appear that plaintiffs had assented to a diversion of a portion of the waters, any more than it would have been sufficient to prove that plaintiffs had granted a portion of the waters. In either case the plaintiffs would not have lost nor parted with the right to be protected in the enjoyment of the waters they retained.
Until it was made to appear that plaintiffs had lost the right to the flow of any part of the stream, the presumption would be that they retained a right to all. And in jmesence of the fact that the work they assented to did not actually deprive them of all the water, their right to the water which flowed through the gate, either continuously or at intervals, was not extinguished. To apply *299 the presumption that every man has a right to control his own property for the benefit of the defendant alone is to assume, not only that the gate belonged to the Kern Valley Water Company, but that the water also (or its exclusive use) which flowed through the gate belonged to that company, in entire disregard of the presumption that the plaintiffs retained every right to the flow of the stream which was not affirmatively shown to have been lost. Thus a disputable presumption (applicable to the use of the gate) would be made to overthrow a presumption applicable to the use of the water. The defendant could not establish that plaintiffs were estopped from asserting that they had a right to the flow of any part of the water,—either prima facie or conclusively,—-except by proving facts which necessarily precluded the retention by plaintiffs of any part of it. The defendant could not rely upon a presumption drawn from facts which did not necessarily exclude a retention by plaintiffs of a right to the flow of some of the waters, in opposition to the legal proposition that plaintiffs had lost only the right which was affirmatively proved to have been extinguished.
Of course, on a retrial of this cause, the evidence may establish an extinguishment of the plaintiffs’ rights—if they ever had any—to the flow of every portion of the waters of Buena Vista Slough to their lands. On this appeal we confine ourselves to the findings and testimony in the transcript now here.
III. While the argument ab inconvenienti should have its proper weight in ascertaining what the law is, there is no “public policy ” which can empower the courts to disregard the law; or because of an asserted benefit to many persons (in itself doubtful) to overthrow the settled law. This court has no power to legislate,—especially none to legislate in such manner as to deprive citizens of their vested rights.

The riparian owner’s property in the water of a stream may (on payment of due compensation to him) be taken to supply “farming neighborhoods ” with water.

*300
In case further legislation shall be deemed expedient for the distribution of water to public uses (the private right being paid for), the validity of such further legislation is to be determined after its enactment, if its validity shall then be questioned.

The respondent contends that it is entirely immaterial what errors were committed by the court below, upon the supposition that plaintiffs, as riparian proprietors, have some rights to the flow of the stream through their lands, —since the plaintiffs have in fact no right to the use of the waters as against the defendant, which has appropriated them in accordance with the provisions of the Civil Code; and this notwithstanding the statute of 1850 adopting the common law as “ the rule of decision,” and the section of the Civil Code providing that “the rights of riparian proprietors are not affected” by the provisions relating to appropriations of waters. (Sec. 1422.)
This court has held that the property of a riparian owner in the waters flowing through his land may, upon due compensation to him, be condemned to the public use by proceedings initiated by a corporation organized to supply a town with water. (St. Helena Co. v. Forbes, 62 Cal. 182.)
In the learned opinions of Justices B.o?'' And Myrick in that case, the right of the riparian proprietor to the use of the water is designated “property,” an “incident of property in the land inseparably annexed to the soil,” as part and parcel of it, “an incorporeal hereditament appertaining to the land.” The main question in the case was whether the code provided for a condemnation of that species of property to public uses. The question was answered in the affirmative.
And it has been held in New York that the taking of a stream of water (on due compensation) for the supply of a town was a proper exercise of the power of eminent domain. (Gardner v. Newburgh, 2 Johns. Ch. 162; S. C., *301 7 Am. Dec. 526.) On like principles the same property-right may be taken for any public use. In every case, however, the provisions of the statute as to the mode and manner of conducting the condemnation proceedings must be strictly pursued. Private property may be taken or damaged for public use, due compensation being made or paid into court. (Const., art. 1, sec. 14.) But another provision of the supreme law is equally operative: “Ho person shall be deprived .... of property without due process of law.” (Id., art. 1, sec. 13.) A
legislative act declaring the necessity for taking the property for public use, or the judgment of a court that the necessity exists when the statute puts the power in a court, is “the law of the land.” (Cooley’s Const. Lim. 528.)
Section 1001 of the Civil Code provides:—
“ Any person may, without further legislation, acquire private property for any use specified in section 1238 of the Code of Civil Procedure, either by consent of the owner or by proceedings had under the provisions of title 7, part 3, of the Code of Civil Procedure; and any person seeking to acquire property for any of the uses mentioned in such title is ‘ an agent of the state,’ or a ‘person in charge of such use,’ within the meaning of those terms as used in sucli title. This section shall be in force from and after the fourth day of April, 1872.”
And Judge Cooley observes that either a corporation or individual may be made the agent of the state to prosecute proceedings for condemnation.
The same writer says: “The question what is a public use is always a question of law. Deference will be paid to the legislative judgment, as expressed in enactments providing for the appropriation of property, but it will not be conclusive.” (Cooley’s Const. Lim. 536. See also note.) With respect to the subject in hand, the judgment of the legislature of this state has been expressed. Among the public uses in behalf of which the right of *302 eminent domain may be exercised are “canals, ditches, flumes, aqueducts, and pipes, for public transportation' and for supplying mines and farming neighborhoods with water.” (Code Civ. Proc., sec. 1238.)
Chancellor Kent has written: “If the public interest can be in <my way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals for that purpose.” (2 Kent’s Com. 340.) Upon this principle the power has been employed for many objects. Not only the direct agents of the government, but individuals and corporate bodies, have been authorized to take private property for the purpose of making public highways, turnpike roads, and canals; of erecting and constructing wharves and basins; of establishing ferries; of draining swamps and marshes; and of bringing water to cities and villages. In all such cases, the object of the legislative grant of power is the public benefit derived from the contemplated improvement, whether such improvement is to be effected directly by the agents of the government or by individual enterprise. (Cooley’s Const. Lim. 532, citing Chancellor Walworth in Beckman v. Railroad, 3 Paige, 45-73, and Wilson v. Blackbird Creek Marsh Co., 2 Pet. 245.) With reference to the phrase of Chancellor Kent, “ where the public interest can in any way be promoted,” Cooley says: “It would not be entirely safe to apply it with much liberality.” He adds, that private property may not be taken for objects which may merely “ tend to give an aspect of beauty, thrift, and comfort to the country, and thereby to invite settlement, increase the value of lands, and gratify the public taste; .... the common law has never sanctioned an appropriation of property based on these • considerations alone; and some further element must *303 therefore be involved before the appropriation can be regarded as sanctioned by our constitutions. The reason of the case, and the settled practice of free governments, must be our guides in determining what is and what is not a public use; and that only can be considered such when the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience, or welfare, which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them otherwise, it is alike proper, useful, and needful for the government to provide.”
Now, the drinking of water is everywhere spoken of as a “natural,” or at least primary, use. Yet when water is entirely taken away from the riparian proprietor to supply a city or town, the use of it has never been limited to that which may be required merely for the support of the lives of the citizens; but the water thus appropriated to the “public use” may be consumed also for lavation, and for all other purposes to which the element is ordinarily applied, as for irrigating private plats or yards and public squares and parks, the watering of the streets, etc. It would seem utterly impracticable to limit the uses to which the citizens or villagers may apply it; or to the quantity to be used by each, except by reference to the quantity introduced. In such cases, the riparian proprietor may be deprived of its use for primary purposes that it may be devoted to such as have generally been deemed secondary. Why, then, may he not be deprived of the water when the law-makers decide that its application elsewhere for irrigation is a public use ?
It is the rule that, where there is any doubt whether the use to which the property is proposed to be devoted is of a public or private character, it is a matter to be determined by the legislature; and the courts will not undertake to disturb its judgment in that regard. *304 (S. V. R. Co. v. Stockton, 41 Cal. 147.) To this yielding to the legislative judgment there is but one exception; that is, when the property of the citizen is taken, or sought to be taken, for a use in no sense public; or, in the language of Chancellor Walworth (5 Paige, 159), “ where there is no foundation for a pretense that the public is to be benefited thereby.” (Con. Chan. Co. v. C. P. R. Co., 51 Cal. 269.)
We are not prepared to say that the supply of water to “farming neighborhoods” for irrigation (and the code evidently means for irrigation) may not be for a public use. Indeed, in view of the climate and arid soil in parts of the state (for this object climate and soil may properly be considered), it is safe to say that the supply for such use may be that which the legislature has decided it to be,—a public use. The judgment of the legislature that it is such ought not, therefore, to be disturbed by the courts.
It is apparent that in deciding whether a use was public the legislature was not limited by the mere number of persons to be immediately benefited as opposed to those from whom property is to be taken. It must happen that a public use (as of a particular wagon or railroad) will rarely be directly enjoyed by all the denizens of the state, or of a county or city; and rarely that all within the smallest political subdivision can, as a fact, immediately enjoy every public use. Nor need the enjoyment of a public use be unconditional. A citizen of a municipality to which water has been brought by a person or corporation which, as agent of the government, has exercised the power of eminent domain, can demand water only on payment of the established rate, and on compliance with reasonable rules and regulations.
And while the court will hold the use private where it appears that the government or public cannot have any interest in it, the legislature, in determining the expediency of declaring a use public, may no doubt properly *305 take into consideration all the advantages to follow from such action; as the advancement of agriculture, the encouragement of mining and the arts, and the general though indirect benefits derived to the people at large from the dedication.
It may be that, under the physical conditions existing in some portions of the state, irrigation is not, theoretically, a “natural want,”—in the sense that living creatures cannot exist without it. But its importance as a means of producing food from the soil- makes it less necessary, in a scarcely appreciable degree, than the use of water by drinking it. The government would seem to have not only a distant and consequential, but a direct interest in the use,—therefore a public use.
The words “ farming neighborhoods” are somewhat indefinite; the idea sought to be conveyed by them is more readily conceived than put into accurate language. Of course, “farming neighborhood” implies more than one farm; but it would be difficult to say that any certain number is essential to constitute such a neighborhood. The vicinage may be nearer or more distant, reference being had to the populousness or sparseness of population of the surrounding country; but the farmers must be so near to each other—relatively to the surrounding settlers — as to make what in popular parlance is known as a “ farming neighborhood.”
A very exact definition of the word is not, however, of paramount importance. The main purpose of the statutes is to provide a mode by which the state, or its agent, may conduct water to arable lands where irrigation is a necessity, on payment of due compensation to those from whom the water is diverted.
The same agent of the state may take water to more-than one farming neighborhood.
It must always be borne in mind that under the codes no man (or set of men) can take another’s property for his own exclusive use.
*306 Whoever attempts to condemn the private right must be prepared to furnish (to the extent of the water he consumes and pays for) every individual of the community or communities, farming neighborhood or farming neighborhoods, to which he conducts it, the consumers being required to pay reasonable rates and being subjected to reasonable regulations. And whether the quantity sought to be condemned is reasonably necessary to supply the public use in a Neighborhood or neighborhoods must be determined by the court in which the proceedings are brought for condemnation of the private right.
In proceedings brought to secure the appropriation of private property to a public use, as in all other legal proceedings, a pretense cannot be set up as a fact,—a sham for a reality. The facts, it must be presumed, will always be fairly determined in each particular case.
Of course, in each case, the question whether the use to which, by statute, the water is to be devoted is a public use is a judicial question; but the rule is that the courts hold it to be such whenever the legislature has declared it to be public, unless it clearly appears that it is only private, and that the attempt to take it is therefore a violation of the constitution. From what is said above no inference is to be drawn as to the exact limits in every respect of the legislative power to declare a use public. We are only called on to say that sections of the codes which provide for taking water from riparian proprietors (on due compensation) to supply “farming neighborhoods ” are constitutional and valid. Whether, in any supposable instance, the public has such interest in a use which can be directly enjoyed only by an individual for his profit, and without any concomitant duty from him to the public, as that the government may be justified in employing the •eminent-domain power for the use, as for a public use, is a question somewhat startling, but which is not involved in-the decision of the present action. In case further legislation shall be *307 deemed expedient for the distribution of waters to public uses, we leave its validity to be determined after its enactment, if its invalidity shall then he asserted.
The Civil Code authorizes any person, for purposes useful to himself alone or for the benefit of himself and others, to divert the waters of a stream, the rights of riparian proprietors not being affected.
The claim of respondent is, that under the provisions of the code, any person may divert all the waters of a stream from the lower lands, conduct them to a distant place beyond the water-shed, and, whatever the additional loss by seepage and evaporation caused by a change of the channel, apply them either to his own purposes or sell them to others, the only conditions being that he shall appropriate them in the manner prescribed by the code, and t' 't they shall be used for an object beneficial to somebody. (Civ. Code, sec. 1411.)
It may be intimated that the court should avoid too narrow a view of the important question involved. It may be suggested that judges in this state should rise to the appreciation of the fact that the physical conditions here existing require an “ appropriator ” to be authorized to deprive, without indemnification, all the lower riparian proprietors, however numerous, on the course of an innavigable stream, of every natural advantage conferred on their lands by the running water. A “ public policy” has been appealed to, which has not found its expression in the statutes of the state, but rests apparently on the political maxim, “The greatest good to the greatest number”; on the claim that, by permitting such deprivation of the enjoyment of the stream by the riparian proprietors, more persons or a larger extent of territory will be benefited by the waters. The proposition is simply that, by imperative necessity, the right to take or appropriate water should be held paramount to every other right with which it may come in conflict.
But the policy of the state is not created by the judicial *308 department, although the judicial department may be called upon at times to declare it; it can be ascertained only by reference to the constitution and laws passed under it, or, which is the same thing, to the principles-underlying and recognized by the constitution and laws.
The contest here is between persons who, as in every other litigation, may be said indirectly to represent other persons or classes of persons having interests like those of the respective parties, since the decision in this case may establish a rule which shall determine the rights of other persons holding positions, relatively to each other, like those of the plaintiffs and defendant herein. Even if the greater number whom it is assumed will be benefited by making the interests of non-riparian takers or appropriators paramount shall also be assumed to constitute “the public,"—■■while riparian proprietors, however numerous, shall be treated merely as individuals having interests adverse to the public,—this considera-" tion, if it should ever have weight with judicial tribunals, should have weight only in very doubtful cases. As was said by Lewis, C. J., in Vansickle v. Haines, “That the interests of the public should receive a more favorable consideration than those of any individual, or that the legal rights of the humblest person in the state should be sacrificed to the weal of the many, is a doctrine which it is to be hoped will never receive sanction from the tribunals of this country. The public is in nothing more interested than in scrupulously protecting each individual citizen in every right guaranteed to him by the law, and in sacrificing none, not even the most trivial, to further its own interests." (7 Nev. 259.)
If the law is settled, we cannot override the established rule to secure some conjectural advantage to a greater number. If, however, we were permitted to do this, the inquiry would still remain whether the recognition of a doctrine of appropriation (such as is contended for by respondent) would secure the greatest good to the greatest *309 number. Observe, if that be the true rule, the appropriator does not necessarily act as the agent of the state employing the power of eminent domain for the benefit of the public, but by his appropriation makes the running water his own, subject only to the trust that he shall employ it for some useful purpose. It would hardly be contended that while he continues to use it for a useful purpose a statute would be valid which should take it from him, without indemnification, under a pretext of regulating the “ common use ” of the. water more profitably, or of providing for its distribution so as to benefit a greater number of persons. He would have a vested right to the use of the water, although the riparian proprietors would have none. If, indeed, one who has appropriated the water of a stream since the adoption of the present constitution has appropriated it “for sale, rental, or distribution” to others, the rates he may charge consumers must be fixed by local authority. (Const., art. 14, sec. 1.) But if he shall consume the water himself, one may thus, for his own benefit, arbitrarily deprive many of an advantage, which, whether technically private property or not, is of great value, and thus secure to himself that which, by every definition, is a species of private property in him. Riparian lands are irrigated naturally by the waters percolating through the soil and dissolving its fertilizing properties. This is sufficiently apparent from the consequences which ordinarily follow from a continual cessation of the flow of a stream. If, in accordance with the law, such lands may be deprived of the natural irrigation without compensation to the owners, we must so hold; but we fail to discover the principles of “public policy” which are of themselves of paramount authority and demand that the law shall bo so declared. In our opinion, it does not require a prophetic vision to anticipate that the adoption of the rule, so called, of “ appropriation ” would result in time in a monopoly of all the waters of the state by comparatively *310 few individuals, or combinations of individuals controlling aggregated capital, who could either apply the water to purposes useful to themselves, or sell it to those from whom they had taken it away, as well as to others. Whether the fact that the power of fixing rates would be in the supervisors, etc., would be a sufficient guaranty against over-charges would remain to be tested by experience.- Whatever the rule laid down, a monopoly or concentration of the waters in a few hands may occur in the future. But surely it is not requiring too much to demand that the owners of lands shall be compensated for the natural advantages of which they are to be deprived.
It is admitted that a single riparian proprietor would stand on the same footing as one not such. But the concession would still leave the rule in force, “First come first served."
It has been assumed that there is no medium between the rule contended for and what has been said to be the rule of the common law, which requires that the stream shall flow “undiminished in quantity" past the lands of all the riparian proprietors. And it has sometimes been gravely argued that, unless the doctrine of appropriation shall prevail, the owner of lands near the mouth of a stream may not only fail to use the waters himself, but will have power to refuse to permit any other person to' employ them.
We have already said that the right to the water of the riparian proprietor may be taken for a public use, on due compensation to such proprietor. And it will be noted (since the defendant is not a riparian proprietor unless made such by the mere fact of its appropriation) that the exigencies of the present case do not imperatively demand that we shall here determine the respective rights of riparian owners as between themselves. But even if the defendant is to be treated as a riparian proprietor with reference to the specific tract in which *311 is the head of its canal, we entertain no doubt, upon principles of the common law, as applied to the conditions here existing, that each riparian proprietor is entitled to a reasonable use of the water for irrigation. This statement has its bearing on the alleged public policy, which, it is claimed, should control when the alternative is presented' between “ appropriation ” and the non-use for irrigation, or like purposes, by any person. What is a reasonable use by a riparian occupant—reference being had to the use required by the others — must depend upon the circumstances of each particular case. This cause was not tried on the theory that defendant was a riparian owner. There is no pretense that the water diverted was necessary for, or was used for, the reasonable irrigation of the specific tract at the head of defendant’s canal.
Counsel do not seem to agree as to the nature and pervading force of the “public policy” relied on. While on the one hand it has been suggested that policy demands the recognition of the doctrine of “appropriation,” so called (a doctrine which would give to the prior appropriator the right to divert, without compensation, all the waters flowing to inferior riparian owners), throughout the state, counsel appearing as amici curise urge that different public policies obtain in different portions of the state. In view of this assumed fact, it is said it should be held that the streams in the more arid portions of California may be entirely diverted by the prior appropriator, as against those below, and that the common-law rights of riparian proprietors should prevail in the regions in which the climate more nearly resembles that of other states where the common-law rule is enforced. The aridity of the soil and air being made the test, the greater the aridity the greater the injury done to the riparian proprietors below by the entire diversion of the stream, and the greater the need of the riparian proprietor the stronger the reason for depriving him of *312 the water. It would hardly be a satisfactory reason for depriving riparian lands of all benefit from the flow, that they would thereby become utterly unfit for cultivation or pasturage, while much of the water diverted must necessarily be dissipated. No precise line of separation between the regions so characterized is pointed out, and the attempted classification is itself somewhat uncertain and indefinite. It would seem there could be no doubt that the law, derived from the same sources, is the same everywhere in California. Were the theory of counsel accepted, would the courts take judicial notice of the physical conditions, in an undefined district, which would compel the adoption of one rule rather than the other? Or would the matter be submitted to the trial court or a jury, upon evidence, to be determined as a question of fact? If the theory were accepted, parties to a litigation would be subjected to one or another law, as it might be deemed by court or jury, in the particular case, that it was for the interest of the neighborhood (or large “region,” as the case might be) that the rights of the parties should be settled by the one law or the other. Perhaps, too, the law with respect to appropriators and bank-owners on the same stream would vary with the changing seasons. And if the issue as to the applicability of one law or another were submitted as a question of fact, two different laws might obtain and determine the rights of parties in different suits, as the evidence adduced with respect to physical conditions of the “region” should bring home to the minds of the triers one conviction or another. Certainly, a judgment in a particular case (if the question would be one of fact) would not be binding upon all the residents of the region, nor determine what law prevailed therein. We can conceive of no “public policy” which should compel us to abandon the rights of the citizen to the whim or caprice, or to the deliberate and honest judgment, of the arbiter in each separate case. Whatever is the gen *313 eral law bearing on the subject, it is the same everywhere within the limits of the state. It is for the court to apply, or to direct a jury to apply, the appropriate rule to the facts proved by the evidence bearing upon the issues made by the pleadings, but neither court nor jury can say that it is expedient to declare that a law shall be operative in one portion of the state which differs from the law in other portions, or to decide that there is no general law bearing on the subject.
IV. By the law of Mexico the running waters of California were not dedicated to the common use of all the inhabitants in such sense that they could not be deprived of the common use.
We have been warned lest in approaching the subject we shall assume that, in the very nature of things, running waters are inseparably connected with the riparian lands. It may be conceded that if riparian owners have any right in the waters (or in the lands themselves) it is such as is created or recognized by the law of the land. It is at least equally true, however, that every inhabitant of a state or district does not possess a potential right, inherent in his habitancy, to divert so much of the waters of a stream as he may have occasion to employ. The whole matter depends upon the law of the country, written or unwritten.
Counsel for respondent announce the proposition: “The fundamental principle upon which all the laws of the former governments of this territory upon this subject (waters and their uses) were based, will be found to be that the flowing waters of the streams and rivers of the country were dedicated to the common use of the inhabitants, subject to that legislative control which is the equivalent of the exercise of that legislative power which we know as the police power of the state.”
We understand this to mean that the “inhabitants” of the territory, or at least the occupants of lands in each valley or watershed capable of irrigation from a stream *314 flowing in it, had under the Mexican law a vested interest in the common use for irrigation and like purposes to which the waters were “ dedicated,” which could not be taken away by the legislative power; that the dedication continues to the present hour; that the state of California has no power to restrict the use to riparian proprietors; that the statute of 1850 adopting the common law “ as the rule of decision” is not to be construed as an attempt so to restrict the use, and if it must be thus construed, it is invalid to that extent, since the power of the state is limited to the mere regulation of the common use.
In support of the proposition above recited, counsel refer to New Orleans v. United States, 10 Pet. 662.
In the year 1717 a charter was issued by the king of France to a corporation styled the Western Company, whereby were granted to the company the lands, coasts, harbors, and islands in Louisiana. Under its auspices the ground where the city of New Orleans now stands was selected as the place for the principal settlement of the province. In 1724 and 1728 maps of the town were made, on which a space on the margin of the Mississippi was designated as a quay. This space was continually used for the purposes to which it was devoted. These, with other circumstances, were held proof of a dedication to the public, in New Orleans v. United States, supra. The ease is in accord with established principles, both of the civil and common law.
It may be conceded that, when under the former gov-eminent property was dedicated to the public use, either by a private person or the nation, the people comprising the public and their successors acquired a vested interest —of which they cannot arbitrarily be deprived — to the extent of the common use to which the property was dedicated. But it would seem to be difficult to derive the right to the exclusive use of the whole or portions of the waters of a stream from their dedication to the com *315 mon use of all. We shall see that the laws of Mexico authorized the diversion of waters for the exclusive benefit of corporations and individuals under some circumstances. The provisions of our Civil Code authorize such diversions for exclusive use. It cannot be successfully argued that laws authorizing such exclusive appropriations are less an infringement of the “ common use ” to which rivers were devoted than a law limiting the use of the waters to riparian proprietors.
And this leads to an inquiry as to the nature of the common use of running waters under the Mexican law.
In the Institutes of Justinian it is declared, concerning things: “ They are the property of some one or no one.” (“Vel in nostro patrimonio vel extra nostrum patrimoniurn.”) “ Some are, by natural right, common to all; some are public; some are of corporate bodies (cities— munieipia); and some belong to no one. Many are the property of individuals, acquired in divers ways,” etc. (Lib. 2, tit. 1.) “The things which by natural law are common to all are these: air, running water (aqua profluens), the sea, and as a consequence, the shores of the sea.” (Id., sec. 1.) “ Flumina autem omnia et portuspiAlica sunt” (Id., sec. 2.) The Roman law distinguished between res-communes and res-publicee. The sea was included amongst the former, the rivers amongst the latter. (Halleck’s International Law, p. 147, notes.) All perennial rivers were public. (Dig. 43, 12, 3.) Such rivers were of the class of things “publico usui destinatee,” like ports and roads. (Moyle's Ed. Insts., p. 184, note.)
The same distinction is recognized by Spanish writers. “ Bienes comunes ” being those which, not being as to property of any, pertain to all as to their use,—as the air, rain-water, the sea and its beaches; “bienes públicos,” those which, as to property, pertain to a people or nation, and, as to their use, to all the individuals of the territory (or district),—such as rivers, shores, ports, and public roads. (Escriche; see also the word “Cosa.”) In Feb *316 rero Novísimo cosas comunes are defined as those “ qui sirven á los hombres y demas vivientes, como el aire, el agua llovediza, el mar y sus riberas.” (T. 1, lib. 2, tit. 1.) Both writers cite law 3, tit. 28, pt. 3. In Hall’s version of the law referred to, there are included in the things belonging, as to property, to none, and as to use to all living creatures, “ air, rain, water, the sea and its shores.” (Hall’s Hex. Law, 447.) This is probably a mistake of the printer. The words of the law are “ el ayre, e el mar, las aguas de la lluvia.” Lord Denman remarks that Fleta, enumerating res-communes, omits “ aqua profluens.” (Mason v. Hill, 5 Barn. & Adol. 23.)
(By the Mexican law the property in rivers pertained to the nation, the use to the inhabitants. The nature of this use will be considered hereafter.
The modern doctrine as to the sea-shores, even in countries where the civil law prevails, seems to be that they belong to the state. (Pollard’s Lessee v. Hagan, 3 How. 212.) It has been suggested that the claim of ownership by the English crown to the ocean beaches is the remnant of the broader claim once asserted to the narrow seas adjoining the British Islands. (Angelí on Watercourses.) But the modern doctrine which attaches to the sovereignty the property in the sea-shores seems to be derived from Oelsus. (Dig. 4, 3, 8, 3; Moyle’s Insts., p. 183.) By the Mexican law the shores of the sea include the space covered by the flux and reflux of the waters at their greatest altitude, whether in winter or summer. Eseriehe calls the playa “la ribera del mar,” and remarks: “ The laws of the Partidas place the playa amongst the common things which all men can use, but it cannot be intended to treat it as independent of the nation to which it may pertain.” And under the head “ribera” he says: “The shores of the sea pertain as to property to the nation of whose territory they are a part, and as to -use to all,” etc. It is unnecessary, however, here to declare whether by the Mexican law the ocean *317 beaches were proprietas nullius, or pertained as to property to the nation.
Whatever the common use to which rivers, harbors, and public roads were subjected, the enjoyment of such use would exclude the notion of an exclusive use or occupation which must interfere with a like use by others. “Communis omnium est harum rerum usus ad quern natura comparatse sunt, turn siquid earum rerum per naturam occupari potest, id eatenus occupantis fit, quatcnus ea oecupatione usus ille promiscuas non bed i tur.” The common use of rivers would seem to be such as all could enjoy who had access to them as rivers. Vinnius says: “ Unicuique licet in ilumine publico navigare et piscari”; and adds, with respect to running water generally: “Aqua profluens ad lavandum et potandum unicuique jure naturali concessa.” (Cited by Lord Denman in Mason v. Hill, 5 Barn. & Adol. 1.) In Mason v. Hill, the learned judge speaks of a distinction mentioned by the civilians between a river and its waters; the former being as it were a perpetual body, and under the dominion of those in whose territory it is contained; the latter continually changing and incapable, “whilst it is there,” of becoming the subject of property. He adds: “It seems that the Boman law considered running water not as a bonum vacans in which any might acquire a property, but as public or common, in this sense only, that all might drink it or apply it to the necessary purposes of supporting life; and that no one had any property in the water itself, except in that particular portion which he might have abstracted from the stream and of which he had the possession, and during the time of such possession only.”
The common use of the waters, it would seem, existed only while they continued to flow in and constituted a portion of the river. But under the Mexican law an exclusive use of parts or the whole of the waters of a river might be legally acquired by individuals.
*318 The oceans “propter immensitatem” may be used to their fullest benefit “without any exclusive appropriation, and such appropriation is not necessary for the purposes of society or of advantage to mankind. “Moreover, the use of the sea may be said to be matter of necessity to all those nations who have any part of their territories bounded by it; and as no nation can possibly assert that it is unable to enjoy the fullest use of the sea without the exclusion of others, so no nation can have any just ground for excluding others from an advantage which all may enjoy, together with equally full utility to each. This legal doctrine is thus admirably summed up by a German civilian: ‘The great sea., is a thing, the use of which is inexhaustible; consequently, as no one can acquire the dominion of things, the utility of which is unbounded and inexhaustible, no one (even were it possible in fact) can subject the great sea to his dominion without violating natural law. And the same must be understood of several nations, who cannot, for the same reasons, divide the dominion of the great seas among them. Consequently, no nation can, without infringement of natural law, subject to its dominion the great sea.’” (Bowyer’s Com. on the Modern Civil Law, p. 64, citing the Pandects, Grotius, Puffendorf, Bynkershoek, Wolf’s Jus. Gent.)
The same writer says: “Both Grotius and Puffendorf deduce the appropriation of things which must probably have been common to all men, from the very constitution and organic rules and necessities of the social state, as well as from the objects for the furtherance of which that state is intended. But it follows from the same principles that those things, the exclusive appropriation of which, either to a portion of mankind or to certain individuals and purposes, is unnecessary for the objects of the social state (that is, for the furtherance of the welfare of mankind), must remain by natural law common to all men. Thus air and light cannot be brought under the power of any one person.”
*319 “ Upon these principles, running waters are held by the Homan juris-consulti to be common to all men. But it also follows that this decision does not apply to waters, the appropriation of which (to the exclusion of the common enjoyment) is necessary for a certain purpose, as water included in a pipe or other vessel for certain uses. The common right to the use of running water therefore applies only to those cases where the quantity of water is so great that its entire exclusive appropriation is not necessary, having regard to the general objects of the institution of property: Grotius, Droit de la Guerre; Puffendorf, Droit de la Nature.” (Bowyer, p. 61.) “ Thus running water is capable, indeed, of a qualified appropriation as property, but subject to a common right by natural law where it is capable of being fully enjoyed without exclusive possession.” (Bowyer, p. 62.)
Vinnius, in his Commentary on the Institutes above referred to, says those things are common which by nature are devoted to the use of all, and which in “ nullius adhuc ditionein aut dominium pervenerunt,” which seems to imply that some things, hitherto common, may become the property of an individual.
And this is true with reference to things the ultimate property of which is in the state, the use of which is common until the exigencies of the social state require that they shall be subject to the exclusive use of individuals. Inasmuch, however, as the property is in the nation, such exclusive use can be acquired only with the nation’s consent.
By the Mexican Civil Code of 1870, it is provided: “ The property in waters which pertains to the state does not prejudice the rights which corporations or private individuals may have acquired over them by legitimate title, according to what is established in the special laws respecting public property. The exercise of property in waters is subject to what is provided in the following articles.” (Art. 1066.) In Guerra’s El Codigo Civil, in *320 Forma Didáctica, the word “private” is inserted after the word “ property,” so as to make the last sentence of the article read: “El ejercicio de la propiedad privada de las aguas, esta sujeto,” etc. If, as is suggested by counsel, the presumption is, that the provisions of the codo are declaratory of the pre-existing law, the right which could be acquired under the laws, to the separate use of the portions of a stream, constituted an exclusive usufruct of the nature of private property, which did not and could not co-exist with a common use of such waters by all. As we have seen, running water is capable of appropriation as private property, independent of any common use, where the quantity of water is so small as to be incapable of being fully enjoyed without exclusive possession. The exclusive appropriation is put in opposition to the common use. (Bowyer, supra.) Article 789 of the Civil Code defines private property: “All things, the dominion of which pertains legally to private persons, and those which cannot be used without the consent of the owner, are private property.”
The Mexican government prohibited any diversion or obstruction of the waters of a river, by riparian proprietors or others, which should interfere with navigation. Escriche says: “ No puede ningún particular hacer en los ríos ni en sus riberas casa ó otro edificio que embarace la navegación; .... porque la utilidad de to-dos los hombres no se ha de impedir por la de uno solo,” etc. It has been said that rivers may be used for purposes of navigation, not only by the denizens of the land where they are found, but by strangers, unless some municipal ordinance, law, or custom confines their use to a certain class of persons. (Febrero.) This of course implies that the sovereign may limit the right of navigation to particular classes. “Notwithstanding the banks of rivers are as to dominion or ownership of those whose lands adjoin, all navigators may use them, by tying their vessels to the trees growing there, landing their mer *321 chandise thereon,” etc. General Halleck says that, by the Roman law, the right to navigate rivers carried with it the right to moor ships to the banks. (International Law, supra.)
Thus it was the policy of Mexico to foster and protect navigation; the rivers naturally adapted to the passage of water-craft were devoted to the common use for purposes of navigation. It would seem to be in the power of the sovereign (except so far as the power is limited by the constitution of government) to authorize such diversions as shall interfere with navigation. It was never doubted that an act of Parliament would operate to extinguish any public right to passage. (Woolrych’s Law of Waters, p. 289.) While, however, a river remained a navigable river, the navigation was, by the civil law, common to all, unless the privilege was limited to a class.
Interference with the appropriate common use of in-navigable rivers was not thus absolutely prohibited by the Mexican law. The common use of the waters of such rivers by all who could legally gain access to them, continued only while the waters legally flowed in their natural channel. And the power of determining whether the public good—the purposes for which the social state exists—demands that the use of the whole or portions of the waters should pass as an exclusive right to one or a class of individuals remained in the sovereign. Whether the power is an incident to the ultimate domain or right of disposing of the property of the state, or is to be referred to some other source or principle, the Mexican government employed the power of permitting the diversion of waters from innavigable rivers by those not riparian proprietors, upon such terms and conditions, and with such limitations, as were established by law, or by-usages and customs which had the force of law. That government saw fit to concede private rights to the exclusive use of the waters of such streams. It had power *322 to do this even if the consequence should be the entire deprivation of the common use.
It may be said that the Mexican laws which provided for such concessions to individuals or corporations did not provide for grants to such persons, but were themselves a recognition of a right in all to a use of the waters. But a system which provided for the mode of acquisition of private, separate, and exclusive rights, by individuals or corporations, cannot be said to be merely in regulation of a common use. The common right of passage over a public road, or of navigation of a river, may be regulated by laws which facilitate the general enjoyment of the common use. But under pretense of exercising the common use, where it exists, no one can interfere with its enjoyment by others. Article 803 of the code of 1870—except perhaps with reference to some of the penalties prescribed declaratory of the preexisting law—provides: “ Those who obstruct the common use of public property are subject to the established penalties, to pay all damage and injury caused, and to suffer the loss of the works they shall have made.”
Those who appropriated and diverted the waters of an innavigable river in accordance with the laws obstructed pro tanto its common use. Nevertheless, they acquired an exclusive right to the use of that which they diverted, because, if they complied with the established conditions, their rights were acquired under and in accordance with law., and the waters they diverted were no longer portions <of the waters of a river, or subject to the common use.
No one .of such .had any right in or to the water until .he had complied -with the conditions which authorized him to appropriate it. Every one of such who complied with the conditions, and appropriated water, acquired a vested .right in such water, at least while he continued to use at, except in the single-case where he acquired a right merely conditional,, under'.laws which reserved the power *323 in the agents of the state or municipality to deprive him of it without indemnification. It may be conceded that one who had acquired the right to the exclusive use of a portion of the waters of a river under the Mexican regime could not be deprived of his right by a law of California. But can it be said that all the inhabitants of the state, or of a valley through which a stream flows, have such a vested right in the use of the waters which some of them (on performance of the conditions prescribed by Mexican law) might have appropriated, but never did appropriate?—this on the theory that the waters had been dedicated to the common use of all. It would be a dedication never accepted by those to whom it was made, and a dedication to a common use which could never be enjoyed in common.
Those who had not appropriated waters iii the mode prescribed had no right or property in the water or its use, of which they would be deprived by subsequent legislation conferring the use of the waters on riparian proprietors alone. And it would seem very clear that those who actually appropriated water, in compliance with the conditions prescribed, acquired a proprietary interest of which they could not be deprived—at least while they continued its use—except on sufficient indemnification. It cannot be presumed that, under a constitution which declares, in as distinct terms as does our own, that private property shall not be taken, except on due compensation, the legislature attempted to authorize an arbitrary deprivation of property rights acquired by expenditures invited by the laws themselves. At common law if a navigable river should happen to change its course, the right of navigation extends wheresoever the channel should run. (Woolrych, 288.) And by the Civil Code of 1870 rivers and their beds (álveos) are declared to be public property of common use. (Sec. 802.) But the property of the nation in the space subjacent to the river ceases when that space ceases to be *324 the bed. “When a river varies its course, the owners of the fields or estates newly covered by the waters lose the space which the river occupies, and the riparian proprietor of the abandoned bed acquires the part in front of his land to the middle of the bed,” etc. (Civil Code 1870, art. 897; see also Escriche, Aguas and Rio.) “The islands which are formed in rivers not navigable or flotable, belong to the proprietors of both banks proportion-ably with the extension of the front of each estate along the river, drawing a dividing line through the middle of the bed,” (Art. 900.)
Thus the property of the nation is in the river and its bed, while it is the bed of the river; the common use continues while the water is the water of a river. But a private right to the exclusive use of the waters could be acquired under the Mexican law by prescription, or on compliance with the established conditions; and the general property of the nation in running waters did not prejudice such special private rights.
Conceding the provisions of the Civil Codes of 1870 and 1884 to be declaratory of the law as it existed when California was ceded to the United States, they do not confer nor recognize any inherent vested right, enforceable in the courts, in others than riparian proprietors, to the use of any portion of the waters of a stream, nor any right, except as to those who actually appropriate waters in the manner and on the conditions prescribed by the laws. It may be that the Mexican system implies a recognition of an imperfect obligation or moral duty on the part of the government to provide for the distribution of the waters in such manner as to encourage the settlement of the country, develop manufactures, and benefit agriculture. In this view it would seem that the laws were inspired with a liberal spirit, and were well calculated to advance those objects.
By the codes the owner of an estate in which there is a natural spring may use or dispose of its waters, subject
*325 only to condemnation for public use on compensation to the owner. (Art. 1056 of, the code of 1870.) Such was the law previously, —the spring was his as part of his land. (Escriche, Aguas.) By article 1066 of the same code the property of the state does not prejudice the rights over waters acquired by individuals or corporations, “by legitimate title, according to what is established by the special laws.” That article declares that the exercise of private property in waters is subject to what is provided in articles 1067, 1068, and 1069. The two first of these prohibit any diversion which shall interfere with navigation. Article 1069 declares: “The owner (el propietario) of water, whatever may be his title, cannot impede the use (el abasto) that may be necessary for the persons or cattle of a possession or rural estate, nor oppose the construction of indispensable works to satisfy this necessity in the manner least injurious to the owner, but he shall have a right to indemnification” (“ por los perjuicios que por tal motivo se le causen ”—Guerra), “ save that the inhabitants shall have acquired the use of the water by prescription or other legal title. ”
Article 966 of the code of 1884 is a substitute for articles 1067-1069 of the code of 1870. In that article it is said: “He who, in conformity with the preceding article” (he who has acquired a private property to waters, by legitimate title, according to what is established in the special laws ?), “ may be using the waters of a river cannot impede,” etc. Article 1073 of the code of 1870 is: “Every one wh'o wishes to use the water of which he can dispose has a right to cause it to pass through intermediate grounds, with the obligation of indemnifying their owners, as well also as those who own the lower lands on or through which the waters may filter or fall.” (“Asi como también á los de las predias inferiores sobre que se filtren ó caigan las aguas.”) We understand the last class to be those whose lands are injured by the water after it has been diverted.
*326 The article treats of a legal servitude which without agreement or prescription, hut simply as a consequence of the respective positions of the estates (art. 1056), is imposed on lands situated between the river and the tract or place to which the water is conducted. It does not purport to give the absolute right, without regard to the conditions provided by laws, or administrative regulations under the laws, to divert waters of a river by one separated from it by other lands, nor define the mode by which rights thus to divert may be gained.
The laws of Mexico relating to pueblos conferred on the town authorities the power of distributing, to the common lands and to its inhabitants, the waters of an innavigable river on which the pueblo was situated. It is not necessary to say that the property of the nation in the river, as such, was transferred to the pueblo, but it would seem that a species of right to the use of all its waters necessary to supply the domestic wants of the pobladores, the irrigable lands and the mills and manufactories within the general limits, was vested in the pueblo authorities, subject to the trust of distributing them for the benefit of the settlers.
A translation of the plan of Pitic is annexed to Dwinelle’s Colonial History of San Francisco. (Addendum, No. 7.) The original is not before us. Whether the plan of Pitic is or is not a scheme in all. respects applicable to every pueblo created after the date, November 14, 1789 (as is claimed by counsel), it may be conceded the provisions therein contained were, in substance, those having force in the pueblos established in California while it was part of the territory of Mexico.
The plan authorized a commissioner, after the measurement of the exterior lines of the four leagues, to set apart the ejidos, poprios, etc:, and to distribute the remaining lands to the settlers in separate tracts.
The nineteenth and twentieth sections of the plan read:—
*327 “ Nineteenth—The advantage of irrigation being the principal means of fertilizing the lands, and the most conducive to the increase of the settlement, the commissioner shall take particular care to distribute the waters so that all the land that may be irrigable might partake of them, especially at the seasons of spring and summer, when they are most necessary to the cultivated land in order to insure the crops, for which purpose, availing himself of skillful or intelligent persons, he shall divide the territory into districts (partidos) or hereditaments, marking out to each one a trench or ditch, starting from the main source, with the quantity of water which might be regulated as sufficient for its irrigation, at the said periods and at the other seasons of the year that they may need them, by which means each settler shall know the trench or ditch by which his hereditament shall be irrigated; and that he cannot and shall not have the power to take the water of another, nor in a greater quantity than that which may fall to his share, for which purpose and that it may not increase in injury to the owners situated on the land beyond or still lower, it shall be proper for the trenches or partitions to be constructed in the main ditch made of lime and stone at the cost of the settlers themselves.
“ Twentieth — In order that these (the settlers) might enjoy with equity and justice the benefit of the waters in proportion to the need of their respective crops, there shall be named annually by the ayuntamiento one alcalde (or mandador) for each trench, to whose charge shall fall the care of distributing them in the estates (heredades) comprised in the ‘ partido ’ or hereditament, which shall be irrigated by them in proportion to their need for this benefit, designating by a list which he shall make out the hours of day and night at which each owner (here-dado) shall irrigate his lands sown with grain; and in order that by the carelessness or indolence of the owners (dueños), those (the lands) that may need them shall not *328 remain without irrigation, nor the crops be lost, whereby independent of the private injury may also result that of the public and community, produced by the want of provisions and supplies, it shall also come within the duty of the alcalde, or mandador, for each trench to have a servant (peon) or day laborer, knowing the hour of the day or night designated for the irrigation of each tract of land or corn-field, who, in default of its owner, shall take care to irrigate it; the just price of his labor, which shall be caused to be paid to him by the owner of the land or estate (heredad) irrigated, to be thereafter regulated by the commissioner or by the justice.”
In Hart v. Burnett, 15 Cal. 530, it was held that the pueblo had a “certain right or title” to-the lands within its general limits, notwithstanding the fact that the Mexican government retained the power to make grants within those limits; that the pueblo authorities were more than mere agents of the government to dispose of the lands as public lands, but the pueblo itself had a vested interest in the lands, and that the portions of such lands not set aside or dedicated to common uses, or for special purposes, could be granted in lots by the municipal officers to private persons in full ownership; that the city of San Francisco succeeded to the right or title of the pueblo, and that the municipal lands to which it thus succeeded were held in trust for the public use of the city, and were not subject to seizure and sale under execution issued on a judgment against the city; that the property and trusts were public and municipal in their nature, were within the supervision and control of the state sovereignty, and the federal government had no such supervision or control; that the act of the state legislature of March, 1858, confirming the so-called Van Ness Ordinance, was a legal and proper exercise of this sovereign power.
By analogy and in conformity with the principles of that decision, we hold the pueblos had a species of prop *329 erty in the flowing waters within their limits, or “ a certain right or title ” in their use, in trust to be distributed to the common lands, and to the lands originally set apart to the settlers, or subsequently granted by the municipal authorities. It may be conceded that such authorities were not authorized to make concessions to individuals of the perpetual and exclusive use of portions of the waters, without reference to the needs of the other inhabitants; or that such concessions would be an abuse of the trust. But they had a species of right or title in the waters and their use, subject to the public trust of continuously distributing the use in just proportion. The trust is within the supervision and control of the state. Thus the legislature has provided for the mode and manner in which shall be exercised the trust of distributing the waters by the city, the successor of the pueblo of Los Angeles. The inhabitants of the former pueblo who were using water when this territory was transferred to the United States had not acquired a vested right to any particular quantity of water. And the occupants of lands within the city, the pueblo’s successor, are beneficiaries only to the extent that they are entitled to the use of such water and at such times as accords with the laws regulating the public and municipal trust.
Each pueblo was quasi a public corporation. By the scheme of the Mexican law it was treated as an entity, or person, having a right as such, and by reason of its title to the four leagues of land, to the use of the waters of the river on which it was situated, while as a political body, it was vested with power, by ordinance, to provide for a distribution of the waters to those for whose benefit the right and power were conferred.
Escriche deduces from law eight, title twenty-eight, and law eighteen, title thirty-two,—partida three,—and from writers basing their opinion on those laws and the Homan laws, that any inhabitant of. a pueblo through which *330 passed an innavigable river might extract a part of its waters, and construct an acequia in order to irrigate his land, or to run his mill, provided he could do so “without prejudice to the common use or destiny which the pueblo shall have given the waters; with the understanding that if the acequia shall cross the land of another, or the crown lands, or the land common to the inhabitants of the pueblo, a license from the private owner, or from the king, or from the town council is indispensable.” (“Bajo el supuesto de que si la acequia hubiese de atravesar suelo ajeno, realengo ó concejil,” etc. Escriche, “Acequia.”)
Thus by virtue of the laws each person having land within the pueblos was permitted to conduct water to it (obtaining the consent of the owners of the lands between his and the river), provided, by so doing he did not violate the municipal ordinances giving destination or distributive use to the waters.
By its terms this permission was-accorded only to the inhabitants of the pueblo, and could be acted on only in such manner as should not interfere with municipal ordinances.
After speaking of springs rising in a man’s land, which are his property, Escriche says: “Waters belong to the public which are not and cannot [thus?] be private property. Such are the waters of rivers which, by themselves, or by accession with others, pursue their course to the ocean.' They may be navigable or not navigable. If navigable no one can avail himself of the waters so as to embarrass or hinder navigation. If not navigable, the owners of the lands through which they pass may use the waters thereof for the utility of their farms or industry, without prejudice to the common use or destiny which the pueblos on their course shall have given them, and with the modifications provided in the laws, orders, and decrees which are spoken of under the word “acequia.” (“Aguas”—“De las aguas que pertenecen al publico.”)
*331 And in treating of “ waters which pass by the side or through an estate,” the same writer says: “ The use of waters of which no one can avail himself without a license from the authority is to be regulated (debe arreglarse) by municipal ordinances, or by the usages and customs of the country.” (Los usos y costumbres,— general and long-continued practices which have acquired the force of law.) “ But in default of ordinances and customs, equity, and the interests of agriculture, dictate the following rules.” He proceeds: “ The waters of fountains and springs are the property of the owners of the lands on which they rise; .... but as they go out from thence they become running waters, aqua profluens, and pertain like common things (cosas comunes) to the first who occupies them, so far as he has need of them. The first who can occupy them are the owners of the estates which they bathe or cross.” He then treats of the rights of riparian proprietors to the use of the waters as between themselves.
From the foregoing it appears that the riparian proprietor could not appropriate water in such manner as should interfere with the common use or destiny which a pueblo on the stream should have given to the waters; and semble* that the pueblos had a preference or prior right to consume the waters even as against an upper riparian proprietor. The common use here spoken of is the use for the benefit of the community or inhabitants of the pueblo, whose interests as a whole were to be considered in the distribution of the waters by the officers of the pueblo. (Plan of Pitic, sec. 20.) It is not necessary here to decide that the pueblos had the preference above suggested. Nor is it necessary here to speak of the relative rights of two or more municipalities on the same stream. In such case (whatever the standard by which were to be determined the relative rights of the pueblos respectively as to quantity of water), it would seem clear that the municipal regulations of each, with *332 respect to the application and distribution of water, would be of force only within its own boundaries. But there could be no municipal ordinance of a pueblo regulating or distributing the waters of a stream amongst its inhabitants, or other persons, until a pueblo was estab-' lished. We take notice that- no pueblo existed on the watercourse (if any there be) which is the subject of the present controversy. No portion of its waters were therefore dedicated or devoted to the use of the inhabitants of a pueblo by virtue of the laws giving to pueblos the power of distributing waters.
Turning now to the “laws, orders, and decrees,” under the word “ acequia,” to which we are referred by Escriche:-—-
In the instructions of May 15, 1788, to corregidores (magistrates with a species of supervision over matters political and economical in pueblos and districts) and superior (appointed) alcaldes, they were directed, in order to promote the utility of the fields by the use of all the water that could be applied for their benefit, to adopt measures for the construction of acequias from the rivers, draining them in the parts most convenient, without prejudice to their course and to the lower districts, and taking care also to discover subterranean waters in order to use them, “ as well as for flour-mills, fulling mills, and other necessary and convenient machinery for grinding,” etc. (Nov. Recopilacion, tom. 3, tit. 11, lib. 7, law 27, sec. 48; Hall’s Mex. Law, sec. 1402.)
By the royal decree of the 31st of August, 1819, favors were extended to ayuntamientos, communities, companies, and individuals, who, “with the previous corresponding permission of the government” should construct at their own cost ditches or canals for new irrigations, taking water from rivers which afford an abundant supply, or carry much water (caudalosos) collecting at one place the waters of the arroyos or springs, or conducting them from the bosom of a high mountain, etc. The *333 favors extended by the decree are enumerated by Escriche, and consisted in the main of remission of tithes, first-fruits, etc. It is doubtful whether this decree was in force when California passed from under the sway of the Mexican rule. But if so, Escriche adds: “Notwithstanding what has been said, no individual or corporation can withdraw from their source, or on their course, the waters of springs or rivers that from ancient times have irrigated other lands lower down, which cannot be despoiled,” etc.
The last statement is based by the author upon the royal order of 1834, which, as is suggested, was never operative in Mexico. Upon principles recognized by the Mexican law, however, no one could be deprived of a right to the use acquired by prescription to waters actually employed by him, and it would appear also by the Mexican code no owner of water, “whatever his title,” can entirely deprive of water a lower estate. Besides, the decree permitted the construction of ditches for “new irrigations,” and speaks of rivers carrying great quantities of water. We are not prepared to say but that, even where the common law prevails, provision may be made for the storing and distribution of waters, the result of extraordinary floods caused by the melting of the snows, or long-continued and heavy rains in the mountains or near the source of a river, since such an extraordinary freshet would not be the ordinary flow of the stream. However this may be, water could not be diverted — under the decree referred to—by an ayuntamiento, community, company, or individual, not a riparian proprietor, without “the previous corresponding permission of the government.”
Thus the waters of innavigable rivers, while they continued such, were subject to the common use of all who could legally gain access to them for purposes necessary to the support of life, but the Mexican government possessed the power of retaining the waters in their natural *334 channel, or of conceding the exclusive use of portions of them to individuals or corporations, upon such terms and conditions, and with such limitations, as it saw fit to establish by law.
The respondent here is not the successor in interest of an individual or corporation which acquired a property in the exclusive use of waters by compliance with the conditions prescribed by the laws of Mexico, or in accordance with municipal ordinances or regulations, or under any custom of the country. No city or pueblo existed on the alleged stream, and at the trial hereof no evidence was given of any special or general custom with respect to-the particular stream or with respect to all rivers in California. No general custom existed. Moreover, if it had ever existed it would have continued only until abrogated by legislation.
It has sometimes been claimed that, by the modern civil law, the proprietor of land in which is the source of a stream may capture and absolutely control the waters, even after they have flowed beyond his boundaries, in a natural stream. But Lord Kingsdown (in Miner v. Gilmour, 12 Moore’s P. C. 131) said it did not appear that, as to riparian rights, any material distinction exists between the French law (prior to the Code Napoleon) and the English law. Sir James Colvile refused to admit that, by the Dutch-Roman law which governs in the Cape of Good Hope Colony, the riparian right of a lower proprietor would not attach upon water which flowed, in a known and definite channel, beyond the boundaries of the land within, which its fountain arose. (Breda v. Silberbaur, L. R. 3 P. C. 94.) In a very late case before the Privy Council, on appeal from the Supreme Court of the Cape of Good Hope, it was said to be probable, that, by the Dutch-Roman law, the dominion of the owner of the source of a stream was subject, to the rights which the English law recognizes in riparian proprietors to water flowing in a known and definite channel. (Comm’rs of Hoek v. Hugo, L. R. 10 Ap. 345.)
*335 V. Upon the admission of California into the Union, this state became vested with all the rights, sovereignty, and jurisdiction in and over navigable waters, and the soils under them, which were possessed by the original states after the adoption of the constitution of the United States.

Since the admission of California into the Union, the public lands of the United States (except such as have been reserved or purchased for forts, navy-yards, public buildings, etc.) are held as are the lands of private persons, except that they cannot be taxed by the state, nor can the primary disposition of them be interfered with.

Between the transfer of California to the United States, by the treaty of Guadalupe Hidalgo, and the admission of this state into the Union, no territorial government was here established. The purely municipal law of Mexico continued in force within this territory until modified or entirely changed by appropriate authority.
By the treaty, the public property of Mexico passed to the United States. It would seem that the latter accepted the cession of the property and sovereign rights in trust (arising out of the very nature of our government) to hold for the state or states which might be subsequently formed out of the territory. Whether so or not, California was admitted into the Union, “ upon an equal footing" with the original thirteen states, and from that date she became seised of all the rights of sovereignty, jurisdiction, and eminent domain which those states possessed.
When the Revolution took place, the people of each state became themselves sovereign, and in that character held the absolute right to all their navigable waters and the soils under them, subject only to the rights since surrendered by the constitution to the general government. (Martin v. Waddell, 16 Pet. 410.)
The navigable waters and the soils under them were not granted to the United States by any of the original states, but were reserved to the states respectively; and *336 the new states have the same rights, sovereignty, and jurisdiction over this subject as the original states. (Pollard’s Lessee v. Hagan, 3 How. 212.)
The lands of the United States (not reserved or purchased for fortifications, etc.) are held, since the admission of the state into the Union, as are held the lands of private persons, with the exception that they are .not taxable, by reason of the contract to that effect. Of course the state cannot interfere with the primary disposition of such lands by their owners.
September 9, 1850, the act of Congress was approved, admitting the state of California into the Union “on an equal footing with the original states in all respects whatever,” with the conditions that the state should never interfere with the primary disposal of the public lands within its limits, nor tax them, and that the navigable rivers should be public highways as to citizens of all the states. (9 Stats, at Large, p. 453.)
VI. Since if not before the admission of California into the Union, the United States has been the owner of all innavigable streams on the public lands of the United States, ivithin our borders, and of their banks and beds.

A grant of public land of the United States carries with-it the common-law rights to an innavigable stream thereon, unless the waters are expressly or impliedly reserved by the terms of the patent, or of the statute granting the land, or unless they are reserved by the congressional legislation authorizing the patent or other muniment of title.

The original states only retained property in the navigable rivers (subject to their free navigation by the citizens of all the states) and the subjacent soils, because, by the common law which prevailed in those states, innavigable streams were private, and their beds the property of riparian proprietors. By the Mexican law, however, innavigable streams were public property. It might be claimed that, as this property of the Mexican nation in non-navigable rivers and their beds was an incident to *337 the sovereignty, it became vested in the state of California when the state was admitted into the Union. If this were admitted, it would follow that the United States has had no property in innavigable streams, their beds and waters, and all attempts to deraign a title from the United States to waters appropriated on public lands —under the act of Congress of 1866, or otherwise — must fail.
It may be maintained, at least plausibly, that the admission of California into the Union, “on an equal footing with the original states,” of itself operated an immediate transfer of the property in the innavigable rivers to the federal government, so that the property of the state was momentary. However this may be, on the 13th of April, 1850, the legislature of California had passed an act “adopting the common law,” which reads: “The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of the state of California, shall be the rule of decision in all the courts of this state.” (Stats. 1850, p. 219.) The validity of the acts of the first legislature of California, or of rights acquired under them, even prior to the admission of the state, has never been questioned. Certainly, when constitutional, those acts became valid and in operation for every purpose from the date of the admission of the state into the Union.
It is urged that the statute quoted was designed and intended simply to furnish a rule of decision for the courts as to rights vested under other laws. We have endeavored to show that during the Mexican rule “ all the inhabitants” of the territory did not acquire a vested right to the use of all the waters by virtue of their dedication to common use. If such right had vested, the peculiar language of the statute would not have affected the question. If there is any ambiguity, arising out of the use of the words “rule of decision” in the body of the act, we can refer to its title, “An act adopting the common law.” And *338 reading the act, “the common law of England is hereby adopted,” etc., the act did not and could not operate to divest property rights previously acquired by private persons, nor any right of common use fixed by previous dedication.
But while vested rights could not be taken away, yet if the innavigable rivers and their beds belonged to the state when admitted into the Union, the state could grant or surrender them to the riparian proprietors, of whom the United States was one. Giving full force to the propoosition that a grant by the state should be construed more strongly against the grantee, we think in view of the purpose of the act (to adopt the appropriate rules of the common law as determinative rules when not in conflict with the constitutions and statutes), and of the subsequent judicial history of the state, the act of April 13, 1850, should now be held to have operated (at least from the admission into the Union) a transfer or surrender to all riparian proprietors, of the property of the state—if any she had—in innavigable streams and the soils below them.
It has often been held by this court and its predecessors that a grant of a tract of land bounded by a river or creek not navigable conveys the land to the thread of the stream. And from a very early day the courts of this state have considered the United States government as the owner of such running waters on the public lands of the United States, and of their beds. Recognizing the United States as the owner of the lands and waters, and as therefore authorized to permit the occupation or diversion of the waters as distinct from the lands, the state courts have treated the prior appropriator of water on the public lands of the United States as having a better right than a subsequent appropriator, on the theory that the appropriation was allowed or licensed by the United States. It has never been held that the right to appropriate waters on the public lands of the United States *339 was derived directly from the state of California as the owner of innavigable streams and their beds. ■ And since the act of Congress granting or recognizing a property in the waters actually diverted and usefully applied on the public lands of the United States, such rights have always been claimed to be deraigned by private persons under the act of Congress, from the recognition accorded by the act, or from the acquiescence of the general government in previous appropriations made with its presumed' sanction- and approval.
If the United States since the treaty with Mexico has been the owner of the innavigable streams and their beds (in trust for the state or absolutely), or has been the owner thereof as a consequence of the act admitting the state into the Union, or of the state act of 1850, or as a consequence of both those statutes taken together, the-same is true as to other riparian proprietors, at least since the date of the first-named act. They have been recognized as such owners by our courts. Prior and subsequent to the enactments of the Civil Code with respect to appropriations of water, the rights to the use of water by private riparian proprietors, as between' themselves, have repeatedly been judicially determined by reference to the common-law rules on the subject, which—as is said by counsel—differ somewhat from those of the Mexican law.
And if the United States, since the date of the admission of the state, has been the owner of the innavigable streams on its lands, and of the subjacent soils, grants of its lands must be held to carry with them the appropriate common-law use of the waters of the innavigable streams thereon, except where the flowing waters have been reserved from the grant. To hold otherwise would be to hold, not only that the lands of the United States are not taxable, and that the primary disposal of them is beyond state interference, but that the United States, as' a riparian owner within the state, has other and different *340 rights than other riparian owners, including its own grantees.
The government of the United States has the absolute and perfect title to its lands. (United States v. Gear, 3 How. 120; Jourdan v. Barrett, 4 How. 185; U. S. v. Hughes, 11 How. 568; Irvine v. Marshall, 20 How. 561; Bagnell v. Broderick, 13 Pet. 450; U. S. v. Gratiot, 14 Pet. 526.) Unless, therefore, running waters are reserved, they pass by grant or patent of the United States. It was so held in Vansickle v. Haines, 7 Nev. 259. The Supreme Court of Nevada cite Cook v. Foster, 2 Gilm. 652; Wilson v. McGhee, 12 Ill. 381; and Calvin v. Burnett, 2 Hill, 620; and quote with approval the language of Mr. Angell, who says:—
“The only mode by which a right of property in a watercourse above tide-water can be withheld from a person who receives a grant of the land is by a reservation directly expressed or clearly implied to such effect. If the intention of the grantor is not to convey any interest in the water, he can exclude it by the insertion in the instrument of conveyance of proper words for the purpose of doing so; but in the absence of such words the bed, and consequently the stream itself, passes by the conveyance.” (Vansickle v. Haines, 7 Nev. 266.)
Whatever may be the weight as authority of Van-sickle v. Haines in other respects, the statement that the grantee or patentee acquires from the United States — the absolute and unqualified owner of the public lands — common-law rights in the waters flowing through the land granted (except where the waters or a portion of them are reserved) has never been disputed.
VII. The state of California became the owner of the swamp-lands described in the complaint herein, on the twenty-eighth day of September, 1850.
The state of California, having been admitted into the Union on the 9th day of September, 1850, on the 28th of the same September the Congress passed an act “ to en *341 able the state of Arkansas and other states to reclaim the swamp and overflowed lands within their limits,” which reads:—
“ Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, that to enable the state of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be and the same are hereby granted to said state.
“ Sec. 2. That it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the governor of the state of Arkansas, and at the request of said governor cause a patent to be issued to the state therefor; and on that patent the fee-simple to said lands shall vest in the said state of Arkansas, subject to the disposal of the legislature thereof; provided, however, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purposes of reclaiming said lands by means of the levees and drains aforesaid.
“ Sec. 3. That in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is ‘'wet and unfit for cultivation/ shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.
“ Sec. 4. That the provisions of this act be extended to, and their benefits be conferred upon, each of the other states of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated.” (9 Stats, at Large, p. 519.)
The lands claimed by the plaintiffs herein are admittedly swamp and overflowed, and no point was made by *342 defendant that the lands had not been duly listed to the átate prior to the certificates of purchase offered in evidence. Even if it had been made to appear that the lands had not been listed, the fact that they are swamp and overflowed would have shown that the state acquired a present vested right in them as of the date of the act of Congress of September 28, 1850. (Railroad Company v. Smith, 9 Wall. 95.) It is true that case turned in part on the language of the grant to the railroad company which reserved lands “ previously sold or disposed of.” (See Railroad Company v. Fremont County, 9 Wall. 89.) But the case clearly recognizes the act of 1850 as a grant to the state in prsesenti of the lands which should subsequently be listed as swamp and overflowed, by the Secretary of the Interior, or which should be proved to be such.
In the subsequent case, French v. Fyan, 93 U. S. 173, it was expressly said that nothing was decided in conflict with Railroad Company v. Smith; the Supreme Court saying that in the opinion in the last-named case there is the strongest implication that if the secretary had made “ an adverse decision,” the evidence that the ■land there in controversy was in fact swamp and overflowed should have been rejected. In French v. Fyan it was held that the determination' of the secretary that certain land was swamp and overflowed, and the patent issued thereon, were conclusive of the fact, and that the opposing party could not be permitted to prove that the land was not swamp-land. Further, that the patent —the evidence that the land described in it had been identified as swamp and overflowed—related back and gave certainty to the title of the date of the grant. The Supreme Court of the United States said: “ This court has decided more than once that the swamp-land act was a grant in prsesenti, by which the title to those lands passed at once to the state in which they lay.” The certificate or listing of the secretary, like the formal patent, *343 relates back to the date of the act granting the lands. And so when the character of the land appears from the evidence identifying it as swamp and overflowed, it is established that the title to the particular land was vested in the state September 28, 1850,—the date of the act granting all the swamp and overflowed lands. But such evidence that the land is swamp and overflowed is admissible in ejectment only where the Secretary of the Interior has failed to act, and is not admissible to overcome the effect of a patent issued to a settler under the pre-emption laws. (Ehrhardt v. Hogaboom, 115 U. S. 67.)
The state then had the title to the lands described in the complaint herein from the date of the act referred to until the sale of the same to the plaintiffs or their assignors.
Note.—We have deemed it unnecessary to consider (under a separate head) the suggestion either that there cannot be a watercourse through swamp-land, or that the defendant was empowered to drain the plaintiffs’ lands for them, and in doing so, to divert a flowing stream from the lands of plaintiffs, and from all the lands lying on the stream above or below the plaintiffs’ lands. The state took the swamp-lands with the political obligation to reclaim them after they were sold. It may be doubted whether the implied promise on the part of the state, to apply the proceeds of sales of such lands exclusively to their reclamation, was legally a condition subsequent, the failure to perform which would authorize a forfeiture of the grant. That, however, would be a question between the United States and the state; a controversy in which the defendant here would have no interest. The state’s grantee of swamp-lands takes the full title, subject to the power of the state to reclaim the land, and for that object to impose and collect assessments upon it; subject also (perhaps) to a forfeiture of his own and the state’s title, in a proceeding inaugurated by the United States, *344 if the land should not be reclaimed by the state. It may be added there are very grave doubts whether, upon a fair interpretation of the state statutes providing for reclamation, the barring of the flow of a regular and defined stream from lands below, not swamp, is contera- * plated; or whether the state would have power, by any statute, to authorize such a proceeding. The statute seems to have in view levees along the sides of watercourses and not across them.
VIII. It has never been held by the Supreme Court of the United States, or by the Supreme Court of this state,, that an appropriation of the water on the public lands of the United States (made after the act of Congress of July 26, 1866, or the Amendatory Act of '1870) gave to the appropriator the right to the water appropriated, as against a grantee of riparian lands under a grant made or issued prior to the act of 1866; except in a case where the water so subsequently appropriated was reserved by the terms of such grant.
Since, as before, September 28,1850, the United States has been the owner of lands in California with power to dispose of the same in such manner and on such terms and conditions (not interfering with vested rights derived from the United States) as it deemed proper. But neither the legislation of Congress with respect to the disposition of the public lands, nor its apparent acquiescence in the appropriation by individuals of waters thereon, subsequent to the act of September, 1850, granting the swamp-lands to the state, can affect the title of the state to lands and waters granted by that act.
Neither the Supreme Court of the United States nor the Supreme Court of California has ever held in opposition to this view.
In Vansickle v. Haines, 7 Nev. 259, the plaintiff had diverted one fourth of the water of Daggett Greek in the . year 1857. He made the diversion at a point then on the public land, hut which in 1864 was patented by the *345 United States to the defendant Haines. In 1865 Van-sickle obtained a patent for his own land where he used the water. In 1867 Haines constructed a wood flume on his land and turned into it all the water of the stream, thereby depriving the plaintiff of that part of it which he had been using.
The Supreme Court of Nevada held that the plaintiff, by his appropriation of water prior to the date of defendant’s patent, acquired no right which could affect that grant, and that while the act of Congress of July, 1866, protected those who at that time were’ diverting water from its natural channels on the public lands, and while all patents issued or titles acquired from the United States since that date are obtained subject to the rights of water by appropriation existing at that time, yet with respect to patents for riparian lands issued before the act of Congress, the patentee had already acquired the right to the flow of the water, with which Congress could not interfere.
In Broder v. Water Company, 101 U. S. 274, it appeared: In the year 1853 the defendant completed a canal through which it had continuously conducted waters and distributed them for mining,, agricultural, and other uses; that a portion of the land through which the canal ran was included in the land granted to the Pacific Railroad (under whom plaintiff claimed), by the act of July 2, 1864; that the plaintiff also claimed as a preemptor, the inception of his claim as such being a declaratory statement filed August 6, 1866.
The court held that the plaintiff was not entitled to have the canal running through his land abated, as a nuisance, by reason of his pre-emption right, because, previous to the initiation of proceedings to secure preemption (on the 26th of July, 1866,—14 Stats, at Large, 251), Congress had enacted a statute, the ninth section of which contained the declaration, “that wherever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have *346 vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals, for the purposes aforesaid, is hereby acknowledged and confirmed.”
'The court also held that the plaintiff was not entitled to relief under his deraignment of title from the railroad company, because the grant to the company of July 2, 1864; contained the following reservation:—
“Any lands granted by this act, or the act to which this is an amendment, shall not defeat or impair any pre-emption, homestead, swamp-land, or other lawful claim, nor include any government reservation or mineral lands, or the improvements of any bona fide settler on any lands returned or denominated as mineral lands, and the timber necessary to support his said improvements as a miner or agriculturist.”
In the opinion of the court the section of the act of 1866 above quoted was said to be “ rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one,” and that the claim of the defendant to the right of way was such a “lawful claim” as was unaffected by the grant to the railroad company made before the act of 1866 was passed.
Broder v. Water Company, supra, may appear to be in conflict with Vansickle v. Haines, supra. But is there any real conflict? It will be observed that the Broder case turned (so far as the plaintiff’s title from the railroad company was concerned) on the reservation clause in the act constituting the grant to the company, and the court held that “ a lawful claim,” within the meaning of the reservation in the act of 1864, was “ any honest claim evidenced by improvements and other acts of possession.” The construction given to the language of the reservation, *347 of course, implies that those who appropriated lands or waters on the public lands,, prior to the acts of 1864 or 1866, had not been treated by the government in those acts as mere trespassers, but as there by license. It does not imply that they had acquired any title, which could be asserted against the United States or its grantees, except so far as their occupations of land or water were protected and reserved to them by acts of Congress.
In Broder v. Water Company, supra, the claim of the appropriator was recognized in the grant to the railroad company, and prior to the initiation by the plaintiff of proceedings to secure a pre-emption. In the case at bar the grant of the lands to the state (containing no reservation of the waters of flowing streams express or to be implied from its terms) was made nearly thirty years before the first appropriation of water by the defendant, which was after the act of Congress of'July, 1866, and the amendatory act of 1870. (Copp’s Mining Decisions, 1873-74, 296.)
In Osgood v. Water Company, 56 Cal. 571, it was held that where a person acquired a right by appropriation to water upon the public lands of the United States, before the issuance of a patent to another for lands through which the stream ran, the patentee’s rights were, “ by express statutory enactment, subject to the rights of the appropriator.” The court cited the amendatory act of Congress, above referred to, the seventeenth section of which reads:—
“That all patents granted, or pre-emptions or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the ninth section of the act of which this is amendatory.”
At the trial of Osgood v. Water Company, supra, in the < lower court, the plaintiff testified that he filed his declaratory statement as a pre-emptor June 18, 1868, but the *348 court found that defendant’s appropriation was prior to that date. There is nothing in that case which precludes us from holding that a pre-emption claim relates to the pre-emption certificate so as to give the pre-emptor the better right as against an appropriation of water made after the certificate is given to the pre-emptor. The late Professor Pomeroy, in one of a series of able articles published in the West Coast Reporter, questions whether the occupant of public lands, with the qualifications of a pre-emptor, can be deprived of the flow of the stream by an appropriator ■ who commences the acts leading to appropriation after the occupation of the other begins. It is not necessary to consider this proposition in the present case.
Two of the members of this court dissented from the conclusion reached in Osgood v. Water Company, supra, on the ground that the waters had not in fact been appror priated in accordance with the local rules or regulations, or with the rulings of the courts. (See 2 Pac. C. L. J. 322.)
Both Broder v. Water Company and Osgood v. Water Company are (by strongest implication) authority for the statement that one who acquired a title to riparian lands from the.United States prior to the act of July 26, 1866, could not (in the absence of reservation in his grant) be deprived of his common-law rights to the flow of the stream by one who appropriated its waters after the passage of that act.
Much stress is laid by counsel on the language used in Broder v. Water Company, supra, with reference to the clause in the act of 1866, that water rights recognized or acknowledged by the local customs, etc., “ shall be maintained and protected,” “was rather a recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one.” But this language is to be interpreted in view of the context. The language cannot be construed as a *349 recognition by the court of vested rights in appropriators of water, created by mere appropriation and independent of statute. The case proceeds on the assumption that neither the plaintiff nor the defendant had any rights except such as were granted or recognized by acts of Congress. It holds that appropriators of water from streams on (or flowing to) the lands granted by the act of 1864 were “recognized,” or admitted to have rights which were protected by that act, because the act by its terms reserved from the grant to the railroad company every “ lawful claim, ” that one who had been permitted to divert water from those lands had a claim which was not in itself unlawful, and that the reservation included “ every honest claim evidenced by acts of possession.”
• There is no statement in the opinion in Broder v. Water Company, supra, that, except for the reservation found in the act of 1864, and the provision in the act of 1866, the defendant would have any right to the water as against the grantees named in the act first named or their successors in interest. The court holds that Broder acquired no right by virtue of his pre-emption, because his proceedings to secure it were begun after the act of 1866,—which recognized the prior appropriation of the water as being a right in the appropriator,—«and that Broder acquired no right under the railroad grant, because the water previously appropriated was reserved in that grant.
IX. The rights of the state under the grant of September £8, 1850, do not depend upon, nor are they limited by, the decisions of the state courts with respect to controversies upon the public lands of the United States. Those decisions do not enter into nor operate upon the subsequent legislation of Congress in such manner as to require that the legislation (or its affirmance of rights recognized by the state courts as existing between occupants upon the public lands of the United States) must be construed as an attempt to deprive the state of its vested rights.

*350
If the decisions mentioned can be referred to for any purpose, semble: That the occupant of a tract of riparian land (iarable or grazing) on the public domain is by such decisions presumed to have received a grant of the flowing water, to the extent of the common-law right to the use of such water as it flows through the land.

And if the doctrine as to adverse claims upon the public lands as declared by these decisions be extended to lands granted to the state, it cannot affect the title or estate of grantees of the state (the water not being reserved in the grants or in the legislation authorizing the grant). The doctrine is applicable alone to actions in which both parties claim only by possession. ■

It is insisted that the “doctrine of appropriation ” is not, and never was, applicable to public lands—state or United States—in California.
It may be conceded that while lands continue public lands—and in controversies between occupants of land or water thereon—the common-law doctrine of riparian rights has no application.
But where one or both of the parties claim under a grant from the United States (the absolute owner, whose grant includes all the incidents of the land and every part of it)', it is difficult to see how a policy of the state ■—or a general practice, or rulings of the state court with reference to adverse occupants on public lands— can be relied on, as limiting the effect of grants of the United States, without asserting that the state, or people of the state, may interfere with “ the primary disposal of the public lands.”
It has been urged that the courts of this state should adopt the doctrine of appropriation as it is accepted in Colorado. But if it be conceded that the Colorado decisions can be sustained on any legal principle, the legal conditions here are different. The sixth and seventh sections of article 16 of the constitution of that state read:—
*351 “ Sec. 6. The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those using "the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes.
“ Sec. 7. All persons and corporations shall have the right of way across public, private, and corporate lands for the construction of ditches, canals, and flumes for the purpose of conveying water for domestic purposes, for the irrigation of agricultural lands, and for mining and manufacturing purposes, and for drainage, upon payment of just compensation.”
In Coffin v. Left Hand Company, 6 Col. 447, Schilling v. Rominger, 4 Col. 102, is referred to apparently as authority for the statement that, in the absence of express statute to the contrary, the first appropriator of a natural stream has the better right as against a subsequent patentee of the lands below. But Schilling v. Rominger, was a contest between appropriators of land and water on the public lands, none of whom had any title other than possession.
In Coffin v. Left Hand Company, supra, both the appropriation of the water and the patent to the riparian land preceded the act of Congress of 1866, and of course the adoption of the state constitution in 1876. The appropriation of the water was prior to the patent. So far as the decision does not depend upon the statutes of the territory of Colorado, it is in conflict with Vansickle v. Haines, 7 Nev. 259, the learned court being of the opinion that the Nevada case was overruled by Broder v. Water Company. But as we have seen in Broder v. Water *352 Company, supra, it was held that in the grant of lands to the railroad company the water was reserved for the benefit of the prior appropriator. And even if the case last mentioned ■ could be held to have decided that the right acquired by one who appropriated water on the public lands prior to a grant to another of land over which the stream would flow (made before the act of 1866) was a vested right, protected, although not mentioned nor referred to in the grant, still there is nothing in that case which would give preference to an appropriation of water made (as in the case at bar) long after the grant of the land.
If, by the act of congress admitting Colorado into the Union, with a constitution containing the provisions above recited, the United States could abandon the primary disposal of its lands to the extent that not only every subsequent but every prior grant of land would be subject to an appropriation of water made prior to the grant, this would not affect the question as applied to the facts of the case now before us, since our constitution does not contain provisions like those in the constitution of Colorado, and here the grant of the land preceded the appropriation. And so, if the United States is bound by the territorial statutes as construed by the Supreme Court of Colorado.
In Coffin v. Left Hand Company, the appropriator was given the preference, by virtue of certain statutes of the territory of Colorado, passed in 1861, 1862, and 1864. It may be that, in interpreting these statutes, the court was somewhat influenced by the general proposition already laid down or assumed in its opinion, that, in the absence of express statute, the prior appropriator of water had the better right as against all the world. But the territorial statutes were so construed as to give the right to the prior appropriator.
It would seem clear, however, that the rights of parties who claim title under grant from the United States, of *353 parts of the public domain, must be determined by reference to laws of the United States relating to the disposition of its domain. And this fact is recognized by the Supreme Court of Colorado, which appeals to Broder v. Water Company as supporting its interpretation of those laws.
It may be suggested, however, that the rulings of the the courts of California, with reference to possessory rights on the public mineral lands, enter into and in. some manner limit the effect of grants of land by the government of the United States, made, as is assumed, under statutes enacted in view of the local law, and of the varying rules and regulations of mining districts. The statutes passed long afterwards cannot affect rights acquired by the state by virtue of a grant made in 1850; nor can the subsequent policy of the United States (which is supposed to be indicated by a failure, by express laws, to prohibit the occupation of portions of its lands for mining, etc., and by the omission of the executive officers to attempt to remove miners and other occupants by force) be held to affect the rights acquired by the state through the grant' of 1850.
The law of California with reference to priority of possession on the public lands has been so long established that we are apt to forget that the whole system was built upon a presumption entertained by the courts, of a permission from the United States to occupy. It was said by Heydenfeldt, J., in 1856: “One of the favorite and much-indulged doctrines of the common law is the doctrine of presumption. Thus, for the purpose of settling men’s differences, a presumption is often indulged where the fact presumed cannot have existed. In support of this proposition, I will refer to a few eminent authorities.....In these cases, presumptions
were indulged against the truth, presumptions of acts of Parliament and grants from the Crown. It is true the basis of the presumption was length of time, but *354 the reason of it was to settle disputes and to quiet the possession. If, then, lapse of time requires the court to raise presumptions, other circumstances which are equally potent and persuasive must have the like effect for the purposes of the desired end; for lapse of time is but a circumstance or fact which calls out the principle, and is not the principle itself.
“Every judge is bound to know the history, and the leading traits which enter into the history, of the country where he presides. This we have held before, and it is also an admitted doctrine of the common law. We must therefore know that this state has a large territory; that upon its acquisition by the United States, from the sparseness of its population, but a small comparative proportion of its land had been granted to private individuals; that the great bulk of it was land of the government; that but little, as yet, has been acquired by individuals by purchase; that our citizens have gone upon the public lands continuously from a period anterior to the organization of the state government to the present time; upon these lands they have dug for gold, excavated mineral rock, constructed ditches, flumes, and canals for conducting water, built mills for sawing lumber and grinding corn, established farms for cultivating the earth, made settlements for the grazing of cattle, laid off towns and villages, felled trees, diverted watercourses; and indeed, have done, in the various enterprises of life, all that is useful and necessary in the high condition of civilized development. All of these are open and notorious facts, charging with notice of them, not only the courts who have to apply the law in reference to them, but also the government of the United States, which claims to be the proprietor of these lands, and the government of the state, within whose sovereign jurisdiction they exist.
“ In the face of these notorious facts, the government of the United States has not attempted to assert any *355 right of ownership to any of the large body of lands within the mineral region of the state. The state government has not only looked on quiescently upon this universal appropriation of the public domain for all of these purposes, but has studiously encouraged them in some instances, and recognized them in all.
“ Now, can it be said, with any propriety of reason or common sense, that the parties to these acts have acquired no rights ? If they have acquired rights, these rights rest upon the presumption of a grant of right arising either from the tacit assent of the sovereign or from expressions of her will in the course of her general legislation, and indeed, from both.
" Possession gives title only by presumption; then, when the possession is shown to be of public land, why may not any one oust the possessor ? Why can the latter protect his possession ? Only upon the doctrine,of presumption, for a license to occupy from the owner will be presumed.” (Conger v. Weaver, 6 Cal. 556, 557; S. C., 65 Am. Dec. 528.)
Both the right to appropriate water on the public lands and that of the occupant of portions of such lands are derived from the implied consent of the owner, and as between the appropriator of land or water the first possessor has the better right. The two rights stand upon an equal footing, and when they conflict they must be decided by the fact of priority. (Irwin v. Phillips, 5 Cal. 140; S. C., 73 Am. Dec. 113.) Since the United States, the owner of the land and water, is presumed to have permitted the appropriation of both the one and the other, as between themselves the prior possessor must prevail.
None of the early cases intimate that the occupant of land bordering on a stream was presumed to have any less rights in the usufruct of the water than the absolute owner of the land so situated,, or that the presumption in his favor was limited to the land without the water, except where the water had been already appropriated.
*356 It was said by Chief Justice Murray, in Crandall v. Woodis, 8 Cal. 143:—
“ If the rule laid down in Irwin v. Phillips is correct, as to the location of mining claims and water ditches for mining purposes, and priority is to determine the rights of the respective parties, it is difficult to see why the rule should not apply to all other cases where land or water had been appropriated. The simple question was, that as between persons appropriating the same land, or land and water both, as the case might be, that the subsequent hppropriator takes subject to the rights of the former.
“ But an appropriation of land carries with it the water on the land, or a usufruct in the water; for in such cases the party does not appropriate the water, but the land covered with water. If the owners of the mining claim in the case of Irwin v. Phillips had first located along the bed of the stream, they would have been entitled as riparian proprietors to the free and uninterrupted use of the water, without any other or direct act of appropriation of the water as contradistinguished from the soil. If such is the case, why would not the defendant who has appropriated land over which a natural stream flowed be held to have appropriated the water of such stream, as an incident to the soil, as against those who subsequently attempt to divert it from its natural channels for their own purposes ?
“ One who locates upon public lands with a view of appropriating, them to his own use becomes the absolute owner thereof as against every one but the government, and is entitled to all the privileges and incidents which appertain to the soil, subject to the single exception of rights antecedently acquired. He may admit that he is not the owner in fee, but his possession will be sufficient to protect him as against trespassers. If he admits, however, that he is not the owner of the soil, and the fact is established that he acquired his right subsequent to those of others, then, as both rest for their foundation upon *357 appropriation, the subsequent locator must take subject to the rights of the former, and the rule, Qui prior est in tempore potior est in jure, must apply.”
The learned judge then proceeds to speak of the alleged evil consequences of the rule he had laid down, saying:—
“Let us examine the effect of such a rule for a moment, and see if the consequences which the respondent predicts, viz., the destruction of the use and value of ditch property in the mines, will necessarily flow from it. A has located mining claims along the bed of a stream, -before any water ditch or flume has been constructed: will any one doubt that he should have the free use of the water, as against subsequent locators of either mining claims or canals? Or suppose he had located a farm, and the water passing through his land was necessary for the purposes of irrigation, is not this purpose just as legitimate as using the water for mining? It may or may not be equally as profitable, but irrigation for agricultural purposes is sometimes necessary to supply natural wants, while gold is not a natural but an artificial want, or a mere stimulant to trade and commerce.
“If it is understood that the location of land carries with it all the incidents belonging to the soil, those who construct water ditches will do so with reference to the appropriations of the public domain that have been previously made and the rights that have been already acquired, with a full knowledge of their own rights as against subsequent locators.” (Crandall v. Woods, 8 Cal. 143, 144.)
Crandall v. Woods, supra, very distinctly decides that, as between an occupant of riparian land (part of the public lands of the United States) and a subsequent appropriator of the waters of the stream, the former may assert the riparian right.
It is claimed, however; that so far as that case decides that the riparian occupant may, under such circum *358 stances, assert a right to the flow of the water, beyond the extent to which he has actually appropriated the same for irrigation or other useful purpose, it has been reversed in later adjudications, if not expressly yet by necessary implication.
In some of the subsequent California cases, where the riparian owner claimed in his pleading, and relied at the trial on, an actual prior appropriation of water, the court confined its inquiry to the existence or non-existence of the facts alleged. Thus in McDonald v. Bear River etc. Co., 13 Cal. 220, one of the parties, although in possession of a tfact through which the watercourse ran, claimed an actual prior appropriation of water for turning his mill. It may be observed, however, that at the common law, the extent of the mill-owner’s right might depend in part on the actual erection and size of his dam, etc. And since the exercise of the particular right might depend on affirmative acts, the case of water for a mill might differ, perhaps, in its nature, or extent rather, from that of the riparian owner, whose lands are naturally irrigated by the flow. American Company v. Bradford, 27 Cal. 360, was an action at law for damages, in which the plaintiff claimed as an appropriator of water through a ditch. The defendants answered, that long .prior to the location of plaintiff’s ditch and dam, they had located and worked in the creek certain mining claims, whereby they became entitled to the use and possession of the waters of the creek, or so much thereof as might become necessary for their mining claims,-—-as prior appropriators of the water. Moreover, the general verdict in favor of the plaintiff included a finding that the mining claims were not located and worked prior to the plaintiff’s appropriation.
In Yankee Jim Co. v. Crary, 25 Cal. 504, it was said that the use of a watercourse on the public mineral lands may be held, granted, abandoned, or lost by the same means as a right of the same character issuing out of lands to which a private title exists.
*359 In King v. Kill, 8 Cal. 336, and Bear River v. York, 8 Cal. 339, it was held, that where the constructor of a ditch had diverted water, he could not complain of the muddying of it by the working of a mine above. To permit this, the court said, would be practically to deprive the miner of the use of the water in his business; and any injury from the incidental fouling of the water was damnum absque injuria. But in Hill v. Smith, 27 Cal. 476, where -water was appropriated through a ditch, and a mining claim was afterwards worked above, it was decided that the miner had no right to work his claim in such manner as to mingle mud and sediment with the water so as to fill up the ditch and reservoirs, and thus to lessen their capacity and increase the expense of cleaning them out; that the prior appropriator of the water was entitled to its use and enjoyment for the purposes for which he claimed it.
Pope v. Kinman, 54 Cal. 3, was an action to quiet title to the flow of a stream, the plaintiff being the owner of riparian lands by grant from Mexico. Held, that the plaintiff had an interest in the living stream which flowed over his land, called the “riparian right”; and that the defendant, by mere diversii n, could not deprive him of that interest or usufruct. ¡
Zimmler v. San Luis Water Co., 57 Cal. 221, not only recognizes the riparian right, the land not being public land, but holds that a recital in a deed that the grantee is about to divert the waters of a certain creek (which flows through the grantor’s land), and to appropriate the same, followed by a grant of a right of way to conduct water over the land of the grantor, does not estop the grantor from denying the right of the grantee to divert the water.
As we understand Ferrea v. Knipe, 28 Cal. 340, the appellant made the claim that the doctrine of “appropriation,” applicable to controversies on the public lands, was also the controlling doctrine in a suit between prh *360 vate owners on the same stream. The court held that the common-law rule obtained, and that the inferior riparian proprietor was entitled to the natural flow, undiminished except by the use of the superior proprietor for domestic purposes and reasonable irrigation.
So far as the cases cited relate to the adverse claims of possessors of land or water on the public lands, no one of them by its terms or by necessary implication overrules Crandall v. Woods, 8 Cal. 136.
It is intimated, however, that that case should now be overruled as not in harmony with the reasons which induced the courts to adopt the rule giving the preference to the prior possessor. It is said that the right acquired, with great expenditure of money and labor, by the ditch-owner, ought not to be restricted by the occupant of a tract of arable or grazing land. The suggestion repeatedly returns that the amount of money invested by the respective parties should have its influence in determining their rights, or at least in fixing the rule by which their rights are to be determined. The same suggestion (that the amounts expended under the implied license of the United States should control in fixing the rule of right) was urged in the “ débris cases,” but seems to have received little consideration in the courts of the state or of the United States. In the case of an occupant of land, as in the case of an appropriator of water, the decisions are based on the presumption that the United States has made a grant which in fact it has not made. The effect of the presumed grant of land, over which water flowed, was logically ascertained in Crandall v. Woods, supra, by reference to the principles of the common law; according to which every part of the land and all its incidents passed by the grant.
If we were prepared to say that Crandall v. Woods was wrongly decided, still there is good reason why, if wrongly decided, it ought not to be overruled in this case. The rulings of the state courts with reference to *361 controversies on the public lands, while they remain such, cannot of themselves operate to deprive the state of the benefit of the grant of the waters of streams flowing over the land granted by the act of September 28, 1850, nor operate upon subsequent legislation of the Congress of the United States so that such legislation shall retro-act and deprive the state of its vested rights.
If the decisions referred to are applicable to lands belonging to the state, yet, since they are applicable only to controversies between adverse claimants to the possession, they do not limit the right or title of the grantees of the state. The title of the state’s grantees depends upon the state laws providing for the disposition of its lands.
X. The common law as to the riparian right was not abrogated by certain statutes of the state, applicable to a district of country within which is included the county of Kern; nor was the State estopped by such statutes from asserting its right to the flow of a natural stream from that district to and over the lands granted to the state by the act of Congress of 1850.
From what has been said, it appears that the respondent has not derived from the United States a right to divert the water of a flowing stream from the lands granted to the state in 1850, or from the premises of a grantee of the state to a portion of those lands. It is in order to inquire whether the state itself has authorized such diversion.
It is claimed that, so 'far as the territory comprised within Kern county is concerned, the common-law doctrine of riparian rights—if it ever existed—does not exist, but has been repealed, and the law of “ appropriation ” adopted by certain statutes.
The county of Kern was created by the act of April 2, 1866, which took effect June 2, 1866. It was formed of portions of Tulare and Los Angeles counties. On the fifteenth day of May, 1854, an act was passed (Stats. *362 1854, p. 76) providing for the election in each township of certain counties (including Tulare and Los Angeles) of a board of three “water commissioners” and an overseer. The commissioners were to examine streams and apportion their waters “ among the inhabitants of their district”; on petition to lay out and construct ditches, etc. The overseers were to execute the orders of the commissioners, superintend works directed by them, and see that the water was kept clear and the ditches in repair. Section 14 of the act provided: “No person or persons shall divert the waters of any river, creek, or stream from its natural channel to the detriment of any other person or persons located below them on any such stream.”
February 19,1857, April 28,1860, and again February 21, 1861, the act of May 15, 1854, was amended, but not so as to affect any question involved in the present case. (Stats. 1857, p. 29; Stats. 1860, p. 385; Stats. 1861, p.31.)
The 2d, 3d, and 14th sections of the act of May, 1854, were amended by the act of April 10,1862. (Stats. 1862, p. 235.) The 2d section, as amended, provided that the supervisors, instead of the county judge, should order the election of the commissioners, etc. The 3d section gave the commissioners power to determine what watercourses ought “to be appropriated to the public use,” to apportion the water, etc. And the 14th section, as amended,—the 3d section of the amendatory act,—declared: “No person or persons shall divert the waters of any river, creek, or stream from its natural channel, to the detriment of any other person or persons located below them on any such stream, unless previous compensation be ascertained and paid therefor, under the provisions of this act, or under the provisions of other laws of this state authorizing the taking of private property for public uses.”
It would be difficult to invent a combination of words which would more explicitly recognize a property to the flow of the stream in the riparian owners below the point of diversion.
*363 The statute of 1854 and the amendments authorized (or attempted to authorize) the commissioners to decide whether a watercourse should be condemned or “ appropriated” to the public use, and to divert and apportion the waters of the stream so appropriated. Evidently, by the persons who are not to be detrimented without compensation, is meant the inferior riparian proprietors, whose property in the waters may be taken for the “public use” on payment of due compensation, according to the laws of the state “authorizing the taking of private property for public uses.” If not they, whom else ? The scheme, if valid, necessarily excludes any diversion at all, by a private person, of waters of a stream “ appropriated to the public use” by the commissioners, and any diversion or appropriation through ditches other than those made under the direction of the commissioners. The persons, then, who are prohibited from diverting water to the injury of those below, except on due compensation, are the commissioners and those acting under command of the commissioners.
Nor can it be said that everybody else might be made to suffer detriment, without compensation, by diversion of water by the commissioners, except only those persons who had “appropriated” waters of the stream prior to the act of 1854, and who continued to use the same. If the intention had been to protect, or rather to recognize, the rights of that class only (if any such class existed), we cannot but believe that the purpose would have been expressed in appropriate language. The language of the provision is sweeping, and while perhaps broad enough to include non-riparian proprietors who had diverted water prior to the act, is peculiarly applicable and certainly includes those who had acquired the title to riparian lands prior to a diversion, and also includes prior riparian occupants,—“No person or persons shall divert,” etc. The term “ location ” has been very generally applied to occupations of portions of the public domain, *364 while diverters of waters have been called, and throughout the elaborate briefs of counsel herein are called, “ appropriators.” The amendatory statute not only recognizes the riparian rights of those in possession of lands through which the stream “ appropriated to public use ” may pass, but is a legislative construction of the words (if any such construction were needed) found in the 14th section of the original act of 1854,— “to the detriment of any person or persons located below them on such stream.”
The act of- April 4, 1864 (Stats. 1863-64, p. 375), provided for the election of three water commissioners in the county of Tulare, etc. It also contains the clause, “ No person or persons shall divert the waters of any river or stream from its natural channel, to the detriment of any person or persons located below them on the same stream.” (Sec. 10.)
March 20, 1866, certain sections of the act of 1864 were amended. (Stats. 1865-66, p. 313.) By the amendments the water commissioners and overseers were shorn of their powers and duties. For the first time water- “companies,” and the “president or authorized agents” of such, are spoken of. The commissioners were no longer required, upon the petition of “ those interested,” to lay out ditches and apportion the water “ among the persons using the same,” in proportion to the amount of land “ each person may wish to irrigate”; no longer empowered to levy a labor tax on such persons, and no longer required or permitted to publish a schedule of the number of hours during which each of such persons shall be entitled to use water. Their duty was simplified, and was limited to the appointment, as overseer of a ditch, of the person designated by the owners of such ditch. The services of the commissioners, instead of being paid for as provided in the act of 1864, out of a tax collected of those supplied in proportion to the quantity of water used by each, were to be compensated “ by the *365 parties requiring their services.” (Sec. 4.) And in this connection, it may be remarked, it was prudently provided: “No ditch shall hereafter be taken out of any stream, in the waters of which different persons have an interest, without leave of said commissioners.”
And by the amendments (Secs. 3, 4) the overseers no longer had the duty imposed upon them of examining ditches, or of estimating the labor necessary to put them in repair, or of reporting the same to the commissioners, together with the capacity of the ditches and the quantity of ground irrigated by each, or of ascertaining that the water was used as apportioned, and that the required labor was properly expended. Instead of all this, the overseers were simply to execute the orders of the persons employing them, by whom they were to be paid “such compensation as may be agreed upon.”
Thus by the amendatory act the commissioners and overseers became the mere agents of the owners of ditches or of “ companies.” For section 5 of the act of 1864 was substituted matter foreign to the original section, the substituted matter being: “Each overseer shall every three months (each counting from the date of his appointment) make up a statement in writing of the number of days that he has been engaged in the discharge of his duties, together with the amount due him as compensation therefor, and upon the approval of the same by the president or authorized agent of the company employing him, shall apportion the same to the different members of such company, pro rata, in proportion to the interest of each therein; and thereupon shall have the right of action against each owner in the ditch for which he is overseer for the amount so apportioned to such owner.” (Stats. 1865-66, p. 313.)
And by section 6 of the act of 1866 (amending section 7 of the act of 1864) it is provided:—
“Whenever a majority in interest of the owners in any ditch company, or their authorized agent, shall deem it *366 necessary to repair, enlarge, or extend their ditch, they shall cause a notice, either written or verbal, to be served upon each owner therein, specifying a time to commence work thereon; and any owner therein neglecting or refusing to perform his proportion of such labor or pay his proportion of the cost thereof shall forfeit his right to the use of any water from such ditch until such time as he pays the same to the person or persons performing his proportion of such labor, together with ten per cent per month thereon additional. The number of hours constituting a day’s labor and the value thereof shall be determined by the respective water-ditch companies in the rules and regulations they may severally adopt,” etc. (Stats. 1865-66, p. 314.)
The act of 1864, then, as amended by the act of 1866, declares the law which, as claimed by counsel, has been substituted for the common law. But the act as amended (if it be conceded to be valid) does not adopt any general rule of appropriation. It seems to have been studiously prepared in the interest of the companies then existing, with a proviso that the commissioners — employed and paid by those of such companies as might choose to employ them—may permit new ditches to be dug.
If the act of 1866 is in force, it should at least be made to appear that the defendant has acquired rights under it. If the act could be construed as declaring the assent of the state to the diversions of water then existing, or to such diversions as might subsequently be made, with the consent of the commissioners named in the act, the assent of the state was limited to such diversions. It nowhere appears that the respondent obtained the consent of the commissioners to the construction of its • <£ works; and, as we have seen, the act expressly prohibits any new ditch or canal “ without leave of said commissioners.” (Sec. 2, subd. 3.)
Sections 7 and 8 relate to the internal management of *367 the companies or corporations, the obligations of its members to each, and the mode of enforcing them. The rest of the act provides for the discharge of functions by the commissioners and overseers, as servants of the companies.
The intent of the legislature to change the previous law as to riparian rights, or to estop the state and its grantees from asserting them, ought to be made to appear distinctly. But the saving clause of section 10 of the act of 1864 was not repealed by the act of 1866, and that section prohibits any diversion to the detriment of those located below on the stream. Moreover, section 10 of the act of 1864 is almost precisely like section 14 of the act of 1854 and the first clause of section 3 of the act of 1862. And the first clause of section 3 of the act of 1862 is interpreted legislatively, by the last clause of the same section, as intended to protect the lower riparian proprietor; except that his property right in the water might be condemned, on due compensation,., “under the provisions of the laws of this state authorizing the taking of private property for public uses.” (Stats. 1862, p. 235.)
The omission of the last clause of the sentence in the subsequent laws is not to be construed as a withdrawal of all protection from the riparian owners,—among whom might be other persons than the state,—but rather as indicating an intention to make that protection absolute. It is to be presumed that in amending the section the members of the legislature were influenced rather by a doubt of the validity or propriety of its last clause than by an intent arbitrarily to take from the riparian proprietors a valuable right, or to deprive a whole class of a right they had previously enjoyed. And the omission should thus be construed, even if it might be held as matter of law that the deprivation of the right could not constitutionally be enforced against those who had already located on the stream when the statutes *368 were passed. In ascertaining the meaning of the law, we find that the protection accorded was clearly intended to apply to locations already made when each of the statutes was passed, and to locations which should be made prior to any subsequent appropriation.
XI. Section 1422 of the Civil Code {“The rights of riparian proprietors are not affected by the provisions of this title”) is protective, not only of riparian rights existing when the code was adopted, but also of the riparian rights of those who acquired a title to land from the state after the adoption of the code and before an appropriation of water in accordance with the code provisions.

Neither a grantee of the United States nor the grantee of a private person who was a riparian owner when the code was adopted need rely for protection on section lJfi2. Such persons are protected by constitutional principles.

The state might have reserved from her grants of land the waters flowing through them, for the benefit of those who should subsequently appropriate the waters. But the state %as not made such reservation.

The water rights of the state, as riparian owner, are not reserved to the state by section 1J$2, because {wherever the state has not already parted with Us right to those who have acquired from her a legal or equitable title to riparian lands) the provisions of the code confer the state’s right to the floto on those appropriating water in the manner prescribed by the code.

It is contended by respondent that the Civil Code gives to it a right to the water superior to that of the riparian proprietor below; that, as against an appropriator under the code, one who has acquired a title to lands from the state (subsequently to the code although prior to the water appropriation) has no right in or to any of the water.
Title 8 of part 4, division 2, of the Civil Code, reads:—
“Sec. 1410. The right to the use of running water flowing in a river or stream, or down a cañón or ravine, may be acquired by appropriation.
*369 “ Sec. 1411. The appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest ceases to use it for such a purpose the right ceases.
“ Sec. 1412. The person entitled to the use may-change the place of diversion if others are not injured by such change, and may extend the ditch, flume, pipe, or aqueduct by which the diversion is made to places beyond that where the first use was made.
“ Sec. 1413. The water appropriated may be turned into the channel of another stream and mingled with its water, and then reclaimed; but in reclaiming it the water already appropriated by another must not be diminished.
“ See. 1414. As between appropriators, the one first in time is the first in right.
“ Sec. 1415. A person desiring to appropriate water must post a notice in writing in a conspicuous place at the point of intended diversion, stating therein,—
“ 1. That he claims the water there flowing to the extent of (giving the number) inches, measured under a four-inch pressure.
“ 2. The purposes for which he claims it, and the place of intended use.
“ 3. The means by which he intends to divert it, and the size of the flume, ditch, pipe, or aqueduct in which he intends to divert it.
“A copy of the notice must, within ten days after it is posted, be recorded in the office of the recorder of the county in which it is posted.
“Sec. 1416. Within sixty days after the notice is posted, the claimant must commence the excavation or construction of the works in which he intends to divert the water, and must prosecute the work diligently and uninterruptedly to completion, unless temporarily interrupted by snow or rain.
“Sec. 1417. By completion’ is meant conducting the waters to the place of intended use.
*370 “ Sec. 1418. By a compliance with the above rules the claimant’s right to the use of the water relates back to the time the notice was posted.
“ Sec. 1419. A failure to comply with such rules deprives the claimant of the rights to the use of the water as against a subsequent claimant who complies therewith.
“ Sec. 1420. Persons who have heretofore claimed the right to water, and who have not constructed works in which to divert it, and who have not diverted nor applied it to some useful purpose, must, after this title takes effect and within twenty days thereafter, proceed as in this title provided, or their right ceases.
“Sec. 1421. The recorder of each county must keep a book, in which he must record the notices provided for in this title.
“Sec. 1422. The rights of riparian proprietors are not affected by the provisions of this title.”
The fourth section of the Civil Code declares that the rule that statutes in derogation of the common law shall be strictly construed has no application to the code. And it is added, “The code establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed, with a view to effect its objects and to promote justice.”
Counsel for respondent contend that section 1410 of the Civil Code promulgates a general law, declaring the doctrine of appropriation to be the law of the land, and argue that, if it be admitted the legislature could not divest the owner of the banks of a watercourse of his riparian rights, the doctrine of appropriation was adopted as the general law, applicable to all public lands of the state and of the United States, from the point of time when section 1410 was enacted. And it is said the whole purpose of section 1422—“The rights of riparian proprietors are not affected by the provisions of this title”—is subserved by saving rights then vested.
*371 It is urged that the words “rights of riparian proprietors ” are sed either in a generic sense, as indicating that principle of law known generally as the doctrine of riparian rights, or else they are used in the more limited sense of private rights of individuals who then (when the code was enacted) owned lands on the banks of streams whose source was on or which flowed over public lands. That it is too self-evident for serious question that the words cannot have been used in the more enlarged sense; for give them that interpretation, and you have, in the same statutory enactment, a declaration of two diametrically antagonistic principles,—the doctrine of appropriation and the doctrine of riparian rights,— doctrines which cannot co-exist. But, it is said, giving the words the other and more restricted interpretation, each and all parts of the statute harmonize one with the other, and the declaration of section 4 is respected. That the law of the state being appropriation, its grant of the land, made after the code enactment, carries with it no right to the water. For since such right can only be derived from some existing law, and the code has abrogated or repealed the law of riparian rights (except to the extent of preserving those then existing), there is no law under which the right to the water as part and portion of the title granted can arise.
As stated above, it is claimed by respondent that by the provisions of the Civil Code the doctrine of appropriation was adopted as the general law of the state, applicable to all public lands of the state and the United States from the time section 1410 was enacted. But section 1410 is not limited in its application to the public lands. Subject to the saving or reservation clause of section 1422,—whatever that section may mean,—section 1410 declares the law applicable throughout the state.
It seems to be admitted that (conceding the rights of riparian proprietors to be measured by the common law) riparian rights already vested were not taken away by *372 section 1410, and could not be taken away except for the public use and on due compensation. It must follow, independent of section 1422, that a purchaser from one who was a riparian owner when the code provisions took effect, by purchase made after the code enactments, would acquire all the estate and property of his vendor. Otherwise, private property would be taken without due process of law, since arbitrarily to deprive the owner of property of all capacity to sell it is to deprive him pro tanto of its benefits. “ The right of acquiring, possessing, and protecting property is inalienable.” “No man shall be deprived of his property without due process of law.” (Const. 1849, art. 1, secs. 2-8; Const. 1879, art. 1, sec. 13.) The provisions of the constitution are intended effectually and completely to protect substantial rights, and cannot be frittered away by indirect legislation.
And as we have seen, one who since the acts of Congress of 1866 and 1870 receives a grant of a portion of the public lands of the United States, without special or implied reservation, takes subject only to appropriations of water made or initiated prior to his grant. Let us suppose, after the adoption of the code, but before any appropriation of the water flowing to the tract granted, a grant or patent for land to be issued by the United States. Could section 1410 be held to divest the grantee of his right in the flow of the stream? True, he has accepted his grant in the presence of the state statute. But the United' States has undertaken to clothe him with the title to the land with the appropriate use of the water as part of the land. Would not a state law which, in advance of the grant, should attempt to take from the grantee the flow of the stream, acquired from or sought to be conveyed by the United States, and confer the waters on one who has acquired no right to them from the United States, be an interference with the “primary disposal” of the public lands ?
We do not find it necessary to say that the prospective *373 provisions of the code would violate the obligation of á contract. But when the state is prohibited from interfering with the primary disposal of the public lands of the United States, there is included a prohibition of any attempt on the part of the state to preclude the United States from transferring to its grantees its full and complete title to the land granted, with all its incidents.
The same rule must apply to homesteaders, pre-emptioners, and other purchasers under the laws of the United States. To say that hereafter the purchaser from the United States shall not take any interest in the water flowing to, or in the trees on, or the mines beneath, the surface,—but others of our citizens shall have the privilege of removing all these things, ■—is to say that hereafter the United States shall not sell the water, wood, or ores.
It would seem, then, that the only persons who can find it necessary to resort to section 1422 of the Civil Code as the protection of their right to the flow of running waters are the state (as the owner of lands granted to it by the United States) and grantees from the state, unless it be where the adverse parties are merely occupants of land and water respectively on the public lands of the United States or of the state.
While the common law has been in force, not only has the right of eminent domain been in the state, but the state has been the direct owner of the swamp and overflowed as well as of other lands derived by grant from the general government. The state legislature has had power, not only to dispose of the lands and waters so held separately, as a private person may dispose of his own, but has had power to authorize the diversion of waters from such lands, either by private persons, the owners of lands above, or by private persons on public lands of the«United States lying above. From the date of such general authorization, a grantee of land from the state would take subject to appropriations of water actu *374 ally made, and if the statutes were broad enough, and operated a.reservation of waters in favor of appropriations which might afterward be made, would take subject to subsequent appropriations.
But the statutes of the state cannot properly be construed as reserving from grants of state land the use of the waters flowing thereon, for the benefit of those who shall subsequently take or appropriate them either on or off the state lands.
The state has granted the waters running to its own lands, by authorizing the diversion of waters from its lands, and doubtless such grantees acquire the state property in the waters whenever the state has a property in the waters at the time of the grant. But can it be said that from the date of the code the state reserved its waters in trust for those who should afterward appropriate them ?
Our attention has been called to no provision of the laws providing for the disposition of the state lands which contemplates such reservation. And we see nothing in the law authorizing appropriations of water which can reasonably bear such interpretation. We must look for the definition of “riparian rights”-—-protected by section 1422—to the common law, which (when not in conflict with or repugnant to the constitution and state statutes) had been the law of the state for more than twenty years. The section which provides “the rights of riparian proprietors are not affected by the provisions of this title” declares, in effect, that those appropriating water under the previous sections shall not acquire the right to deprive of the flow of the stream those who shall have obtained from the state a title to or right of possession in riparian lands before proceedings leading to appropriation shall be taken. Such is the meaning of the W'ords employed.
The right to the use of the waters as part of the land, once vested in its private grantee, the state has no power *375 to divest him of the right, except on due compensation. It is for those who claim that since the code enactments riparian rights have never vested in the state's grantees to point to the statute which expressly so declares, or which, by necessary implication, operates a reservation of all the waters on the state lands, for the benefit of subsequent appropriators. Such reservation cannot be assumed, nor be based on any doubtful interpretation of language.
The use of the present tense—“the rights of riparian proprietors are not affected”—is not sufficient to justify a finding of a reservation by the state of all its waters.
It is difficult to believe that the section, so far as it applies to riparian lands not those of the state, is other than declaratory of the pre-existing law. It certainly was intended to be declaratory in so far as it announces the protection of all private persons who had acquired riparian rights from any source before the provisions of the code went into operation, since (if the common-law right existed) such persons were protected independent of the section. We cannot presume that it was intended to limit the protection to those private persons who had then acquired riparian rights from the United States (but not through the state), or from Spain or Mexico, and to deprive the subsequent grantees of such of their riparian rights. The legislature had no power to deprive-of their right to water the subsequent grantees or success sors of those private persons in whom the right had vested prior to the code. The attempt would have been violative of constitutional principles. As the language of section 1422 will bear a reasonable interpretation which will render it applicable everywhere within the limits of the state, and to all classes of riparian proprietors (without impinging upon the vested interests of any), we ought not so to construe it as- that, if’ enforced with respect to all, it would deprive any man, of his. constitutional right.
*376 Our conclusion on this branch of the case is, that section 1422 saves and protects the riparian rights of all those who, under the land laws of the state, shall have acquired from the state the right of possession to a tract of riparian land prior to the initiation of proceedings to appropriate water in accordance with the provisions of the code.
If section 1422 of the Civil Code were interpreted as saving all riparian rights actually vested before the section took effect, the mere appropriator could acquire no rights to water, by virtue of the provisions of the code, but would be left to the enjoyment of such as he might secure by convention with the riparian proprietors. If all riparian rights existing when the section was adopted were preserved by section 1422, then, inasmuch as both the state and the United States were at that time riparian owners, the lands of neither government would be affected by the other sections relating to water rights; nor, of course, would any subsequent grantee of either government be affected by those provisions.
It is contended by counsel for appellants that the rights of the state to the flow of the waters on her lands were not affected by the code, for the further reason that the code provisions were intended merely to continue or supply a rule for deciding disputes “ on the public lands of the United States.”
But we think it was the manifest purpose of the legislature—derivable from title 8, as a whole, read in view of the judicial and legislative history of the state —that the rule should be the same whether applied to mere occupants of the lands of the state or of the United States; and that the riparian rights of the state, as owner of lands, were not preserved by section 1422.
As we have seen, by resort to the presumption of a grant or license from the owner of the paramount title, our courts from an early day have determined controversies between occupants of waters or of lands and waters,—on *377 the public domain of the United States; holding the prior possessor to have the better right. And during its first session, the state legislature provided a mode by which one might acquire a constructive or statutory possession of a portion of the unsurveyed, and as yet unsalable, public lands of the United States, to be accepted by the courts as proving a right to the possession against all but the government. (Act “prescribing the mode of maintaining and defending possessory actions on lands belonging to the United States.” Stats. 1850, p. 20-23.) The validity of such acts, so far as they affect mere intruders on the public land, or those entering thereon with the tacit consent of the government, has not heretofore been questioned. The right of the prior occupant of the land or water on the public domain of the United States being recognized by the courts, it cannot be doubted that the legislature had power to establish or change a rule of evidence according to which the prior occupation is to be proved. With reference to appropriations of waters on public lands, for example, the legislature had power to require that the notice of appropriation should contain certain statements, that work should be commenced within a definite’ time, and be completed within a named period, etc. Neither the state legislature nor the state courts have any independent power to interfere with the primary disposal of the public lands of the United States, nor to detract from the estates in such lands granted under the laws of the United States. Nevertheless, whilst a body of land and the waters thereon shall remain a portion of the public lands of the United States, the rights of mere possessors, or asserted possessors, thereon will continue to be determined, as between themselves, by the law applicable to such controversies as the same was laid down by our courts previous to the code enactments, except so far as it may have been modified by the provisions of the code. The legislation of the state (with reference to *378 occupations on the public lands), like the judicial decisions, is based on the presumption that the general government has permitted the occupation of water, or of land with the water thereon, as the case may be. But this (so far as the operation of the state law is concerned), necessarily excludes the United States, although a riparian owner when the code was adopted, from the saving clause of section 1422.
The doctrine of presumption is enforced, however, not only on lands of the United States, but on lands of the state and of private persons. This has been the rule applied in every action of ejectment where the plaintiff has recovered on his prior possession. In such cases it has repeatedly been held that the defendant cannot be permitted to prove title in a third party unless he connects himself with it. The prior possessor is presumed to have acquired that title as against the mere intruder on his possession. In controversies upon the state lands the courts have not heretofore permitted the title of the state to be proved, by one not deraigning from the state, for the purpose of destroying the asserted right of the prior possessor. Even where a court should be called on to take judicial notice of the state title, and that no law had been passed for the disposition of the state lands, it would, in the interest of peace and good order, presume, “contrary to the fact,”—as was said by Mr. Justice Heydenfeldt,—not only that the prior possessor had entered and occupied with the consent of the state, but that he had acquired the state title.
Prior to the adoption of the code there can be little doubt that in controversies between persons upon the lands of the state, as in like controversies upon lands of the United States (where neither of the parties had derived title from the government), the doctrine of priority of appropriation of water alone, or of water as a part of land appropriated, would prevail. These considerations create a very strong presumption that the riparian rights *379 of the state as a landed proprietor existing when the sections of the code went into operation were not intended to be reserved by section 1422.
Inasmuch as the sections of the code relating to water rights (so far as they relate to appropriations of water on the public lands of the state or of the United States) are in furtherance and recognition of the previous doctrine of the courts of the state (according to which, as it would seem, the prior appropriator of land, and the water thereon, had the better right as against the subsequent appropriator of the water alone), it may be contended that section 1422 recognizes and reaffirms that part of the rule, and protects the riparian occupant on the public lands of the state from a subsequent appropriation of water on or above those lands. Either so (it may he argued) or section 1422 has no meaning or application when the controversy is between mere occupants on the public lands.
But however this might be where both parties were mere possessors on public lands of the United States, the title 8 of the Civil Code, so far as it relates to waters flowing to the lands of the state, is more than an acknowledgment of the doctrine of prior appropriation on public lands. It is plainly a concession to those who may comply with its conditions, which operates as a grant of the servitude when the conditions are fully performed, relating back to the date of the commencement to perform. It is a concession, however, only of the rights to the water which the state shall not already have parted withal when the appropriation shall be made.
XII. The statute of April 13, 1850, adopts the common law of England, not the civil law, nor the “ ancient common law ” of the civilians, nor the Mexican law.

In ascertaining the common law of England, we may and should examine and weigh the reasoning of the decisions, not only of the English courts, but also of the courts of the 
*380
United States and of the several states, down to the present time. We are not limited to the consideration of the English decisions rendered prior to July 4-, 1776.

The possessory rights of occupants of portions of the public lands, or of waters thereon (recognized by the California courts), are protected by the common law.

It must be assumed, as the cause is now presented, that the plaintiffs obtained from the state title to riparian lands prior to an appropriation of water flowing to those lands by the defendant; because, as we shall see, the court below erred in refusing to admit certain evidence bearing on that issue. Inasmuch, then, as the defendant here has acquired no right to the water by it appropriated—by reason of .a reservation, express or implied, in the grant to the state or in the conveyances to the plaintiffs—which it can assert against the plaintiffs; and as there is no “public policy ” arising out of physical conditions existing within our borders, or from the implied license to private persons to enter upon and occupy portions of the public lands, or the waters thereon, while they remain such, which compels or authorizes us to . disregard the general law, or which should control or modify the meaning which should otherwise be attributed to the statutes of the United States,—it follows: that the defendant has no right to divert the water from the lands of the plaintiffs unless that right exists under and by virtue of the common law, as the same was adopted in and by the act of April 13, 1850.
It is said by counsel for respondent that the common law adopted by the act of 1850 is the common law as the same ivas administered prior to July 4, 1776. Throop v. Hatch, 3 Abb. Pr. 23, is referred to as authority for this statement. But there the question was, what was presumed to be the law of another state, in the absence of averment and proof with respect to it. It was held there was no presumption that the statutes of another state were the same as those of New York. It is held in Cali *381 fornia, that, in the absence of evidence on the subject, it would be presumed that the statutes of another state are the same as ours. (Hickman v. Alpaugh, 21 Cal. 225; Marsters v. Lash, 61 Cal. 724.)
In Throop v. Hatch, supra, the learned judge adds: “It is well established that the common law is presumed to have originally existed in all the states of the Union, except, perhaps, those which had been, before becoming members of the Union, subject to another code and system of laws, and it is a well-established presumption of law that things once proven to have existed in a particular condition continue in that condition until the contrary is established by evidence either direct or presumptive.” It was therefore ruled it would be presumed that the common law had not been changed by statutes of the state whose law was in question.
There is no suggestion (except, perhaps, in the mere statement of a question on page 25) that, in ascertaining the common law, the examination should be confined to decisions of the English or colonial courts rendered prior to the Declaration of Independence. In that very case many adjudications made after that event are cited; and it may he added that it is the uniform practice of the courts in this country to rely upon the reasoning of later decisions of the courts of England and Ireland, and of the courts of other American states, when the question is as to the rules of the common law applicable to the facts before them.
It has sometimes been said that the English statutes, down to a period corresponding with the earliest settlement of the colonies in North America, are adopted as part of the common law. Of course, where a statute adopts the English statutes prior to a certain date or reign, and thus impliedly excludes others, the courts in the United States do not regard the statutes passed since the date or reign.
A different question from the foregoing is the question *382 whether, in adopting “the common law of England ” the legislature adopted a law derivable from the usages and customs of miners and other occupants of public lands. It is alleged, in effect, that the last was a different law, with reference to waters, from the common law as enforced in England and other states of the Union. If this were true, it certainly was not adopted by the statute. The substitution of what is now called “ appropriation ” for the English rule would not be a mere modification of the common law; and strictly speaking, the common law is not modified by an application of its principles to new facts. It is quite certain that the alleged modification could not have been brought about by a general practice which could be upheld, upon the doctrine of license or grant, in accordance with the common law.
In entertaining, “against the fact/' the presumption that the occupants of land or water on the public domain had received grants from the paramount sources of title, the courts of California did not repeal or modify the common law; but immediately after its adoption they began to follow the common law in that regard. The English courts had frequently held that a grant from the Crown would be presumed from lapse® of time. The courts here had held that lapse of time was only a reason for the presumption, and that upon common-law principles, it might be sustained on other facts. Upon this common-law presumption is based the whole fabric of the law which determines conflicting possessory rights on the public domain. The presumption has no place where either party has received a grant from the government; for a presumptive grant (except perhaps when based on lapse of time) can never be asserted against an actual grant.
By the act of 1850, the common-law presumption was adopted as part of the common law; as was also the application of the presumption, as subsequently held by the courts, since its subsequent reasonable application *383 was implicioly comprised in the presumption itself. Thus the principles of the common law fully protected the just possessory rights of occupants on the public lands. In adopting the common law, therefore, the legislature adopted the common law, and not some other and different law.
“The customs, usages, and regulations of the bar or diggings” were afterward, by express statute, declared to be admissible as evidence in “actions respecting mining claims.” (Practice Act, 1861, sec. 621.) It has always been held that local regulations, etc., accepted by the miners of a particular district, are binding only as to possessory rights within the district, and that they must be proved as a fact. When they have been proved, the courts have considered them only for the purpose of ascertaining the extent and boundaries of the alleged possessions of the respective parties to a litigation, and the priority of possessory right as between them; or for the purpose of ascertaining whether the right of action has been lost or abandoned by failure to work and occupy in the manner prescribed. When the priority, limits, and continuation of a possession have thus been ascertained, the courts have proceeded to apply the presumption of grant from the paramount source, a presumption, we repeat, sustainable on common-law principles. It is also true (where no special “mining laws” have been proved) that, in ascertaining the limits of a mining possession, the courts have said the same common-law principles are to be relied upon as those which regulate rights to the possession of agricultural lands, although the indicia of possession are not necessarily the same. (English v. Johnson, 17 Cal. 107; S. C., 76 Am. Dec. 574.) The possession in such case may be proved by satisfactory evidence of notorious acts of occupation, reference being had to the nature of the lands, the uses to which they can be put, and to the general practices or customs of the region with respect to the occupation of lands of the *384 particular character. But the possession, however proved, being established, the presumption of grant arises.
The act of 1850 adopts the common law of England: not the- civil law; nor the jus commune antiquum, or Roman “law of nature” of some of the civil-law commentators (Braly v. Reese, 51 Cal. 564, note); nor the Mexican law; nor any hybrid system. And the expression “common law of England ” designates the English common law as interpreted as well in the English courts as in the courts of such of the states of the Union as have adopted the English common law. We cannot presume that the members of the legislature, even at that day, were utterly ignorant of the climate and soil of the country in which they lived; and there were included in their number many natives of California, who must be presumed to have represented the intelligence of a race which, for several generations, had been familiar with natural conditions here existing. The report of the proceedings of the legislature shows that there was a considerable minority in favor of the adoption of the civil law; and there are circumstances appearing from the proceedings tending to prove that the advantages of each system, as the fundamental law of the future, were discussed and fully considered. Under these circumstances, we must believe that if it had been intended to exclude the common law as to the riparian right, the intention would have been expressed. Moreover, it is a well-established principle, that when the legislature of this state has enacted a statute like one previously existing in other states the courts here may look to the interpretation of such statute by the courts of the other states. (People v. Webb, 38 Cal. 477; People v. Coleman, 4 Cal. 50; S. C., 60 Am. Dec. 581; Taylor v. Palmer, 31 Cal. 254.)
Whatever the law pre-existing the statute of 1850, it was then and there done away with, except as it agreed with the common law. The matter was settled if. the law-makers had power to settle it.
*385 And it was not the common law “as the same was administered” at a certain date that was adopted, but the common law. Indeed, the administration of the law in particular cases may be a very different thing from the law itself. [Note: We give counsel for respondent the benefit of the last suggestion, to be applied, if applicable, to the present decision.] The statute adopts the common law of England, except where inconsistent with the constitutions and statutes, and there can be no good reason why, to ascertain the common law of England, we should not refer to the decisions of English and American courts (in states where the common law prevails) rendered before and subsequent to the date of the statute.
Looking at the whole array of adjudications, if we find a question has often been decided in one way,—the cases preceding the line of corroborative and conformable decisions being adverted to in them, analyzed, and held not necessarily conflictive,—the rule of the common law involved or presented in the question ought to be considered as settled.
There is no pretense that the courts ever were infallible; it is sometimes held that a previous decision does not declare the law. Where the rule has become settled, it is not, as opposed to any former decision, a new rule, but must be held to have been the law from the beginning, because “ right reason ” has always been the prime element of the law. And in such case, if anything has been said in an earlier, decision—which cannot be resolved into mere dictum, or as applicable to the peculiar-facts—that apparently conflicts with the settled rule, it is considered to be an erroneous exposition of the law. Courts do not repeal former decisions; when they reverse-them they hold they were never law.
The common law of England may be said to consist off ¿ collection of principles found in the opinions of sages,, or deduced from universal and immemorial usage, and. *386 receiving progressively the sanction of the courts. It was imported by our colonial ancestors, so far as it was applicable, and was sanctioned by royal charters. (1 Kent’s Com. 473.) The best evidence of the common law is found in the decisions of the courts, contained in numerous volumes of reports, and in the treatises and digests of learned men, “ which have been multiplying from the earliest periods of English history down to the present time.” (Id.)
There is no implied exception in the words " so far as applicable ” which would exclude the common law from the colonial law, except, perhaps, when the question was ab ovo, and no principle of the common law could have appropriate bearing upon it. Since the Revolution the ■ common law of England has, of course, been inapplicable in the particulars that it does not harmonize with the political conditions on this continent. Where it is in conflict with our constitution of government, it is not part of our law, because the organic law is the supreme law. This would be the case if the statute were silent; and, as we have seen, the statute of 1850 does not adopt the common law so far as “ it is repugnant to or inconsistent with the constitution of the United States, or the constitution and laws (statutes) of the state of California.”
We know of no decisions which intimate that a difference in climatic or geographical conditions may operate to transfer a right of property from those in whom a right of property is vested by the common law. To so hold would be an attempt to do that which, as contended by counsel, could not be done with reference to the common use to which (as claimed) property was dedicated by the Mexican law. Such conditions may, perhaps, affect the mode of enjoyment of the common right of all the -.riparian proprietors on the same stream. Nor do we know of cases where the courts in the United States have .undertaken to change the common law. . We think *387 it is abundantly proved by Mr. Houck that there has been no substantial change in the United States in the law with respect to navigable rivers (although the contrary has been asserted), but that the true test of navigability was always the fact of a river being in fact navigated or capable of being navigated; that all streams above tide are not in England innavigable. (Houck on Navigable Rivers, passim.)
In an English case cited in Woolrych on Waters, p. 41, Mr. Justice Bayley observed: “ The strength of the prima facie evidence arising from the flux and reflux of the tide must depend upon the situation and nature of the channel”; and held of a petty stream, although the daily tides went up it, that it was not a navigable river. And Woolrych says of the English law: “ Public user for the purposes of commerce is consequently the most convincing evidence of the existence of a navigable river.” (Woolrych on Waters, 42.)
XIII. The doctrine of “ appropriation,” so called, is not the doctrine of the common law.
Counsel for respondent assert that the property in the use of waters is, by the common law, acquired only by appropriation. In support of this proposition are cited Bealy v. Shaw, 6 East, 370; Saunders v. Newman, 1 Barn. & Ald. 261; 2 Bla. Com. 14, 403; Cox v. Matthews, 1 Vent. 237; Liggins v. Inge, 7 Bing. 692; Sackrider v. Beers, 10 Johns. 241; Van Bergen v. Van Bergen, 3 Johns. Ch. 287; Goddard’s Law of Easements, 250 et pas.
Mason v. Hill, 5 Barn. & Adol. 1, was decided in the King’s Bench in 1833. The court there said: “ The position that the first occupant of water for a beneficial purpose has a good title to it is perfectly true in this sense, that neither the owner of the land below can back the water, nor the owner of the land above divert it, to his prejudice. In this, as in other cases of real property, possession is a good title against a wrong-doer.” He adds that the owner of a mill, if the stream is obstructed or diverted, *388 may recover consequential damages to his mill (Rutland v. Bowler, Palmer, 290), and to the same effect are some American cases. “ But,” says Lord Denman, in Mason v. Hill, “ it is a very different question whether he can take from the land below one of its natural advantages, which is capable of being applied to valuable purposes, and generally increases the fertility of the soil even when unapplied; and deprive him of it altogether by anticipating him in its application to a useful purpose.” .... We think that this proposition has originated in a mistaken view of the principles laid down in the decided cases of Bealy v. Shaw; Saunders v. Newman; Williams v. Moreland, 2 Barn. & C. 915. It appears to us also that the doctrine of Blackstone and the dicta of learned judges in some of those cases, and in that of Cox v. Matthews, have been misconceived.”
The court then proceeds to show that neither Bealy v. Shaw, nor Saunders v. Newman, nor Williams v. Moreland, nor the dictum of Lord Chief Justice Tindal in Liggins v. Inge, nor that of Lord Hale in Cox v. Matthews (when properly understood), nor the observations of Blackstone . ought to be considered as authority that the first occupant, or first person (although a riparian owner), who chooses to appropriate a natural stream has a title against the owner of the land below, and may deprive him of the natural right to the water. And Lord Den-man adds that the view taken in Mason v. Hill, supra, as to the riparian right accords with the law as laid down by Sergeant Adair, Chief Justice of Chester, in Prescott v. Phillips, 1 Vent. 237, by Lord Ellenborough in Bealy v. Shaw, and by the master of the rolls in Howard v. Wright, 1 Show. 64.
It has been suggested that what is said on the subject in Mason v. Hill was mere dictum, since, it is claimed, that case might have been decided on the theory of “ appropriation.” The case shows that the question was •fairly presented, and was fully, and in one point of view necessarily, considered.
*389 Sackrider v. Beers, 10 Johns. 241, was an action at law. The defendant had taken water out of the stream and conducted it by means of a race-way to a point in the stream below the plaintiff’s dam. Plaintiff recovered.
In Van Bergen v. Van Bergen, 3 Johns. Ch. 282, S. C., 8 Am. Dec. 511, the plaintiff had fully released to the defendant. The court said the remedy of the plaintiff, if any, ought to be sought at law, by an action on the case, or upon the covenants contained in his deed of release.
Goddard, in his Law of Easements, p. 251, declares: “That all riparian owners of natural streams have a riparian right to the use of water as it flows past their lands, as long as they do not interfere with the natural rights of other riparian owners, and to sue for disturbance is now an established doctrine of the law.” He adds: “The doctrine was not established until comparatively modern times,” etc. He says, after referring to some of the earlier decisions, that the (apparent) theory of appropriation was much modified by various decisions “as the nature of riparian rights was brought more fully under consideration”; citing in this connection Mason v. Hill, and Cueker v. Cowper, 5 Tyrw. 103. He concludes: “Appropriation of the water of flowing streams has thus gradually fallen from being considered the means of acquiring important rights to being deemed of no importance whatever.”
Mr. Angelí, however, cites a case of as early a date as 82 Edward III., where an assize of nuisance was brought by A against B, for that B had made a trench from a river, and drawn away thereby a part of the water and stream another way from that in which it did formerly use to run; and the assize passed for the plaintiff; and it was adjudged that the water should be removed to its ancient channel at the cost of the defendant. (Angelí on Watercourses, 93. See also Year-book, 14 Hen. VIII., 31, referred to by Angell.)
In Chaseman v. Richards, 7 H. L. Cas. 384, Lord Wins *390 leydale declares: “We may consider, therefore, that this proposition is indisputable, that the right of the proprietor to the enjoyment of a watercourse is a natural right, and is not acquired by occupation,” etc.
In examining the numerous cases which establish that the doctrine of “ appropriation” is not the doctrine of the common law, we meet an embarrassment of abundance. The authorities referred to under the next head, and many others, clearly hold to the contrary of the proposition contended for by counsel for respondent.
XIV. jRiparian rights. By the common law the right of the riparian proprietor to the flow of the stream is inseparably annexed to the soil, and passes with it, not as an easement or appurtenance, but as part and parcel of it. Use does not create the right, and disuse cannot destroy or suspend it. The right in each extends to the natural and usual flow of all the water, unless where the quantity has been diminished as a consequence of the reasonable application of it by other riparian owners for purposes hereafter to be mentioned.
In the case now here there is no question as to the use of water for propelling machinery. And in treating of the riparian right at common law, we shall reserve (for the present) the consideration of the effect of the diminution of the flow of a stream, by reason of its consumption by a riparian proprietor, to satisfy what has been called “ natural wants,”—■ its reasonable consumption by cattle or for domestic uses,—and also the effect of absorption and evaporation by reason of its application to the purposes of irrigation.
As to the nature of the right of the riparian owner in the water, by all the modern as well as ancient authorities the right in the water is usufructuary, and consists not so much in the fluid itself as in its uses, including the benefits derived from its momentum or impetus. (Angelí on Watercourses, sec. 94, and notes.)
But the right to a watercourse begins ex jure natures, and having taken a certain course naturally, it cannot be *391 diverted to the deprivation of the rights of the riparian owners below. So say all the common-law text-books and the decisions. (Angell on Watercourses, sec. 93.) Aqua currit, et debet currere, ut currere solebat, "is the language of the ancient common law.” (Angell on Watercourses, sec. 93; Shury v. Pigott, Bulst. 399; Countess of Rutland v. Bowler, Palmer, 390.)
"As a general proposition every riparian proprietor has a natural and equal right to the use of the water in the stream adjacent to his land, without diminution or alteration.” (Washburn on Easements and Servitudes, 319.)
“ Riparian proprietors are entitled, in the absence of grant, license, or prescription limiting their rights, to have the stream which washes their lands flow as is wont by nature, without material diminution or alteration.” (Gould on Waters, sec. 204.)
Each riparian proprietor has a right to the natural flow of the watercourse undimished except by its reasonable consumption by upper proprietors. (Angell on Watercourses, c. 4, passim.)
The right to the flow of the water is inseparably annexed to the soil, and passes with it, not as an easement or appurtenant, but as a parcel. Use does not create, and disuse cann ot destroy or suspend it. Each person through whose land a watercourse flows has (in common with those in like situation) an equal right to the benefit of it as it passes though his land, for all useful purposes to which it may be applied; and no proprietor of land on the same watercourse has a right unreasonably to divert it from flowing into his, premises, or to obstruct it in passing from them, or to corrupt or destroy it. (Chief Justice Shaw, in Johnson v. Jordan, 2 Met. 239.)
The right to the use of water flowing over land is undoubtedly identified with the realty, and is a real and corporeal hereditament.. .(Cary v. Daniels, 5 Met. 238.)
Prima facie every proprietor on each bank of a river is entitled to the land covered by the water to the middle *392 thread of the river; and has a right to the use of the water flowing over it in its natural current, without diminution or obstruction. Priority of occupancy of the flowing waters of a river creates no right, unless the appropriation be for a period which the law deems a presumption of right. (Mr. Justice Story, in Tyler v. Wilkinson, 4 Mason, 396.)
Whatever may be said of Sampson v. Hoddinot, 1 Com. B., N. S., 590, as bearing on the right to irrigate, it recognizes the riparian right. Creswell, J., says: “It appears to us that all persons having land upon a flowing stream have, by nature, certain rights to the use of the stream, whether they exercise them or not, and they may begin to exercise them whenever they will.”
It has always been held that a grant of land carries with it the water flowing over the soil. The well-known maxim, Gujus est solum, ejus est usque ad caelum, inculcates that land, in its legal signification, has an indefinite extent upward.
We need not add that rights to the use of water may be acquired by grant, under some circumstances by assent, and by adverse user and possession.
It is unnecessary to pursue the subject further, or to refer to the many text-books and decisions of the courts in England, and in other states, which fully support the proposition laid down in the foregoing title. (No. XIV.)
The supreme court of California has not been silent with respect to the subject.
“The right to running water is defined to be a corporeal right or hereditament, which follows or is embraced by the ownership of the soil over which it naturally passes. (Sackett v. Wheaton, 17 Pick. 105; 1 Cru. Dig. 39; Angell on Watercourses, p. 3”; Hill v. Newman, 5 Cal. 445; S. C., 73 Am. Dec. 140.) By settled principles of both the civil and common law, the riparian owner has a usufruct in the stream as it passes over his land, of which he cannot be deprived by mere diverson. (Pope v. *393 Kinman, 54 Cal. 3.) The right of a riparian proprietor to have the water of a stream run through his land is a vested right, and an interference with it imports damages. (Creighton v. Evans, 53 Cal. 55.) The riparian right is fully recognized in Ferrea v. Knipe, 28 Cal. 340, where it was held that, although an upper riparian proprietor had a right to the use of a stream for watering his cattle and for domestic purposes, he had not a right to dam up the creek and spread out the water over a large surface, by which it became lost by absorption and evaporation, to an extent which prevented the stream from flowing to the premises of the lower proprietor; such obstruction not being a proper or reasonable use of the water. As decided, the judgment in Hale v. McLea, 53 Cal. 578, necessarily involved a determination of the question. It was there assumed that a defendant through whose land ran a subterranean stream which continued to the land of the plaintiff had no greater right to divert the water than if the stream had been on the surface. This was an assumption against the defendant, adversely to whom the case was decided. Mr. Justice Crockett says: “ Tested by the rule [as to surface streams], the utmost that can be claimed for the defendant on the facts is, that he is entitled to take from the stream as much water as he needs for watering his cattle and for domestic uses, such as cooking, washing, and the like, leaving the surplus to flow to the spring of plaintiff in its natural channel.” If it were a surface stream, the plaintiff would be entitled to have it flow to and across his lands, in its natural channel, subject only to the right of the defendant to use so much of the water as is necessary to supply his natural or primary wants as above indicated..... But the findings show that the defendant has diverted the whole body of the stream through pipes, in such a manner that no portion of the water can reach the spring; and the surplus at the beginning of this action was running to waste.....There is no question in this *394 case involving the right of a riparian owner to the use of water for the purposes of irrigation.”
Hanson v. McCue, 42 Cal. 303, was decided on the ground that, upon the facts of the case, no defined subterranean channel, with water flowing therein, existed. But both Chief Justice Wallace and Mr. Justice Crockett, who delivered opinions, seem to assume that the rules of law which apply to surface, apply to underground, currents, flowing in a definite channel; and that as to surface streams, the right of a riparian proprietor is to have the water flow ubi solebat.
XV. By our law the riparian proprietors are entitled to a reasonable use of the waters of the stream for the purpose of irrigation. What is such reasonable use is a question of fact, and depends upon the circumstances appearing in each particular case.
To decide this appeal, it is not imperatively necessary to lay down a rule which shall govern the matter of irrigation by riparian owners. By the common law none but riparian owners can employ or suffer the employment of the water for any purpose. The defendant here relies entirely on its right to appropriate under the-provisions of the Civil Code—a right limited only by the capacity of its canal—the quantity actually appropriated and appropriately applied. It is not averred that the defendant is a riparian proprietor. Neither the statutes of the general government nor those of the state contemplate (if it were possible in fact) appropriations for the benefit of the United States. They must always be for the benefit of the persons seised of lands, or actually possessed of tracts of the public domain. The defendant’s appropriation Was “for the purpose of irrigating and supplying with water the lands in the notice of appropriation designated and lying along the route of said canal.” (Finding.) The notices of appropriation do not describe the tract of land it was the intention to irrigate, nor are the limits of the tracts *395 irrigated described in the findings. There is no suggestion that such tracts, if any there are, belong to or are possessed by the same person or persons, nor any (an important consideration) that the surplus waters were returned to the channel. It is only the tracts next the stream which are riparian lands, and the owners of such tracts are alone riparian owners. Even if the defendant were treated as having received a license from the owner of the tract in which its canal heads, or as being itself the owner of that tract, there is no pretense that the water actually diverted was used to irrigate that particular tract, or that the quantity consumed was necessary or reasonable for that purpose.
Nevertheless, as upon a new trial of this action the question may possibly be presented, we propose to make a few observations upon the doctrine of the common law with regard to irrigation by riparian owners.
Mr. Angelí submits whether it may not fairly be deduced from the authorities that for an essential diminution of the water of a watercourse, which nature has directed to run in a certain and determinate channel for any purpose, the law in this country will not interpose.
So far as the question may be supposed to imply that an upper appropriator may not “essentially” diminish the water by using it for domestic purposes and for watering cattle, the weight of authority is that he may, if necessary, consume all the water of the stream for those purposes. (Gould on Waters, sec. 203.) Such is the California rule. (Farrea v. Knipe and Lane v. McLea, supra.) Indeed, in case of a small rivulet the necessary consequence of using it at all, by one or more upper owners, for these “natural” or “primary” purposes, must often be to exhaust the water.
Chancellor Kent (Commentaries, vol. 3, p. 429) is sometimes quoted as proving that water cannot be employed for irrigation; sometimes as proving that it may *396 be. He says: “ Streams of water are intended for the use and comfort of man; and it would be unreasonable and contrary to the general sense of mankind to debar any riparian proprietor from the application of water for domestic, agricultural, or manufacturing purposes; provided the use of water be made under the limitation that he do no material injury to his neighbor below him, who has an equal right to the subsequent use of the same water.”
It seems to us that the foregoing (although a very distinct statement of the general proposition) ought not to be taken literally, unless the words material injury be impressed with a signification, the equivalent of a substantial deprivation of capacity in a lower proprietor to employ the water for useful purposes. The adjective is prefixed to “ injury ” and the words seem to have reference to the enjoyment of the use by the inferior owner, not to his mere abstract right to the use as against others than riparian owners; and to intimate that he cannot complain of a reasonable exercise of the use by another who possesses the general right in common with himself.
The passage as a whole may be fairly said to convey the idea that water may be used for agricultural or manufacturing purposes when such use does not materially deprive the lower proprietors of water, either for drinking or for agriculture, etc. Undoubtedly, as against an appropriation by a mere wrong-doer, a riparian proprietor may insist upon the entire and complete natural flow of the stream. The employment by Kent of the words “ material injury ” implies that every diminution is not an injury, and it excludes, where water is reasonably used above for irrigation, mere sentiment, or the consideration of a diminution from the natural flow so far merely as such flow pleases the eye or gratifies a taste for the beautiful. Of course, in ascertaining whether irrigation is reasonable, its effect in depriving the lower proprietor of natural irrigation is to be considered with the *397 other circumstances. Moreover, as we have seen, it is established that, so far as the use is for domestic purposes, all the water of a stream may, if necessary, be exhausted. In that case the lower proprietor receives none of it; and Chancellor Kent cannot have intended that material diminution always means material injury.
A priori it would be expected that the decisions in Great Britain and Ireland would not much assist the inquiry; since, owing to the humidity of the climate of those islands, it must rarely happen that any use for irrigation can be reasonable. And for any purpose the use must be reasonable, the maxim which every riparian proprietor is bound to respect being, Sic utere tuo, ut alienum non leedas. The question whether the use is reasonable is not so much whether the water below is diminished thereby as whether the lower proprietor is materially injured by the diminution,—injured by not receiving the benefit in due proportion of the enjoyment to which he and the other proprietors are entitled. It is obvious that the use of water for the purposes of irrigation always involves some loss by evaporation and absorption, and must often result in a sensible and clearly perceptible reduction of the quantity in the channel.
An entire diversion of a watercourse by an upper riparian proprietor (or a diversion of a part of it), for irrigation, without restoring to the channel the excess of the water not actually consumed, is never allowed.
Whether or not a diversion of water is reasonable is a question not so much as mentioned by any writer or judge. The very proposition assumes the right of the proprietor above to use the water for his own purposes, to the exclusion of the proprietors below,—a proposition inconsistent with the doctrine universally admitted, that all proprietors have the same rights. (Van Hoesen v. Coventry, 10 Barb. 518-522.)
In Sampson v. Hoddinot, 1 Com. B., N. S., 590, the court said that the detention for the purposes of irrigation *398 was, under the circumstances of that case, necessarily injurious; the effect being wholly to prevent the natural course of the stream for a certain number of hours. In Chaseman v. Richards, 7 H. L. Cas. 449, the lords seem to refer with approbation to the “ American ” doctrine of irrigation.
Embrey v. Owen, 6 Ex. 352, decides that the use of water by a defendant for irrigation was no injury to the plaintiff, a mill-owner, in fact or law. There the irrigation took place only at intermittent periods when the river was full, etc. But in delivering his opinion, Parke, B. (after quoting from Kent), said: “In America, as may be inferred from this extract, and as is stated in the judgment of the Court of Exchequer in Wood v. Wand, a very liberal use of the stream for the purposes of irrigation and for carrying on manufactures is permitted. So in France, where every one may use it ‘ en bon pere de famille, et pour son plus grand avantage.’ (Code Civil, art. 640, note a, by Pailliet.) He may make trenches to conduct the water to irrigate his land if he returns it with no other loss than that which irrigation caused. In the above-cited case of Wood v. Wand, it was observed that in England it is not clear that a user to that extent would be permitted; nor do we mean to lay down that it would in every case be deemed a lawful enjoyment of the water, if it was again returned into the river with no other diminution than that which was caused by the absorption and evaporation attendant on the irrigation of the lands of the adjoining proprietor. This must depend upon the circumstances of each case. On the one hand, it could not be permitted that the owner of a tract of many thousand acres of porous soil, abutting on one part of the stream, could be permitted to irrigate them continually by canals and drains, and so cause a serious diminution of the quantity of water, though there was no other loss to the natural stream than that arising from the necessary absorption and evaporation of the *399 water employed for that purpose; on the other hand, one’s common sense would be shocked by supposing that a riparian owner could not dip a watering-pot into the stream, in order to water his garden, or allow his family or his cattle to drink it. It is entirely a question of degree, and it is very difficult, indeed impossible, to define precisely the limits which separate the reasonable and permitted use of the stream from its wrongful application; but there is often no difficulty in deciding whether a particular case falls within the permitted limits or not.”
And in the same case the learned judge said: “It was very ably argued before us by the learned counsel for the plaintiffs that the plaintiffs had a right to the full flow of the water in its natural course and abundance, as an incident to their property in the land through which it flowed; and that any abstraction of the water, however inconsiderable, by another riparian proprietor, and though productive of no actual damage, would be actionable, because it was an injury to a right, and if continued, would be the foundation of a claim of adverse right in that proprietor.
“We by no means dispute the truth of this proposition with respect to every description of right. Actual perceptible damage is not indispensable as the foundation of an action; it is sufficient to show the violation of a right, in which case the law will presume damage; injuria sine damno is actionable, as was laid down in the case of Ashby v. White, 2 Ld. Raym. 938, by Lord Holt, and in many subsequent cases, which are all referred to, and the truth of the proposition powerfully enforced, in a very able judgment of the late Mr. Justice Story in Webb v. Portland Manufacturing Company, 3 Sum. 189. But in applying this admitted rule to the case of rights to running water, and the analogous cases of rights to air and light, it must be considered what the nature of those rights is, and what is a violation of them.
*400 “The law as to flowing water is now put on its right footing by a series of cases, beginning with that of Wright v. Howard, 1 Sim. & St. 190, followed by Mason v. Hill, 3 Barn. & Adol. 304, S. C., 5 Barn. & Adol. 1, and ending with that of Wood v. Wand, 3 Ex. 748, and is fully settled in the American courts. (See 3 Kent’s Com., lect. 52, 6 p., 439, 445.)
, “ The right to have the stream to flow in its natural state without diminution or alteration is an incident to the property in the land through which it passes; but flowing water is publici juris, not in the sense that it is a bonum vacans, to which the first occupant may acquire an exclusive right, but that it is public and common in this sense only, that all may reasonably use it who have a right of access to it, that none can have any property in the water itself, except in the particular portion which he may choose to abstract from the stream and take into his possession, and that during the time of his possession only. (See Mason v. Hill, 5 Barn. & Adol. 24.) But each proprietor of the adjacent land has the right to the usufruct of the stream which flows through it.
“This right to the benefit and advantage of the water flowing past his land is not an absolute and exclusive right to the flow of all the water in its natural state; if it were, the argument of the learned counsel, that every abstraction of it would give a cause of action, would be irrefragable; but it is a right only to the flow of the water, and the enjoyment of it, subject to the similar rights of all the proprietors of the bank on each side to the reasonable enjoyment of the same gift of Providence.
“It is only therefore for an unreasonable and unauthorized use of this common benefit that an action will lie; for such a use it will.”
Professor Washburn (Easements and Servitudes, 234) refers “to two or three recent English cases,” where the subject of irrigation is considered, and where the courts take occasion to speak of the American cases with approbation, etc.
*401 Gould (citing in the notes many English and American decisions) writes (Gould on Waters, sec. 217): “The right of a riparian proprietor to divert the waters of a stream for the purpose of irrigation is recognized in England, and generally in this country. According to the later decisions in both countries, this is not a natural want, authorizing an exclusive or undue appropriation by one proprietor, but the use of the stream for this purpose must be reasonable, and must not materially affect the application of the water by other riparian proprietors. TYlq ^extent of each proprietor’s right to thus withdraw the water depends upon the circumstances of the case. The owner of a large tract of porous land, abutting on one part of the stream, could not lawfully irrigate such land continually by canals and drains, and so cause a serious diminution of the quantity of water, though there may be no other loss to the natural stream than that arising from the necessary absorption and evaporation of the water employed for the purpose. If the water used for irrigation is not abstracted on a person’s own land, but is withdrawn at a distance above it, or returned at a distance below it, this would have a material bearing upon the question of reasonable use with respect to an opposite or other proprietor affected by such diversion. So a riparian proprietor who obstructs the stream- by a dam, for the purpose of overflowing and irrigating his land, or who diverts the water for such purpose excessively, and without returning the surplus into the natural channel, is liable to the owner of a mill below, the operation of which is thereby impeded, or to another proprietor below who only uses the water for irrigation, and is deprived of that right to an unreasonable extent.”
Weston, J., in Blanchard v. Baker, 8 Me. 253, S. C., 23 Am. Dec. 504, observes: “A riparian proprietor may make a reasonable use of the water itself for domestic purposes, for watering his cattle, or even for irrigation; *402 provided it is not unreasonably detained or essentially diminished.” -
In Gillett v. Johnson, 30 Conn. 180, Butler, J., speaks of the right of a defendant to irrigate as limited. “She was bound to apply the water in such a reasonable manner and quantity as not to deprive the plaintiff cf a sufficient supply for his cattle. The claim of the defendant was that she had a right to divert the whole for the purposes of irrigation, regardless of the rights of the plaintiff. Such diversion was unreasonable, and therefore illegal.”
And in Arnold v. Foote, 12 Wend. 330: “The defendant has a right to use so much as is necessary for his family and cattle, but he has no right to use it for irrigating his meadow, if he thereby deprives the plaintiff of the reasonable use of the water in its natural channel.”
The Supreme Court of Massachusetts has said: “Every man through whose land the water passes may use it for irrigating his land; but he must so use it as to do the least possible injury to his neighbor who has the same right.” (Anthony v. Lapham, 5 Pick. 175.)
In Newhall v. Ireson, 8 Cush. 595, S. C., 54 Am. Dec. 790, Chief Justice Shaw says: “Even in cases [which Newhall v. Ireson does not necessarily overrule] where it has been considered that a riparian proprietor had authority to make use of a stream for purposes of irrigation, and thus, by that use, divert a portion of it, it has been held under the condition that such diversion was, under all the circumstances, a.reasonable use of the stream, and that the surplus of the water thus used must be returned into its natural channel.”
The same learned judge and luminous writer has very fully considered the matter of irrigation in Elliott v. Fitchburg R. R. Co., 10 Cush. 193-195; S. C., 57 Am. Dec. 85. “This'appears to have been a small stream of water; but it must, we think, be'considered that the same rules of law apply to it, and regulate the rights of riparian proprietors through and along whose land it passes, as are *403 held to apply to other watercourses, subject to this consideration, that what would be a reasonable and proper use of a considerable stream, ordinarily carrying a large volume of water for irrigation or other similar uses, would be an unreasonble and injurious use of a small stream just sufficient to furnish water'for domestic uses, for farm-yards, and watering-places for cattle. *405 Massachusetts on this subject: Weston v. Alden, 8 Mass. 136; Colburn v. Richards, 13 Mass. 420; S. C., 7 Am. Dec. 160; Cook v. Hull, 3 Pick. 369; S. C., 15 Am. Dec. 208; Anthony v. Lapham, 5 Pick. 175.
*403 “The instruction requested by the plaintiff is, we think, founded on a misconception of the rights of riparian proprietors in watercourses passing through or by their lands. It presupposes that the diversion of any portion of the water of a running stream, without regard to the fitness of the purpose, is a violation of the right of every proprietor of land lying below on the same stream, so that, without suffering any actual or perceptible damage, he may have an action for the sole purpose of vindicating his legal right.
“The right to flowing water is now well settled to be a right incident to property in the land; it is a right publici juris, of such character that, whilst it is common and equal to all through whose land it runs, and no one can obstruct or divert it, yet, as one of the beneficial gifts of Providence, each proprietor has a right to a just and reasonable use of it as it passes through his land; and so long as it is not wholly obstructed or diverted, or no larger appropriation of the water running through it is made than a just and reasonable use, it cannot be said to be wrongful or injurious to a proprietor lower down. What is such a just and reasonable use may often be a difficult question, depending on various circumstances. To take a quantity of water from a large running stream for agriculture or manufacturing purposes would cause no sensible or practicable diminution of the benefit to the prejudice of a lower proprietor; whereas, taking the same quantity from a small -running brook passing through many farms would be of great and manifest injury to those below who need it for domestic supply or
*404 watering cattle; and therefore it would be an unreasonable use of the water, and an action would lie in the latter case, and not in the former. It is therefore to a considerable extent a question of degree; still, the rule is the same, that each proprietor has a right to a reasonable use of it for his own benefit for domestic use and for manufacturing and agricultural purposes.
“ It has sometimes been made a question whether a riparian proprietor can divert water from a running stream for purposes of irrigation. But this, we think, is an abstract question, which cannot be answered either in the affirmative or negative as a rule applicable to all cases. That a portion of the water of a stream may be used for the purpose of irrigating land, we think is well established as one of the rights of the proprietors of the soil along or through which it passes. Yet a proprietor cannot, under color of that right, or for the actual purpose of irrigating his own land, wholly abstract or divert the watercourse, or take such an unreasonable quantity of water, or make such unreasonable use of it, as to deprive other proprietors of the substantial benefits which they might derive from it if not diverted or used unreasonably. The point may, perhaps, be best illustrated by extreme cases. One man, for instance, may take water from a perennial stream of moderate size by means of buckets or a pump,—for the mode is not material, —to water his garden. Another may turn a similar current over a .level tract of sandy soil of great extent, which in its ordinary operation will nearly or quite absorb the whole volume of the stream, although the relative position of the land and stream are such that the surplus water, when there is any, is returned to the bed of the stream. The one might be regarded as.a reasonable use, doing no perceptible damage to any lower proprietor, whilst the other would nearly deprive him of the whole beneficial use, and yet in both the water would be used for irrigation. We cite a few of the leading cases in
*405 “ This rule, that no riparian proprietor can wholly abstract or divert a watercourse by which it would cease to be a running stream, or use it unreasonably in its passage, and thereby deprive a lower proprietor of a quality of his property, deemed in law incidental and beneficial, necessarily flows from the principle that the right to the reasonable and beneficial use of a running stream is common to all the riparian proprietors, and so each is bound so to use his common right as not essentially to prevent or interfere with an equally beneficial enjoyment of the common right by all the proprietors. Were it otherwise, and were it an inflexible rule that each lower proprietor has a right to the full and entire flow of the natural stream, without diminution, acceleration, or retardation of the natural current, it would follow that each lower proprietor would have a right of action against any upper proprietor for taking any portion of the water of the stream for any purpose; such a taking would be a disturbance of his right; and if taken by means of a pump, a pipe, a drain, or otherwise, though causing no substantial damage, it would be a nuisance, and warrant the lower proprietor in entering the close of the upper to abate it. (Colburn v. Richards, 13 Mass. 420; S. C., 7 Am. Dec. 160.)
' “ It would also follow, as the legal and practicable result, that no proprietor could have any beneficial use of the stream without an encroachment on another’s right, subjecting him to actions toties quoties, as well as to a forcible abatement of the nuisance. If the plaintiff could, in a case like the present, have such an action, then every proprietor on the brook to its outlet in Nashua River would have the same, and because the quantity of diminution is not material, every riparian proprietor on *406 the Nashua would have the same right, and so every proprietor on the Merrimac River to the ocean. This is a sort of reductio ad absurdum, which shows that such cannot be the rule, as was claimed by the plaintiff.”
In Evans v. Merriweather, 3 Scam. 496, S. C., 38 Am. Dec. 106, the Supreme Court of Illinois said: “The use must be a reasonable one. Now, the question fairly arises, Is that a reasonable use of running water by the upper proprietor by which the fluid is entirely consumed? To answer the question satisfactorily, it is proper to consider the wants in regard to the element of water. These wants are either natural or artificial. Natural are such as are absolutely necessary to be supplied in order to his existence; artificial, such only as, by supplying them, his comfort and prosperity are increased. To quench thirst and for household purposes, water is absolutely indispensable. In civilized life, water for cattle is also necessary. These wants must be supplied, or both man and beast will perish. The supply of a man’s artificial wants is not necessary to his existence; he could live if water was not employed in irrigating his lands, or in propelling his machinery. In countries differently situated from ours, with a hot and arid climate, water doubtless is indispensable for the cultivation of the soil, and in these water for irrigation would be a natural want.” There can be little doubt, under the authorities, that for a riparian proprietor entirely to consume water (except ordinarily for domestic uses, etc.) is to use it unreasonably, as is said in Evans v. Merriweather, and that was the question involved in that case. The distinction between natural and artificial “wants” seems to be derived from a distinction previously recognized, and which has sometimes been designated as a difference between the use of water for “ ordinary ” and “ extraordinary ” purposes. Thus Lord Kingsdown (in Miner v. Gilman, 12 Moore P. C. C. 156) said: “By the general law applicable to riparian proprietors, each has a right to what may *407 be called the ordinary right of a use of water flowing past his land; for instance, to the reasonable use of the water for domestic purposes and for his cattle; and this without regard to the effect that such use may have in case of deficiency upon the proprietors lower down the stream. But further, he may have the use of it for any purpose, or what may he deemed the extraordinary use of it, provided he does not thereby interfere with- the lawful use of it by other proprietors either above or below him. Subject to this condition, a riparian proprietor may dam up a stream for the purpose of a mill, or divert the water for the purpose of irrigation. But he has no right to interrupt the regular flow of the stream if he thereby interferes with the lawful use of the water by other proprietors, and inflicts on them a sensible injury.”
The real difference here pointed out between the classes of uses is, that (as is assumed) water may be used for ordinary purposes without regard to the effects of such use in case of deficiency below; while with reference to extraordinary uses, the effects on those below must always be considered in determining its reasonableness.
Lord Kingsdown’s “instances” indicate that he was using them as illustrations of the relative importance of the uses by him mentioned. It may perhaps be doubted whether an arbitrary classification can be made which is applicable everywhere where the common law prevails.
Even the use of water of a stream for potation may not be of paramount importance, when the stream is small, and the particular proprietor is amply supplied with water for such purpose by living springs independent of the creek. And it may happen, all the conditions being considered, that the exhaustion of an entire stream by large bands of cattle ought not to be permitted. Or, indeed, it might be that a flouring mill would be of more relative consequence than the cultivation of the ground. (See Escriche with respect to riparian rights in Mexico.) This last, however, is hardly a supposable case since the *408 general introduction of steam as a propelling power. The distinction between natural and artificial “ wants ” would be, under supposable conditions, somewhat fanciful. The urgent and pressing necessity of a particular use, as distinguished from another, may itself depend on circumstances. We cannot say that it is always reasonable, in a “ hot and arid climate,” to elevate irrigation to the rank of primary uses, to which drinking usually belongs. If that should be adopted as the uniform rule, the upper proprietor might perhaps exhaust all- the water for irrigation, to the entire exclusion of those below him,—-“a proposition inconsistent with the doctrine universally admitted, that all proprietors have the same rights.” ( Van Huesen v. Coventry, 10 Barb. 518.) The reasonable usefulness of a quantity of water for irrigation is always relative; it does not depend on the convenience of or profitable results to the particular proprietor, but upon the reasonable use, reference being had to the needs of all the other proprietors on the stream. It depends, in other words, on all the circumstances.
We anticipate the objection that this is not an absolute rule at all, but, as said by the judges in the opinions quoted from, the very nature of the common right is such that a precise rule as to what is Reasonable use by any one proprietor for irrigation cannot be laid down. A stream may be so small that any use for irrigation may deprive all the others of any like use; and the same may be true of a larger stream, where the use is by several of a large number of proprietors. The effect might be, that while there might be sufficient water to supply several for irrigation, there would not be enough for all, and so all might be deprived of the benefit. But the private interests of all would in most cases, if not in every case, lead to an avoidance of the supposed evil. It is not to be doubted that the riparian proprietors would settle by convention upon a plan by which each could secure a reasonable use for irrigation purposes; as by *409 authorizing each to stay the flow at recurring periods, or otherwise distributing it for'their mutual and common benefit.
The right of the riparian proprietors to a reasonable use of the water of the stream for purposes of irrigation is recognized in many of the California cases hereinbefore referred to, and in Anaheim Company v. Semi-Tropical Company, 64 Cal. 185.
XVI. On behalf of the defendant certain witnesses gave testimony tending to prove that, after the commencement of the action and issue joined, and during the trial of this action, there was no watercourse, as claimed, and no channel through which water could have flowed. The court erred in rejecting evidence offered by the plaintiffs, in reply, tending to prove that, after the dates mentioned by said witnesses for defendant, there was a watercourse and channel.
The court below found—as its findings are construed by both parties—that no watercourse (connected with Kern River or otherwise) runs by or through any of the lands of the plaintiffs. We cannot say but there was a substantial conflict with respect to that matter, and in accordance with the established rule, must affirm the judgment and order, unless at the trial the court erred in rejecting or admitting evidence bearing, or claimed to bear, on the question of the existence of the watercourse.
The court below refused to permit the plaintiffs to introduce certain evidence, after the defendant had closed, on the ground that the same was merely cumulative.
One exception saved by the plaintiffs related to an offer of testimony as to a place spoken of as Be Weber road-crossing. With regard to that exception, we think it may fairly be argued from the record that the defendant introduced evidence tending to prove there was no channel at any point where the De Weber road crosses the swamp, at a time several years before the commencement of this action. But we also think that the plain *410 tiffs had already given evidence that at the time and subsequent to the time mentioned by defendant’s witnesses, the De Weber road did cross a channel. We cannot say, therefore, that the court erred in refusing to permit further evidence in reply with respect to that matter.
The plaintiffs, in making out their case, introduced witnesses who stated that at various times prior to the diversion of water by the defendant, they had passed along Buena Vista Slough, and that there was a channel throughout its alleged length. As to several of these witnesses, it might be questioned whether their inspection was not broken and interrupted. Crocker said that, as he passed along, the channel was in places concealed from his vision; McCrary, that the slough or channel existed at each section line; Still, that he had crossed through nearly every quarter-section of the swamp. In argument, however, counsel for plaintiffs have insisted, that in opening their case, they proved a continuous slough from Buena Vista Lake to Tulare Lake, not merely as an inference from its existence in different places, but as a physical object, visible to their witnesses from one lake to the other.
Assuming, as claimed by plaintiffs’ counsel, that some of their witnesses pursued the alleged slough throughout its entire length, viewing each and every portion of it, it would be difficult to say on what principle plaintiffs could demand the absolute right, by way of reply, to contradict the declarations of witnesses for the defendant that, at or about the times when the plaintiffs’ witnesses had stated there was a channel from Buena Vista Lake to a point below the plaintiffs’ lands, there was in places no channel between the lake, and that point.
Defendant called as witnesses Murray F. Taylor and others, who testified that, after the commencement of the action, and after answer filed herein and the trial was commenced, they had passed from one side to the other *411 of the swamp (avoiding disconnected sloughs and ponds), without crossing a channel. Plaintiffs offered to prove by McCrary that he subsequently ran a certain line through portions of township 27 south, range 22 east, and “what natural objects” he found on the line he ran. As no witness on the part of the defendant had testified with respect to such a line in the township named, the court properly sustained an objection to the offer.
But the plaintiffs also offered in reply to show by the witness McCrary “that at each one of the lines where the witnesses for defendant testify they have crossed, not only has this line been run where they testified to, but that the line has been run by this witness from one half a mile to three quarters of a mile on each side of that line, and that an examination has been made between these lines as to all channels and natural features of the country between the lines on each side of the line,” etc. And plaintiffs offered to prove the same things by Mr. Harrold, “who accompanied McCrary,” and by Huntley, Beard, Noble, and others.
Defendant might have insisted on the offer being made more definite; that plaintiffs’ counsel should name the witnesses whose testimony they intended to rebut, and specify the exact fact they disputed, as the fact that there was no channel where defendant’s witnesses crossed. The offer to prove by McCrary, “in case he found sloughs or channels or anything of that kind they were leveled and their width ascertained,” did not absolutely exclude the idea that he found no slough or channel. But no such specific objection to the offer was made, and it sufficiently appears from the transcript that both the learned judge (who ruled that the offer was of cumulative testimony) and counsel understood the evidence on the part of the defendant against which the offer was directed.
The defendant’s witness McMurdo testified that in April, 1881 (after suit brought and answer), there was no water flowing at points in the alleged slough above the *412 lands of the plaintiffs, and his testimony tended to prove that at the same time no water was flowing, and no channel existed, at another point also above such lands. After defendant rested, plaintiffs offered to prove that within thirty days prior to June 1, 1881, the witness McCrary, with Beard and Huntley, had gone from Headquarters (a place above the points where McMurdo had stated no water flowed) in a boat to the Bonestell House, which is below certain lands of the plaintiffs.
Taylor, Jastro, Cross, and Barker, witnesses for the defendant, testified to crossing the swamp on the 14th of April, 1881 (after the commencement of this action), and to the absence of a channel on the route they pursued. One Estee conducted the party from a point near his house, on the west side of the swamp, to the Bound Corral, near the east side. Estee was not examined by the defendant. In reply, the plaintiffs called him and asked, “What did you see when making that crossing as regards sloughs or channels ? ” The court sustained an objection to the question, and the plaintiffs excepted to the ruling.
Witnesses for defendant, McMurdo and Fillebrown, testified to the running of a line (after the trial had commenced) across the body of swamp-land, ascertaining levels along that line, and to the making of a profile of the same. • They also testified that, in running the line, they came to a pond, which constituted no part of a continuous slough or channel, but was without inlet or outlet. One G. W. Smith was called by plaintiffs, who testified that he followed the same line; that he also came to a pond, as to which there was evidence tending to prove it was the pond mentioned by defendant’s witnesses, to which there was both inlet and outlet.
Other offers, similar in character, were made by plaintiffs, to which defendant objected. To the ruling of the court sustaining the objection of defendant to the several offers plaintiffs duly excepted.
*413 We think the first question presented by these rulings may fairly be stated thus: Defendant gave evidence tending to prove that, during the trial, there were places along the line of the alleged slough and channel where there was in fact no channel,—breaks in the continuity.
The question to be considered is not modified by the claim of respondent that the effect of its evidence was to establish the absence of any channel through which the water was wont to flow, and to prove that, on the extraordinary occasions when the water came into the slough, it soon ceased to flow in a defined channel, but spread throughout the swamp. If the water did not flow with regular periodicity, or if, flowing periodically, it had no defined channel (other than the whole swamp), the plaintiffs had no cause of action: in the first case, because there was no watercourse; in the second, because there was no such watercourse as described in the complaint; and perhaps also because the plaintiffs, being owners only of swamp-lands (even conceding the water in the swamp might constitute a stream), were owners merely of the bed of the stream, and were not riparian proprietors. (Gould on Waters, 148; Lyon v. Fishmongers Company, L. R. 1 App. Cases, 662; L. R. 10 Ch. 679.) But the testimony, to contradict which the offers of the plaintiffs were made, was testimony that the swamp-land had been crossed on divers lines without the persons so crossing it coming into contact with any defined channel, or distinct evidences of such. There may be a continuous watercourse through a body of swamp-lands. The plaintiffs had given evidence tending to establish the existence of such a watercourse. The evidence of defendant was to establish that there was no such watercourse by proof that there was none at places where its witnesses, crossed the swamp. That such testimony tended to prove, or if true proved, that there was no watercourse touching the plaintiffs’ lands, is not an objection to the counter-testimony offered. Testimony *414 in reply is directed against the precise facts testified to by defendant’s witnesses, not against the inferences which may be drawn from them. The witnesses testified that they crossed the swamp on certain lines and found no channel. Did the court err in disallowing the offer of plaintiffs to prove that at such places there was in fact a channel at or subsequent to the times mentioned by defendant’s witnesses ?
All agree that it is within the discretion of the trial court to admit additional evidence in support of the plaintiff’s case after the defendant has rested. Of course, it is always safer to admit evidence claimed to be in reply if the court entertains doubt of its admissibility. Nevertheless, the respondent here has a right to insist that it is for the appellants to point out plain error in the rejection of evidence.
The rules as to the transfer of the burden of proof are not always determinative of the rules as to testimony in reply. The burden of proof is shifted by every species of evidence strong enough to establish a prima facie case. (2 Best on Evidence, 473.) But this only means that there is a necessity of evidence to answer the prima facie case, or it will prevail. (Heineman v. Heard, 62 N. Y. 455.) A party on whom is the affirmative cannot reserve a portion of his evidence until the opposite party has exhausted his evidence to negative that offered in the first instance. (Taylor on Evidence, sec. 386.)
Questions as to the admissibility of evidence in reply offered by the plaintiff arise ordinarily where the answer consists of denials of the affirmations of the complaint. Where the answer avers new matter which it is for the defendant to prove, evidence on the part of the plaintiff to meet the evidence given by the defendant in support of his affirmative plea is not given in reply, or “ rebuttal,” as the term is used in this connection. Bebutting testimony is addressed to evidence produced by the opposite party, not to his pleading.
*415 It seems, indeed, at one time to have been held in England that when two pleas were tendered,—as the general issue, and another plea of affirmative matter constituting a defense,—the plaintiff was compelled to prove in advance the non-existence of the affirmative matter. Lord Ellenborough held the general rule to be “ where by pleading or by means of notice the defense is known, the counsel for the plaintiff is bound to open his whole case in chief, and cannot proceed in parts.” (Reese v. Smith, 2 Stark. 31; Delanney v. Mitchell, 1 Stark. 439.) The practice seems long to have been settled in the English courts, however, that where the general issue is pleaded, and the plaintiff is also notified of a special defense, he has his option to give all the evidence»he intends to offer to rebut the averments of the special plea or notice in the first instance, or to give none of such evidence, and to reserve all to be given in reply. (Browne v. Murray, Ryan & M. 254.) In this country the right of the plaintiff to reserve all his evidence to meet the evidence of the defendant in support of his special or affirmative plea has always been recognized.
And so where the plea or answer consists of denials alone, under which, however, affirmative matter is provable, which may constitute a defense, the plaintiff is entitled to rebut the defendant’s evidence of such affirmative matter. In a note to Greswald v. Kemp, Car. & M. 635, the reporters say: “ One test whether the plaintiff is entitled to call witnessess in reply to the defendant’s proofs seems to be whether the defendant’s defense is disclosed by the plea.....He cannot reasonably be called on to give contradictory evidence by anticipation of proof which the defendant might never give, or which if given the plaintiff could not foresee.” As was said by Bronson, J., in Hollister v. Bender, “the substance of the allegation to be tried, rather than the particular form of the pleading, must determine where the onus lies; par *416 ticularly where the defendant is not required to plead the particular matter on which he intends to rely.” (1 Hill, 153.)
In that case the action was assumpsit; the plea nonassumpsit, under which, by the New York practice, the defendant, without actually controverting the promise, might prove payment, release, accord and satisfaction, etc. If, said Judge Bronson, any of these defenses were pleaded specially, the defendant would clearly have the affirmative of the issue, “and the burden of proof is the same when the defense is affirmative matter sought to be proved under a denial of the promise.”
The rule is not that, the plaintiff must anticipate all evidence that may be admitted under the denials of an answer. The rule assumes that evidence may be admitted which he cannot reasonably be expected to anticipate.
Mr. Croswell, in his note to section 469 of Greenleaf on Evidence (14th ed.), says:—■
“There is considerable conflict in the decisions in regard to the order of proof and the course of trial in the different states. In some of the states the party is only required to make a prima facie case in the opening, and may reserve confirmatory proof in support of the very points made in the opening, till he finds upon what points his opening case is attacked, and then fortify it upon those points. ( Clayes v. Ferris, 10 Vt. 112.) But in this state (Massachusetts) the defendant must put in all his evidence in the first instance, and the plaintiff in his reply is confined to fortifying those points in his case which are attacked by defendant. And in some of the states, it is understood that this process of making and answering the plaintiff’s case is allowed to be repeated an indefinite number of times. But .at common law, the plaintiff puts in his whole evidence upon every point which he opens, and the defendant then puts in his entire case; and the plaintiff’s reply is limited to new points first opened by defendant.”
*417 Investigation shows that the preponderance of authority is in favor of what Mr. Oroswell calls “ the common-law rule,” and it has never been suggested that any other rule obtains in California. The rule has been expressed in different terms by writers and judges. Mr. Oroswell says the evidence to rebut may be confined to “new points first opened by the defendant.” Mr. Taylor states it negatively. (Taylor on Evidence, sec. 386.) In Hastings v. Palmer, 20 Wend. 225, Cowen, J., said: “Strictly speaking, the plaintiff or party holding the affirmative is bound in the first instance to introduce all the evidence on his side, except that which operates merely to answer or qualify the case as it is sought to be made out by his adversary’s proofs.” And Starkie wrote: “After the defendant has adduced his evidence the plaintiff's counsel at once proceeds, without any observations, to tender any evidence he may have in reply; but this must be confined by negativing specific acts sworn to by defendant’s witnesses which he could not be expected to have anticipated.” (Starkie on Evidence, 10th ed., p. 609.) We are brought back to the proposition that where the plaintiff is not informed by the answer of now matter which constitutes a defense he is entitled to adduce evidence in reply to the evidence given to establish such matter.
It is admitted that it is no objection to evidence in reply to an affirmative defense that it may strengthen the plaintiff’s original case. And upon just principles, it would seem that if the new matter offered by the defendant may constitute an affirmative defense, the plaintiff is not precluded from replying to it, because such, new matter may also have a tendency to weaken or negative plaintiff’s case as originally presented,
A watercourse has been said to consist of “ bed, banks,, and water.” The water need not flow continually, but it would seem the flow must be periodical, such as maybe expected during a portion of each year. It must be- *418 ■ made to appear that the water usually flows through a regular channel with banks or sides. (Angelí on Watercourses, sec. 4.) It may be conceded that it was for the plaintiffs here to establish a natural stream, flowing, at least periodically, up to the time of the diversion, and that to justify a permanent injunction, the court must have been satisfied that the water would have continued to flow except for the diversion. The court would be authorized to deny the decree prayed for if the evidence showed that the channel, proved to exist when the diversion occurred, had disappeared (and ceased to exist) as the result of natural causes, and not as a consequence of any acts of the defendant, or of interference by others.
Evidence that there were no indications of a channel at a certain date would perhaps tend to prove that there vzas no channel at a previous date. But—unless we can say as law that the channel could not have gone out of existence—such evidence would not establish conclusively that the channel never existed. Nor would it create the disputable presumption that “a thing once proved to exist continues as long as is usual with things of that nature.” (Code Civ. Proc., sec. 1963.) The presumption that a thing existing in the present existed at any time in the past—if it could be considered to be a presumption—would be the reverse of the code presumption. The effect of the evidence must, of course, depend upon the permanent or transitory nature of the thing itself. Apply the code presumption to the case before us. Let us suppose a watercourse was proved at or before the commencement of the trial. The disputable .presumption is that it continued “as long as is usual with .things -of that nature.” We cannot say how long a channel for ’water will continue.
It is not essential to a watercourse that the banks shall .be unchangeable, or that there shall be everywhere a visible change in the angle of ascent, marking the line between -bed and .banks- The law cannot fix the limits *419 of variation in these and other particulars. As was said, in effect, by Curtis, J. (Howard v. Ingersoll, 13 How. 428), the bed and banks or the channel is in all cases a natural object, to be sought after, not merely by the application of any abstract rules, but, “like other natural objects, to be sought for and found by the distinctive appearances it presents.” Whether, however, worn deep by the action of the water, or following a natural depression without any marked erosion of soil or rock; whether distinguished by a difference of vegetation or otherwise rendered perceptible,—a channel is necessary to the constitution of a watercourse.
Of course we cannot judicially declare that a channel is of such a nature that it can never cease to exist. Both the evidence and findings herein show that, as a result of the action of water, channels have been closed and new channels formed. We cannot say but the indications of a channal may be removed by other natural forces. We can conceive that along the course of a stream there may be shallow places where the water spreads and where there is no distinct ravine or gully. Two ascending surfaces may rise from the line of meeting very gradually for an indefinite distance on each side. In such case, if water flowed periodically at the portion of the depression, it flowed in a channel, notwithstanding the fact that, the water being withdrawn, the “ distinctive appearances ” that it had ever flowed there would soon disappear.
Causes are ordinarily tried with reference to the condition of things prior to and when an action is commenced. The pleadings (except supplemental) relate to that date, and the evidence is confined to the averments or denials of the pleadings. A plaintiff seeking the peculiar relief here sought must satisfy the court that, unless the injunction be made perpetual, he will be deprived of water in the future. But the continuation of the status quo, at the commencement of the action, is an *420 inference. The plaintiffs here were not bound to prove by independent evidence that the channel continued to exist after suit brought. The issue was, Had they a cause of action when the suit was commenced ? If they had it was because of conditions existing when the water of Kern River was diverted, and when they commenced their proceedings, and this is none the less so because, in order to secure the decree they prayed for, the conditions must be such as would authorize the court to infer that they would continue in the future. The inference would always have to be drawn, whether educed from facts proved to exist prior to suit brought, or from facts existing at the time of the trial. It was not the duty of plaintiffs, under the pleadings in the first instance, to prove the continued existence of a channel after the action was begun, except so far as it might be implied from its existence previously. Even, therefore, if the evidence of the defendant, as to the absence of a channel at times after the action and after the trial was commenced, be treated merely as evidence tending to prove its non-existence before, the plaintiffs were not bound to anticipate it by contradictory proofs. The pleadings gave no notice that such evidence would be offered.
But the évidenee given by the defendant also tended to prove that the channel, or the distinctive appearances of it, have ceased. It is not impossible that they had ceased between the dates testified to by the plaintiffs’ witnesses and those of the examinations made by the witnesses for the defendant. If the channel had so ceased to exist, that fact would constitute an affirmative defense.' The defense was not pleaded in terms, and as the evidence tended to prove that a channel had never existed, it was admitted without objection. That fact ought not to deprive the plaintiffs of their right to reply to the new matter constituting an affirmative defense of which the answer had not informed them. They could not reason *421 ably have been expected to anticipate that the defendant would offer evidence of new matter of which the answer did not give them notice.
Further, the testimony of certain witnesses for the defendant was not merely to the bald fact that there was no channel at a certain time. The facts to which they testified were, that on an occasion they passed from one side to the other of the lands through which the slough had been said to run, without crossing or coming to any slough or channel. The court refused to permit the plaintiffs, in reply, to produce evidence tending to prove that on the occasion referred to the defendant’s witnesses did meet with a slough or channel. Thus, the defendant having called some of those who made the trip together, the court rejected the plaintiffs’ offer to call another of the same party, to contradict the statement of those examined by the other side. It is difficult to distinguish this from the other offers made, but it presents the question sharply. In this instance there can be no possible doubt that the offered testimony related to the matter testified to by the witnesses for the defendant.
Our conclusion is, that the court below erred in sustaining the defendant’s objections to offers of evidence, with respect to the existence of a slough.or channel, made by plaintiffs after the defendant had rested.
XVII. The court below erred in rejecting all or some of the certificates of purchase offered by the plaintiffs in reply.
In their amended complaint the plaintiffs allege: “ That plaintiffs were at the commencement of this action the owners in fee, seised, and possessed (and for more than a year theretofore they and their grantors were such owners) of all those lands situate in the county of Kern, in the state of California, and particularly described (according to the surveys by the authority of the United States of America, and referred to the Mount Diablo base and meridian) in a certain schedule, which is hereto annexed, marked ‘ schedule M,’ and made a *422 part of this complaint. That said lands are swamp and overflowed lands, and as such belonged to the state of California until the year 1876 and later, in which year and at various times afterward, and before the commencement of this action, they were granted by the state to the plaintiffs and their grantors.”
The action was commenced September 2, 1880.
In its answer to the amended complaint, the defendant avers: “That heretofore, to wit, on or about the fourth day of May, A. D. 1875, defendant’s grantors, acting in the full faith and bona fide belief that a large portion, to wit, more- than seventy-four thousand (74,000) inches, measured under a 4-inch pressure, of the waters of said Kern River were unused, vacant, unappropriated, and free and open to appropriation and use, posted a certain notice of appropriation of water on the north bank of said river in Kern County, state of California, at a point on or about the southwest quarter of section thirteen (13), in township twenty-nine (29) south, range twenty-seven (27) east, Mount Diablo base and meridian, according to the United States surveys, wherein they claimed and whereby they notified plaintiffs, plaintiffs’ grantors, and all persons whomsoever it might concern, that they claimed and appropriated, and proposed and intended to take out and divert, use, and consume, a large part and portion, to wit, seventy-four thousand (74,000) inches, measured under a 4-inch pressure, of the flowing waters of said Kern River, for the purpose of irrigating certain lands, in said notice described, and of supplying thereunto and thereon for other purposes in said notice set forth. That within ten days after the posting of said notice, to wit, on the fourth day of May, A. D. 1875, the said notice was duly recorded in the office of the county recorder of said Kern County, in book 1 of Water Rights, page 37, to which said record reference is here made, and which said record is made a part hereof. That defendant’s said grantors' thereby appropriated and acquired the *423 said amount of flowing waters of said Kern Kiver, with the right to take out, divert, use, and consume the same for the uses and purposes in said notice mentioned, all of which appropriations, rights, and properties they (defendant's said grantors), on, to wit, the eighteenth day of May, A. D. 1875, granted, bargained, and sold, transferred, assigned, and conveyed to this defendant. That, within twenty days after the posting of said notice as aforesaid, to wit, on or about the-day of May, A. D. 1875, defendant, for the purpose of utilizing said waters of Kern Kiver, in the manner and at the places in said notice mentioned, commenced the construction of that certain ditch, or canal, known as the Calloway Canal, and being the same as in said complaint described, and thereafter and thenceforth defendant continuously and diligently prosecuted the work on said canal until the same was completed, and expended thereon and in the construction thereof large and vast sums of money, amounting in the aggregate, to wit, ninety thousand ($90,000) dollars; that during the construction of said canal, defendant diverted and used the aforesaid amount of water in irrigating and fertilizing the lands in said notice described, and for stock and other beneficial purposes on said described lands, and defendant has continued so to use said amount of water from and after the completion thereof.”
At the trial, the plaintiffs, as part of their evidence in chief, produced patents from the state of California granting to the plaintiffs or their grantors certain of the lands described in the complaint. The several patents are dated January 18, 1876, February 17, 1876, September 11, 1876, and June 15, 1877. And the plaintiffs also gave in evidence the judgment roll in an action brought by the people of the state of California against John Center and others, by the judgment in which action it was decreed that the plaintiffs herein have certain of the lands described in the complaint in the present action, *424 and. that they were entitled to patent for the same as provided in “An act to provide for determining the rights of parties in certain swamp and overflowed lands in Fresno and Kern counties, approved March 20,1878.”
The decree in the said action, People v. John Center et al., was entered September 17, 1878.
We are about to consider whether the court below erred in rejecting, when they were offered by plaintiffs, all or any of the certificates of purchase issued by the state land-office to assignors of the plaintiffs. The court below held that there was no stream. As we have seen, however, the court erred in refusing to admit certain evidence bearing on that issue. In deciding the question as to the admission of the certificates, we must assume that there was evidence of a stream running from Kern River to some of the lands described in the complaint, and to a tract described in at least one of the certificates. It does not follow, however, that all the certificates would in any event have been admissible. It is to be borne in mind that if the court below had found a watercourse to, through, or past any one or more of the tracts described in the complaint, only such of the certificates of purchase would have been admissible as showed the purchase of tracts so found by the court to be touched or traversed by the watercourse. If at the trial the court found, on sufficient evidence, that no watercourse existed, or that none of the lands described in the complaint bordered on it, and had committed no error with respect to the admission of evidence relating to these matters, it is very clear that no material error would have.been committed by rejecting all of the certificates of purchase. It is asserted by counsel for respondent, that in any view of the ease no evidence was given tending to prove that the stream ran through or touched the lands described in any of the certificates of purchase offered, except one.
If the court erred in rejecting one of the certificates, *425 the consequence, so far as it should influence the action of this court, is the same as if all were erroneously rejected. But in case there shall be a retrial in the Superior Court, it is perhaps important, and it is certainly proper, to limit any general statement in such manner as that it may be made applicable to the evidence as it shall be presented to that court when the case shall be retried. If we shall say in general terms that the certificates of purchase ought to have been admitted, this must be understood in a limited sense, and to apply only to the certificates with reference to the lands described, as to which there is evidence that they are lands by or through which the watercourse passed. All the sections or fractional sections mentioned in any one certificate constitute a single tract of land. If, however, lands have been granted by patent, and the patent was issued on the cancellation of more than one certificate, the patent can operate, by relation (for the purpose of this suit), to the date of those certificates only, the lands described in which border on the stream.
The defendant having given evidence to prove the matters so, as aforesaid, pleaded in its answer, the plaintiffs, as evidence in reply, offered certificates of purchase, dated September 30, 1872, for sections and portions of sections (being part of the lands described in the complaint) in township twenty-five south, range twenty-one east; portions of sections in township twenty-six south, range twenty-one east; sections and portions of sections in township twenty-five south, range twenty-two east; sections and portions of sections in township twenty-six south, range twenty-two east; each of said certificates being signed and issued by the register of the state land-office, and the same appearing to have been canceled by issuance of patent; also, like certificates for portions of the lands described in the complaint, one dated February 5, 1877, and three March 2, 1874.
By the first section of the act of March 27, 1872, "to *426 put in effect the provisions of the Civil Code relative to water rights/’ title 8 of part 4 of division 2 of the Civil Code went into full force and operation on the first day of May, 1872. (Stats. 1871-72, p. 622.) All the certificates of purchase above mentioned were therefore issued after the title of the Civil Code became operative.
It is manifest that if, as contended by counsel for appellants, the state is a “riparian proprietor” within the meaning of section 1422 of the Civil Code, the defendant could acquire no rights to water by appropriation, as against the grantees of the lands from the state, even as against those who became such after the appropriation was made. But, in that case, no injury was done to the appellants' by the rejection of all the certificates of purchase, since the appellants, as part of the evidence in chief, had given in evidence their patents issued after the appropriation.
In order, however, to meet inferences which may be drawn from the assumption that the state is a “riparian proprietor” within the meaning of the section, it is proper to consider that matter. It is urged by counsel that the title of the Civil Code only relates to the right to appropriate waters upon public lands of the United States; (the same right growing out of priority of appropriation, recognized by the courts for many years past, and recognized and confirmed by the acts of Congress of 1866 and 1870, that the state,- in the exercise of its police power and of a trust assumed on its part, has only regulated the conduct of its subjects going on lands of the United ^States (under an implied or express license) with reference to this matter ■ of appropriation. It is adjmitted the state may give the right to appropriate water on its lands, but it is contended the state has not done so, and on the contrary, has reserved the’rights of all’riparian proprietors, of whom it is one. . . t
The grant, however, is. general. “The right to the use of flowing .water, etc., may be acquired by appropria *427 tion.” (Civ. Code, sec. 1410.) No class of lands is mentioned from, which water may be diverted, yet, as to its lands, the United States is a riparian proprietor. True, the United States had already recognized the right of appropriation on its lands, but if the acts of 1866 and 1870 had never been passed, it cannot be doubted that section 1422 of the Civil Code would have been held not to apply to public lands of the United States. This would have been necessary to give effect to the title, and to carry out the apparent intention of the legislature in the light of the history of the country to which reference has been made. Thus by implication the United States, as a riparian proprietor, is excluded from the benefit of the section. “ The rights of riparian proprietors are not affected by the provisions of this title.” (Civ. Code, sec. 1422.)
The citizens of the state have never been prohibited from entering upon the public lands of the state. The courts have always recognized a right in the prior possessor of lands of the state as against those subsequently intruding upon such possession. The same principle would protect a prior appropriator of water against a subsequent appropriator from the same stream. It is not important here to inquire whether, as against a subsequent appropriation of water, a prior appropriator of land, through which the stream may run, would have the better right. It is enough to say that, as between two persons, both mere occupants of land or water on the state lands, the courts have determined controversies. The implied permission by the general government to private persons to enter upon its lands has been- assumed to have been given by the state with reference to the lands of the state. And the state, for the maintenance of peace and good order, has protected the citizen in the. acquisition and enjoyment on its lands of certain property rights obtained through possession,-—perhaps the mode by which all property was originally acquired.' In *428 view of these facts, we feel justified in saying that it was the legislative intent to exclude as well the state as the United States from the protection which is extended to riparian proprietors by section 1422 of the Civil Code.
We have elsewhere had something to say with reference to the class of persons whose rights are protected by section 1422. For the present we shall assume that it includes those who may become riparian proprietors at any time before an appropriation of water is actually made in accordance with the provisions of the Civil Code.
Assuming this, the certificates of purchase above mentioned were admissible in evidence if the other certificates, which were of a date anterior to the enactments of the Civil Code, were admissible.
To the introduction of each of the certificates of purchase, when offered, counsel for defendant objected, on the grounds that it was “ irrelevant, immaterial, and not proper testimony in rebuttal.”
It has been suggested that the plaintiffs were precluded from showing title in themselves prior to 1876, by reason of their allegation in the complaint “that the lands belonged to the state of California until the year 1876 and later.” If they were estopped by that allegation, they would have been equally estopped if the certificates had been offered as part of their evidence in chief. But we think they were not so estopped. The lands are swamp lands, and are alleged to have been granted by the state. If the averment had not been inserted,—that the lands belonged to the state up to the grants,—the presumption would have been that they belonged to the state up to the date of the patents, or at least up to the initiation of the proceedings which ended in patents. Yet, notwithstanding the presumption, the plaintiffs would have been entitled to prove that they owned them at a date previous to that at which the complaint alleges they became the owners. The averments are, in effect, that the lands be *429 longed to the state until they were granted to plaintiffs. The dates of the grants, as pleaded, are immaterial, if they were in fact granted before the diversion of water. As to the averment of previous ownership by the state, it is an averment of a fact of which we would take judicial notice, and may be disregarded. If the complaint had simply stated that the plaintiffs had become the owners at a certain date, by virtue of grants, would it be an objection to the admission of a grant of an earlier date that the state then owned the lands? Under our system, that which the law presumes need not be alleged, and if alleged, ought not to determine the rights of parties, unless the presumption, independent of the allegation, would determine them.
The certificates, in connection with the patents, would have been admissible as part of plaintiffs’ evidence in chief under the averment of ownership in fee. In connection with the patents, they would have proved a title to every intent, as against tjie state and its grantees, as of the dates of the certificates. In Union Mill v. Dang-berry, 2 Saw. 455, Hillyer, J., said: “It is settled that the entry and payment, and certificate thereof, convey the equitable title. Thereafter the land ceases to be public, and the government has no right to sell it again, but holds the legal title in trust for the purchaser..... ■ As possessors and equitable owners, they (the holders of . certificates) are entitled to enjoy all the incidents to the land and its ownership, as well as the land itself. The patent, when issued, relates back to the original entry, the inception of the title, so far as is necessary to protect the purchaser’s title to the land.” (Gibson v. Chouteau, 13 Wall. 92; Gilman v. Lockwood, 4 Wall. 410; Hughes v. United States, 4 Wall. 232; People v. Shearer, 30 Cal. 648; Carroll v. Safford, 3 How. 441.)
The certificates offered by the plaintiffs herein were evidence of a right of entry by the assignors of the plaintiffs, and of the receipt by the state of part of the pur *430 chase-money; in the last respect differing from certificates issued to pre-emptioners under the laws of the United States, which evidence the receipt of the whole of the purchase-money. The right to the possession might have been terminated by a failure to pay the balance of the purchase-money. ' But the patents issued when the certificates were canceled proved payment of the balance of the purchase-money, and related to the dates of the ‘certificates. The certificates and patents would have proved that plaintiffs and their assignors had been entitled to the possession of the lands in law and equity from those dates. They certainly would have shown them to have been the owners so far as the fact of ownership could have been. made the basis for. relief in an action like the present.
There can be no doubt but the equitable owner in possession of a tract of land bordering a stream is entitled to relief in a court of equity against the wrongful diversion of water of the stream. Even at law, as between parties claiming under patents from the general or state government for the same land, the junior patent will prevail if the proceedings to secure it were commenced before those culminating in the senior patent. Here the .plaintiffs have patents which relate back to the certificates (the contracts of the plaintiffs and their assignors having been fully performed), so as to protect them in their title t) the lands, with all their incidents. Assuming that the rights of these parties are to be determined by the decision of the question, Did the plaintiffs acquire a right to their lands before the defendant appropriated the waters, the patents of the plaintiffs related to the certificates of purchase as against the defendant’s appropriation.
Inasmuch as a sale of lands includes a sale of the corporeal hereditament, a right to the flow of the water, it is clearly the intention of the statutes providing for sale of the state lands, that the purchaser shall be pro *431 tected from a deprivation, of any of the valuable incidents of ownership until he shall lose his right to purchase by failure to complete his contract; to reserve and withdraw such lands from the privilege accorded to appropriators to divert waters from state lands. To hold otherwise, and so to construe the code as that he who has made part payment for land, and entered into possession under a contract with the state guaranteeing to him a complete title in case he shall pay the balance, can be deprived of the benefit of that which is a valuable incident of ownership (notwithstanding he shall subsequently have fulfilled his contract according to its terms), would operate manifest injustice. We are not now speaking of the power of the state. Doubtless it may sell its lands with such limitations as it may deem proper,. But if the code provisions and the statutes providing for the disposition of state lands can be held to mean that the purchaser shall have riparian rights as against subsequent appropriators, it would lead to iniquitous results to construe the provisions in such manner as that he shall not secure the benefit of those rights in case he performs his contract; in other words, that his patent shall not relate to his certificate of purchase.
So far as the certificates merely tended to prove title in the lands at and prior to a wrongful diversion of water by defendant, they were not admissible in reply. Proof that they were owners at the time of the diversion complained of, that is, the diversion which occurred after they became owners, as alleged, was part of their original case. The plaintiffs were fully informed by the answer that defendant relied upon a right to appropriate water acquired from the state prior to the dates of the patents. But that was an affirmative plea, the averments of which it was for the defendant to establish. If, when the plaintiffs rested, they had proved title by patent, the existence of a watercourse running through the lands, and diversion by defendant subsequent to the patents, they had *432 proved their case, not merely prima facie, but conclusively, in the absence of proof of the affirmative matter set forth in the answer. They were not bound to disprove in advance the appropriation pleaded. Having made out, or attempted to make out, their case in the first instance, the plaintiffs would not have been entitled, in contradiction of evidence given on the part of the defendant, under the denials of the answer, that the plaintiffs ivere not the owners at the time of the alleged diversion, to produce further evidence in support of their title. But after the defendant rested, the plaintiffs were authorized to meet the evidence in support of the plea that the water was appropriated by evidence that the waters were never legally appropriated by the defendant. If the waters could be appropriated, as against the lands described in the complaint, only while they remained the lands of the state, then evidence that, when the appropriation was made, the lands were not the lands of the state was admissible, and none the less admissible because it also proved that the plaintiffs, or their assignors, were then the owners. Such evidence was not evidence in reply to new matter proved under the denials of the answer, but was evidence relating to .an issue made by the plea of the defendant,—an issue as to which the defendant had the affirmative. It was evidence which, by every interpretation of the rule, the plaintiffs had a right to reserve until after the defendant had closed.
It has been suggested that the plaintiffs gave some evidence in chief tending to prove their possession prior to the appropriation. We are not aware that the English rule, which at one time prohibited a plaintiff, in case he gave any evidence tending to negative an affirmative defense in the first instance, from giving further like evidence in reply, was ever enforced in this country, or in equity. Moreover, the mere prior occupation of lands of the state can constitute no reason for preventing the diversion of water flowing through them by one expressly *433 authorized by the state to divert the water from the occupant.
In opposition to these views, and as adjudications that the certificates of purchase, and possession under them, gave the plaintiffs no riparian rights, and that the certificates, as against the defendant, were not evidence even prima facie of the payment of any portion of the purchase-money, the counsel for respondent cite Smith v. Logan, 18 Nev. 149; Covington v. Becker, 5 Nev. 281; Lake v. Tolles, 8 Nev. 285; Brewer v. Hall, 36 Ark. 351; Lansdale v. Daniels, 100 U. S. 118; Megerle v. Ashe, 33 Cal. 84; Smith v. Athern, 34 Cal. 506; Daniels v. Lansdale, 43 Cal. 41; Osgood v. Water Company, 56 Cal. 574.
It is suggested that the certificates were not even prima facie evidence of the receipt of any money by the state as against the defendant, alleged to be a stranger to the contract. But if by reason of the fact of the payment of one fifth of the, purchase-money by the assignors of plaintiffs, the issuance of the certificates and the entry thereunder, the assignors of plaintiffs acquired riparian rights, the defendant is not a grantee of the legal title of the waters from the state. Even if it should be conceded that, in a suit for specific performance by a vendee against the grantee of his vendor’s title, the vendor’s receipt for part of the purchase-money from his vendee would not be evidence against the grantee, the analogy is not perfect.
Here there is no specific grant to the defendant to divert the water. It claims to have acquired the right to take it by taking it. The laws of the state are to be read together. Statutes provide for the sale of the lands and the mode by which the title can be acquired by individuals. They are to pay twenty per cent of the purchase price, and then a certificate issues; on the payment of the balance, within a certain time, the purchaser receives a patent. As against the state, the certificate is evidence of the receipt of certain moneys; it is also evi *434 deuce of the right of possession. The state has done no act indicating a purpose to transfer to another its right to the balance of the purchase-money, or its duty, upon the receipt thereof, to convey the legal title. If a certificate is obtained without the previous payment of the twenty per cent, it is for the state by proper proceeding to annul the certificate. While the contract of purchase is recognized by the state authorities as alive, the water of a stream flowing through the land cannot be diverted by a mere appropriator, because it is the intent of the statutes that the water shall not be so appropriated. The rights of appropriators are all subject and subordinate to those of persons with whom the officers of the state may have previously dealt as purchasers of lands, and recognized as such by delivery of certificates of purchase. All lands thus contracted for are reserved from the effect and operation of any appropriation of water until failure of the purchaser to complete his payments, the completion whereof can be proved by patent issued within the time limited by law. It remains with the state to determine whether the purchaser of the land has complied with his contract, and whatever is recognized as sufficient evidence of such compliance by the state is sufficient evidence against one attempting to appropriate water after the purchaser of the land has been let into possession, as shown by a certificate of purchase.
In this view, the cases cited have little bearing on the question we are considering. This is not merely a case of two persons claiming to derive by patent from the same source, between whom the prior equity prevails. The defendant had an absolute right to divert the water when it appropriated the flow, or it had no right. The plaintiffs would have had no equity afte'r paying for the land in full (had patents been refused), on which they could follow the legal title to the flow of the waters into the hands of the defendant, and have a trust decreed. They would have no right, legal or equitable, arising out *435 of their ownership of the lands, to divert the waters, out-side of their own lands, or to demand from another a conveyance of such right. The effect of holding that a valid diversion of water from the lands could be madq after part payment therefor, and certificate, would be to deprive them of the moneys paid, or of the benefit of the water which may have been a principal inducement to the purchase.
It may be said that the purchaser knows that he is liable to have the water diverted by a subsequent appropriator when he makes his payment. But the matter of notice cannot determine the right or be conclusive of the proper interpretation of the statutes. If, construing the statutes one way, the purchaser has notice when he makes the first payment that the water may subsequently be diverted, it is also true, construing the statutes the other way, the appropriator has notice that the land has been contracted and partly paid for. In the one case, however, the purchaser has already parted with value; in the other the appropriator has expended nothing prior to the purchase and part payment by the purchaser. Assuming, as has been assumed thus far, that the statutes do not authorize the diversion of water from lands which shall have passed into the absolute ownership of private persons, it is equally clear their purpose is to protect the flow of water to lands contracted for and partly paid for under the laws of the state.
In Smith v. Logan, 18 Nev. 149 (cited by respondent’s counsel), it seems to have been held that one in possession of land under an unexecuted contract for the sale thereof cannot assert the rights of a riparian proprietor in an adjoining stream. In that case it appeared that the land was owned in fee by another private person, who had contracted to sell it to a defendant in the suit. The Supreme Court of Nevada said: “The contract is unexecuted, and the conveyance depends on the performance by Logan of the obligations imposed upon *436 him. Since he' has not acquired the fee, it is obvious that the doctrine of riparian proprietorship cannot be invoked in his behalf.” When water is diverted from land, an injury is done to the possession,' and ordinarily it is sufficient if the plaintiff shows he has the possession as against a mere wrong-doer. (Gould on Waters, 476.) But inasmuch as it here appears that the fee was in the state when the diversion commenced, the mere possession of state lands would not be sufficient to establish a right to the water in plaintiffs as against one authorized by the state to appropriate. It became necessary, therefore, for the plaintiffs to establish that they had acquired the right to the possession from the state. Did the contracts of their assignors with the state and their entry and possession show this? The plaintiff in such cases is not bound to prove the same title as he alleges, “ for the disturbance is the gist of the action, and the title is only the inducement.” (Gould on Waters, 478, and cases cited in note.) He need not prove the precise title to the land as alleged, but must prove that he is entitled to the water. If he has acquired the right to the possession of the land from the state, even although he may hold it subject to the right of the state to deprive him of the possession if he shall not satisfy a deferred payment, it would seem that he is entitled to the enjoyment of the flow of the stream as an incident to his possession. One subsequently diverting water from the land cannot defend his acts by proving that the plaintiff is not the owner in fee, although entitled to the possession as against the legal owner and third parties. But if this were doubtful when the legal title is in another private person, here, as we have seen, it is the evident intent of the statutes that those placed in possession of lands under contracts made with the state shall not be deprived of the flow of the water by mere appropriators while the right to the possession shall continue in the purchaser as against the state.
It would seem to have been held in McDonald v. Bear *437 River Co., 13 Cal. 220, that a contract of purchase and possession under it constitute an equitable estate, with the present right to the enjoyment of all its incidents. There the whole purchase price had been paid.
Of the other Nevada cases cited by counsel for respondent, Covington v. Becker holds that, upon public lands of the United States, the prior appropriator of water has the better right as against a subsequent appropriator of the same stream.
In Lake v. Tolles the plaintiff was a riparian proprietor, holding under a United States patent. The defendant had a bare possession of unsurveyed public lands higher up on the stream It was decided that the defendant had no riparian rights, and could not dispute the plaintiff’s right to the water; in the Arkansas case, that a mere certificate of the swamp-land commissioners of that state, that the applicant “ has this day applied to purchase ” a designated tract, imported in itself no contract; Megerle v. Ashe, that, as against a prior patent from the state of lands, as school-lands (five-liundred-thousand-acre grant), a subsequent patentee from the state may introduce evidence that he had acquired a prior pre-emption right; but, to overcome the state patent, must prove that he filed his declaration after the plat of the survey had been filed in the office of the United States register. In Smith v. Athern the established rule is repeated: “At common law, and under our mode of procedure, in case of conflicting patents to land from one paramount source, the court, in actions of ejectment, will look behind the patents and ascertain which party had the prior equity; and when ascertained, it will attach itself to the legal •title, which by relation takes effect at the time the equity accrued; and thus a junior patent founded on a prior equity will prevail over an elder patent founded on a junior equity.” Lansdale v. Daniels asserts the principles laid down in Smith v. Athern, that the prior equity must prevail, and applies it in a case where in an action *438 to recover the possession of lands the defendant filed a cross-complaint alleging prior equities. Upon the facts of that case, however, it was held that the plaintiff had both the prior patent and the prior equity. Daniels v. Lansdale merely adjudges that the filing of a pre-emption declaration before the surveyor-general has filed his plat of survey is premature and a nullity. Osgood v. Water Company presented a question of priority between an appropriator of water on lands of the United States and a pre-emptioner. It was there held that, by reason of the express language of the 17th section of the act of Congress of July 9, 1870, amending the act of July 26, 1866, the rights of the pre-emption claimant, as against an appropriator, date only from his patent or certificate of purchase.
It is not necessary here to inquire whether the section of the amendatory act of 1870 referred to in Osgood v. Water Company should be read distributively, so as to mean that all patents thereafter issued or pre-emptions thereafter “allowed” (or proved up and paid for) should be subject to water rights previously acquired under or ■recognized by the act of 1866. The right of appropriation, which is the basis of defendant’s claim, so far as it may affect land of the state or its grantees, is to be derived from some law of the state. Osgood v. Water Company construes statutes of the United States. And no one of the decisions cited by counsel interprets the statutes of the state bearing upon the question of water rights, or determines the relative rights of those deriving title to lands from the state and appropriators of water.
It is contended by defendant, however, that from the time the title of the Civil Code relating to water rights went into operation, no grantee of state lands has any “riparian rights.” That title went into operation on the first day of May, 1872. (Stats. 1871-72, p. 622.) If this be so, the certificates hereinbefore mentioned as having been issued subsequently to that date were properly rejected.
*439 The bill of exceptions shows that plaintiffs also offered in evidence certificates of purchase issued prior to 1872. But if the proposition of defendant’s counsel be correct, the certificates last mentioned were not admissible in reply, because they would have tended to make out an entirely new case. The plaintiffs were obliged to prove in the first instance that they were entitled to the relief prayed for; that they were the owners or entitled to the exclusive possession, by right derived from the state, of the lands through which the stream flowed; and that defendant had diverted water from their lands. If by their evidence in chief they entirely failed to prove that they were entitled to have the water flow to their lands, —and they did so entirely fail if their patents issued after the provisions of the code took effect, gave them no right to the water,—they could assert no claim to prove facts on which their whole case depended, after the defendant had rested.
It was necessary to inquire, therefore, whether the provisions of the Civil Code from the time they took effect (May 1, 1872) operated to deprive subsequent grantees of state lands, intersected or bordering on streams, of all the rights known as riparian rights. Such is the contention of defendant; and it includes the proposition that section 1422 of the Civil Code only protects riparian rights already acquired when the title of the code went into operation. For convenience we have treated the question presented in an earlier place in this opinion. We have there endeavored to show that section 1422 of the Civil Code saves riparian rights to those receiving grants of state lands subsequent to the enactment of that section. (Ante, Title XI.) Assuming this, the court below erred in excluding the certificates of purchase.
For errors mentioned in the foregoing titles, Nos. XVI. and XVII., a new trial should have been granted by the court below.
Judgment and order reversed, and cause remanded fot a new trial.
*440 McKee, J., Sharpstein, J., and Thornton, J., concurred.